**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| GIGAMONSTER NETWORKS, LLC, *et al.*,[1] | Case No. 23-10051 (___) |
| Debtors. | (Joint Administration Requested) |

**DECLARATION OF RIAN BRANNING IN SUPPORT OF THE**
**DEBTORS' CHAPTER 11 PETITIONS AND FIRST DAY RELIEF**

I, Rian Branning, hereby declare under penalty of perjury that the following is true to the best of my knowledge, information, and belief:

1.      I am the Chief Restructuring Officer ("CRO") of the above-captioned debtors and debtors in possession (the "Debtors" or the "Company"). I became CRO of Debtor GigaMonster Networks LLC ("GM Networks") on or about October 1, 2022 and CRO for the remaining Debtors on December 23, 2022. Prior to being appointed CRO, I advised the Company in my capacity as a partner with Novo Advisors ("Novo"). Novo is an advisory firm that provides, among other things, turnaround and restructuring services to clients in a variety of industries. As a result of my advisory and CRO roles, I am familiar with the Debtors' businesses, financial affairs, and day-to-day operations.

2.      On the date hereof (the "Petition Date"), the Debtors each commenced a case (together, the "Chapter 11 Cases") by filing a petition for relief under chapter 11 of title 11 of the United States Code, §§ 101 *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (the "Court").

---

[1]    The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number are: GigaMonster Networks, LLC (2854); Gigasphere Holdings LLC (0250); GigaMonster, LLC (3014); Fibersphere Communications LLC (0163); and Fibersphere Communications of California LLC (5088). The Debtors' business address is 350 Franklin Gateway, Suite 300, Marietta, GA 30067.

3.      I submit this Declaration to provide an overview of the Debtors' business and the Chapter 11 Cases and support for the Debtors' "first day" applications and motions (collectively, the "First Day Pleadings").  I am over the age of 18, competent to testify, and authorized to submit this Declaration on behalf of the Debtors.

4.      Except as otherwise noted, I have personal knowledge of the matters set forth herein.  All facts set forth in the Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management, my review of relevant documents, and/or my opinion based on my experience and knowledge of the Debtors' operations and financial condition.  In making the Declaration, I have relied in part on information and materials that the Debtors' personnel and advisors have gathered, prepared, verified, and provided to me, in each case under my ultimate supervision, at my direction, and/or for my benefit in preparing the Declaration.  If I were called to testify as a witness in this matter, I could and would testify competently to the facts set forth herein.

## Preliminary Statement

5.      Simply put, the Debtors have commenced these Chapter 11 Cases to preserve and maximize value for all stakeholders through one or more sales of their assets.  The Debtors determined that, absent a strategic transaction, the Company was no longer viable to conduct its business over a long period of time due to its financial constraints.  To pursue one or more sales transactions, the Debtors have obtained debtor in possession financing from M/C Partners VIII, L.P., as agent and lender (the "DIP Lender") to allow the Debtors to continue operating in these Chapter 11 Cases pending the sale process described herein.  Following the prepetition marketing process described below, Bel Air Internet LLC and Everywhere Wireless, LLC, entities affiliated with the DIP Lender, are acting as the stalking horse buyer for a significant portion of the Debtors' operating assets (in such capacity, the "Buyer").

6.      To familiarize the Court with the Debtors and the relief the Debtors seek on the first day of these Chapter 11 Cases, this Declaration is organized in three sections. The first section provides background information with respect to the Debtors' businesses and corporate history, as well as their prepetition capital structure. The second section describes the circumstances surrounding the commencement of these Chapter 11 Cases. The last section sets forth the relevant facts in support of each of the First Day Pleadings.

## GENERAL BACKGROUND

### I.      The Debtors' Businesses

7.      The Company develops and deploys universal access networks ("UANs") in multi-family and commercial real estate properties, providing internet, video and other network services to approximately 400 customer properties and nearly 35,000 end-user subscribers.  The Company contracts with property owners to set up UANs in their buildings and also provides internet services to subscribers in those buildings. The Company's differentiated UAN platform enables seamless connectivity across all Internet, mobile, nonstandard computing devices that connect wirelessly to a network, and smart home devices.  This commercial-grade service provides subscribers the



ability to manage all network devices, and provides property owners ubiquitous on-property coverage and in all cases is activated through an instant, one-click sign up process with no need to send a support technician [i.e., no "truck roll"]. The Company provides each subscriber with their own VPN to stay connected throughout the entire property. This comprehensive UAN infrastructure for both residential and commercial properties is a key differentiator versus cable management services organization ("MSO") competitors. Unlike legacy cable MSO offerings, the Debtors' differentiated UAN platform enables seamless commercial-grade connectively to all next-generation applications (Internet, mobile, IoT, smart home, etc.) and can be activated instantaneously by each resident, staff and vendor. The Debtors deploy a commercial-grade backbone which enables optimal performance and reliability for all consumer applications. Through the use of a common network in a building, the Company is able to provide ubiquitous connectivity solutions such as energy tools, smart door locks, security systems, etc. UAN leverages technology-enabled networks to manage all devices, deliver symmetrical 1Gbps speeds and high-security, private data portals. The Company's best-in-class sales & marketing practices drive strong relationships with property owners and top customer satisfaction.

8.      The Debtors' business breaks down into two primary models: bulk contracts and opt-in contacts. Bulk contracts refer to situations where the Company has the exclusive right to serve all units in a property over the life of the contract with the property owner. Such contracts typically have a seven year term. Conversely, opt-in contracts arise when the Debtors contract with the property owner to gain access to the property but must compete with any existing provider for individual subscriber uptake. Under both scenarios, the capital expenditure costs may be funded either by the Company or the property owner, with revenue and cost sharing dependent on the model used. The Debtors recently eliminated focus on new self-funded opt-in deployments and planned to launch only new opt-in properties that are owner funded to optimize unit economics.

9.      The Debtors have developed a proven strategy of identifying and converting large, multi-region deployments with national multi-dwelling units-focused (such as condominiums and

apartments) property owners.  By focusing on bulk contracts and owner-funded capex deployments with imbedded revenue sharing arrangements, the Company is aligned with property owners to maximize the end-customer experience while driving critical owner benefits including high occupancy and real estate value accretion.

### A.  History

10.     The Company's origins date to 2013 when Kubix LLC, a Florida limited liability, was formed; in November 2014, it changed its name to GigaMonster, LLC.  In May 2017, GigaSphere LLC was formed as a Delaware entity; it changed its name to GigaSphere International LLC on October 12, 2018, and on July 17, 2019 changed to its current name of GigaMonster Networks, LLC.

11.     The Company recognized that growth was necessary to support its national footprint goal, especially given the up-front expenses associated with creating the internet infrastructure required to support the UANs.  Debtor GigaSphere Holdings LLC was formed on May 17, 2018 in connection with the June 2018 acquisition of Debtors Fibersphere Communications, LLC and Fibersphere Communications of California, LLC.   In connection with that acquisition, the former members of Debtor GigaMonster, LLC received interests in Debtor GigaSphere Holdings LLC; and Debtor GigaMonster, LLC became a wholly owned subsidiary of GigaMonster Networks.  In November 2019, Barings Asset-Based Income Fund (US), L.P. ("Barings") became the Company's majority investment stakeholder.  Additional acquisitions followed in 2020 and 2021, including the June 2021 acquisition of non-Debtor GigaMonster Networks Costa Rica S.R.L.

### B.  Operations

12.     As of the Petition Date, the Debtors employ approximately 70 full-time employees in positions such as sales and marketing, product management, human resources, accounting and finance, customer care, and field operations.  None of the Debtors' employees are subject to a collective bargaining agreement.

13.     The Company is headquartered in Marietta, Georgia.  Employees working from the corporate headquarters generally handle critical corporate and back office functions.  Many employees work remotely as a result of the Covid-19 pandemic.  Other employees, especially field technicians, are spread throughout the country, and also work remotely.

14.     While the Debtors do not own any real property, they do own the internet infrastructure at the buildings for which they provide services.  In order to ensure access to the buildings that they service, the Debtors are party to numerous "right of entry" agreements ("ROEs") with the property owners.   The ROEs generally grant the Company and its employees an easement to and into the buildings to construct, install, maintain, service, remove and operate the Company's property, including cabling, wiring, fiber optic lines and related equipment.  The ROEs specify and recognize the Company's ownership interest in these assets.

15.     Non-debtor GigaMonster Networks Costa Rica S.R.L. operates as a call center for the Debtors.  When the Company's subscribers call to report an issue with their internet service they are routed to GigaMonster Networks Costa Rica.  Employees there will first attempt to resolve the issue.  If not resolved, the GigaMonster Networks Costa Rica S.R.L. employee will schedule a technician visit to the subscriber's home.

16.     The Company funds GigaMonster Networks Costa Rica S.R.L. as a cost center, paying roughly $160,000-$175,000 per month for payroll and other nominal expenses.  Having its

own call center is critical to the Company's operations.  The Debtors own and control a number of trademarks, trade names, registered domain names, and other intellectual property rights that, in the aggregate, are important to the Debtors' businesses.  The Debtors' intellectual property portfolio protects, among other things, the Debtors' trademarks and logos, and provides the Debtors with a competitive advantage.

### C.  Financial Performance

17.     The Company has suffered recurring losses from operations and negative cash flows from operating activities for the past several years.  For the calendar year ending December 31, 2021, the Debtors generated a net operating loss of approximately $22 million on revenues of approximately $18.8 million.  The Debtors' circumstances did not improve during 2022; as of October 31st, they recorded a net loss of over $22.5 million.

## II.     The Debtors' Organizational Structure

18.     Debtor Gigasphere Holdings, LLC, a Delaware limited liability company, owns 100% of the membership interests of Debtor GigaMonster Networks, a Delaware limited liability company.  GigaMonster Networks owns 100% of the membership interests of Debtors GigaMonster, LLC, a Florida limited liability company and Fibersphere Communications, LLC, an Oregon limited liability company ("Fibersphere").  Fibersphere owns 100% of the membership interests of Debtor Fibersphere Communications of California, LLC, an Oregon limited liability company.  GigaMonster Networks also owns 100% of the membership interests of non-debtor GigaMonster Networks Costa Rica S.R.L.  The Debtors' corporate structure is illustrated below.



III.    **The Debtors' Debt Structure**

A.    **Secured Debt**

19.    The Debtors are party to that certain Loan and Security Agreement dated as of October 23, 2020 (as the same has been amended, restated, supplemented or modified from time to time, the "<u>Prepetition Credit Agreement</u>", and along with all other agreements, documents, notes, guarantees, subordination agreements, instruments, amendments, and any other agreements delivered pursuant thereto or in connection therewith, each as amended, restated, supplemented or otherwise modified from time to time, the "<u>Prepetition Loan Documents</u>") with Barings as collateral agent (the "<u>Prepetition Agent</u>") and certain financial institutions parties thereto from time to time as lenders (collectively with the Prepetition Agent, the "<u>Prepetition Lenders</u>").  To

support growth and on-going operations, the Prepetition Credit Agreement was amended several times in 2021 and, again, most recently, in September 2022, to provide the Debtors with additional liquidity to fund their day-to-day operations, pay employees, to continue to work to identify a suitable buyer of their assets, and to bridge to the filing of these Chapter 11 Cases.  In addition, as a result of numerous events of default under the Prepetition Loan Documents, the Prepetition Lenders agreed, on multiple occasions, to forbear from exercising rights and remedies against the Debtors.  The last forbearance expired on October 31, 2022.  Therefore, as of the Petition Date, the Debtors were in default under the Prepetition Loan Documents.  The total outstanding amount under the Prepetition Loan Documents is not less than $44 million in principal, plus interest, fees and costs, all of which was due and payable as of the Petition Date.

20.     The Debtors' obligations under the Prepetition Loan Documents are secured by first priority liens on substantially all of the Debtors' property and assets, and, in all instances, the proceeds and products thereof (as more fully described in the Prepetition Loan Documents.)

**B.      Unsecured Debt**

21.     As of the Petition Date, the Debtors estimate they owe approximately $2.5 million of unsecured indebtedness, including trade debt and payables, and amounts owing to circuit providers.

**C.      Equity**

22.     As noted above and in **<u>Exhibit A</u>**, Holdings is the direct or indirect parent company of each of the other Debtors.  Barings owns a majority of the interests in Holdings with the remainder held by GigaMonster Holdings, LLC, Fibersphere Investors, LLC and Management Investors.

**EVENTS LEADING TO THE COMMENCEMENT OF THE CHAPTER 11 CASES**

23.     Despite its ambitions to continue to grow the Company through acquisition, the Company was unable to achieve the growth necessary to increase profitability.  Growth was slower than anticipated and the Company did not generate revenues sufficient to offset the drain on cash occasioned by the fixed costs associated with the Debtors' business model.  In late 2021, the Company engaged The Bank Street Group LLC ("Bank Street") as investment banker to evaluate various avenues to improve the Debtors' liquidity and financial position and analyze strategic alternatives.

24.     Bank Street initiated a process in December 2021 in an effort to raise capital to support future growth or an outright sale of the Company or its assets.  Bank Street contacted 42 potential sponsors and strategic counterparties who either expressed interest or were in the niche market.  Of those contacted, 33 executed NDAs and received CIMs and access to diligence materials.  Bank Street's efforts resulted in 2 different non-binding expressions of interest.  Neither provided value at a high enough level to warrant further action.  This initial process concluded in April of 2022.

25.     In July, 2022, Bank Street initiated a second round of marketing efforts.  They contacted a mix of entities from the first round and all known strategic players in the industry. Bank Street received 3 offers from sponsor participants for different collections of assets.  The Buyer's offer was selected as providing the highest value.

26.     By the summer of 2022, the Company was running out of cash and was unable to secure additional financing or investment capital to finance additional growth or support operations.  Faced with this liquidity crisis, the Company commenced difficult cost saving initiatives in an attempt to "right-size", including implementing a reduction in force of approximately 15% of its workforce.  In addition, in early November, 2022, BAI Connect PNW, LLC (an affiliate of the Buyer) provided some short term liquidity to the Company by buying $3 million worth of buildings serviced by the Company.  The Company also sold certain excess inventory to third parties to raise cash.  On top of the economic stressors, the Debtors also suffered

the loss of several members of their senior leadership in the fall of 2022, which necessitated the hiring of a chief restructuring officer to oversee a sale process and stabilize operations.

27.      As Barings had indicated it would not provide additional funding, the Debtors and DIP Lender began negotiating the terms of a debtor in possession credit facility (the "<u>DIP Facility</u>") to provide the necessary runway, including funding the expenses of these Chapter 11 Cases (subject in all cases to the DIP Facility's approved budget), to complete the sale process. The Debtors will seek this Court's approval of the DIP Facility as part of the requested first day relief. Barings, as the Debtors' senior secured lender, has consented to the terms of the DIP Facility and the priming of its liens on the terms set forth in the documentation of the DIP Facility.

28.      Despite the robust process that Bank Street ran prior to the commencement of these Chapter 11 Cases – and that resulted in the Buyer's offer - the Debtors fully intend to conduct a postpetition marketing and sale process. The Debtors intend, with Bank Street's assistance, to reengage parties who originally showed interest in the Company's assets, along with any new potential buyers, and conduct an auction if sufficient interest is generated. The Debtors will also pursue a sale of the assets not included in the sale to Buyer, a process Bank Street commenced in November, 2022 and will continue after the commencement of these Chapter 11 Cases. The Debtors believe such actions represent their best option to preserve and maximize value for the benefit of all of their stakeholders.

## <u>RELIEF SOUGHT IN THE FIRST DAY PLEADINGS</u>

**I.      Administrative Motions**

**A.      Joint Administration Motion**

29.      The Debtors request entry of an order directing joint administration of their Chapter 11 Cases, for procedural purposes only, pursuant to Rule 1015(b) of the Federal Rules of

Bankruptcy Procedure providing for the Court to maintain one file and one docket for all of the Debtors' Chapter 11 Cases under the lead case, *Gigamonster Networks, LLC, et. al.*

30.     The Debtor entities are "affiliates" as that term is defined in section 101(2) of the Bankruptcy Code.  Accordingly, joint administration of these Chapter 11 Cases will allow for the efficient administration of the Debtors' interrelated Chapter 11 Cases, will yield significant cost savings, and will not prejudice the substantive rights of any party in interest.

31.     I believe that entry of an order directing joint administration of the Chapter 11 Cases will reduce fees and costs by avoiding duplicative filings and objections.   Joint administration also will allow the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") and all parties-in-interest to monitor the Chapter 11 Cases with greater ease and efficiency.   Accordingly, on behalf of the Debtors, I respectfully submit that the Joint Administration Motion should be approved.

**B.     Creditor Matrix Motion**

32.     In the Creditor Matrix Motion, the Debtors seek an order (a) authorizing the Debtors to (i) file a consolidated list of creditors in lieu of submitting a separate mailing matrix for each Debtor, (ii) file a consolidated list of the Debtors' thirty largest unsecured creditors in lieu of filing lists for each Debtor, and (iii) redact certain personally identifiable information for the Debtors' individual creditors; and (b) granting related relief.

33.     Although I understand that a list of creditors usually is filed on a debtor-by-debtor basis, in some cases involving more than one debtor, the debtors may file a consolidated creditor matrix "in the interest of justice."   Requiring the Debtors to segregate and convert their computerized records to a Debtor-specific creditor matrix format would be an unnecessarily burdensome task and result in duplicate mailings.

34.     Similarly, I submit that it is appropriate for the Debtors to file a single list of their thirty largest general unsecured creditors on a consolidated basis.  Because the list of creditors that hold the 30 largest unsecured claims against each Debtor (the "Top 30 List") of the Debtors could overlap, and certain Debtors may have fewer than thirty (30) significant unsecured creditors, the

Debtors submit that filing separate Top 30 Lists for each Debtor would be of limited utility.  In addition, the exercise of compiling separate Top 30 Lists for each individual Debtor could consume an excessive amount of the Debtors' limited time and resources.  Further, I believe that a single, consolidated list of the Debtors' thirty largest unsecured, non-insider creditors will aid the U.S. Trustee in its efforts to communicate with these creditors.

35.     Additionally, I believe that it is appropriate to authorize the Debtors to redact from any paper filed or to be filed with the Court in these Chapter 11 Cases the home addresses of individual creditors—including the Debtors' current and former employees—because such information could be used, among other things, to perpetrate identity theft or to locate survivors of domestic violence, harassment, or stalking.

36.     The Debtors propose to provide an unredacted version of the Creditor Matrix (and any other applicable filings) to the U.S. Trustee (if requested), counsel to any official committee of unsecured creditors appointed in these Chapter 11 Cases, any party in interest upon reasonable and legitimate request, and the Court.

37.     Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Creditor Matrix Motion.

**C.     The 156(c) Application**

38.     In the 156(c) Application, the Debtors seek entry of an order appointing Kroll Restructuring Administration LLC ("Kroll") as their Claims and Noticing Agent in the Chapter 11 Cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Chapter 11 Cases.  It is my understanding that the Debtors' selection of Kroll to act as the Claims and Noticing Agent has satisfied this Court's protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c), in that the Debtors, with the assistance of their advisors, have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I submit, based on input from the Debtors' advisors regarding all engagement proposals obtained and reviewed, that Kroll's rates are competitive and

reasonable given Kroll's quality of services and expertise. Although the Debtors have not yet filed their schedules of assets and liabilities, it is anticipated that there could be thousands of entities to be noticed. In view of the number of anticipated claimants and the complexity of the Debtors' businesses, I believe that the appointment of a claims and noticing agent is required by Rule 2002-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware, and is otherwise in the best interests of both the Debtors' estates and their creditors.

## II.      Operational Motions Requesting Immediate Relief

### A.      Cash Management Motion

39.      By the Cash Management Motion, the Debtors request interim and final (i) authority to continue using their existing cash management system (the "Cash Management System") including the payment of all fees related thereto; (ii) authority for continued use of their existing business forms; and (iii) related relief.

40.      In the ordinary course of business, the Debtors utilize their centralized Cash Management System to collect, manage, and disburse funds used in their business. The Cash Management System, including the Credit Card Program and the Intercompany Transactions (both as defined in the Cash Management Motion), is essential to the stability of the Debtors' assets and business objectives, and to maximizing the value of their estates. Any disruption to the Cash Management System would unnecessarily and significantly disrupt the Debtors' operations and impede the successful administration of their Chapter 11 Cases.

41.      I believe that the relief requested in the Cash Management Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in these Chapter 11 Cases with minimal disruption, thereby benefiting all parties in interest. Accordingly, for the reasons set forth herein and in the Cash Management Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Cash Management Motion should be granted.

**B.**     **Wage Motion**

42.     By the Wage Motion, the Debtors seek entry of interim and final orders granting them (a) authorizing, but not directing, the Debtors to (i) pay prepetition wages, salaries, other compensation, and reimbursable employee expenses, and (ii) continue employee benefits programs in the ordinary course, including payment of certain prepetition obligations related thereto; and (b) granting related relief.

43.     The Debtors' workforce performs a variety of functions critical to the Debtors' operations and the administration of the Debtors' estates.  In many instances, these individuals are intimately familiar with the Debtors' businesses, processes, and systems, and who cannot be easily replaced.  The Debtors' failure to honor their obligations to their workforce could lead to considerable attrition, which would severely threaten the Debtors' ability to operate at this crucial juncture.  Indeed, without the continued, uninterrupted services of their employees and other individuals, the Debtors simply could not run their businesses and maximize value for the benefit of all stakeholders.

44.     More importantly, many of the Employees (as defined in the Wage Motion) rely on the compensation and benefits they receive to pay daily living expenses and secure services central to their health and welfare.  As such, the Debtors' workforce would be exposed to significant hardship if the Debtors are not permitted to continue satisfying the obligations described in the Wage Motion,

45.     Accordingly, for the reasons set forth herein and expanded on in the Wage Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Wage Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

**C.**     **Insurance Motion**

46.     The Debtors request the entry of an order authorizing, but not directing, the Debtors to continue their existing Insurance Policies (as defined in the Insurance Motion); (ii) authorizing,

but not directing, the Debtors to pay certain (A) prepetition obligations relating to the Insurance Policies and (B) postpetition obligations relating to the Insurance Policies, in the ordinary course of business; (iii) authorizing the Debtors to honor obligations relating to their surety bond program (defined in the Insurance Motion), to the extent necessary; (iv) authorizing the Debtors to renew, amend, supplement, extend, or purchase and finance insurance policies in the ordinary course; and (v) granting related relief.

47.     In the ordinary course of business, the Debtors are the beneficiaries of certain Insurance Policies that provide coverage for, among other things, property, business automobile, general commercial liability, directors' and officers' liability, technology liability, and workers' compensation liability.  The Debtors obtain the Insurance Policies through various third-party insurance carriers.  A list of the Insurance Policies is attached to the Insurance Motion as **Exhibit C**.

48.     As part of maintaining their Insurance Policies in the ordinary course of business, the Debtors pay premiums and other obligations related thereto, including any broker or advisor fees, assessments, or other fees.

49.     Continuation of the Insurance Policies, and entry into new insurance policies and related financing agreements, is essential to the preservation of the value of the Debtors' businesses and operations.  Moreover, in many instances, insurance coverage is required by the regulations, laws, and contracts that govern the Debtors' commercial activities, including the Office of the United States Trustee's (the "U.S. Trustee") requirement that a debtor maintain adequate coverage given the circumstances of its chapter 11 case.

50.     Accordingly, for the reasons set forth herein and expanded on in the Insurance Motion, on behalf of the Debtors, I respectfully submit that the relief requested in the Insurance Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

**D.      Utilities Motion**

51.      By the Utilities Motion, the Debtors seek entry of interim and final orders: (i) approving the Debtors' proposed form of adequate assurance of payment to the Utility Companies (as defined below); (ii) establishing procedures for resolving objections by Utility Companies relating to the adequacy of the proposed adequate assurance provided by the Debtors; (iii) prohibiting the Utility Companies from altering, refusing, or discontinuing service to, or discriminating against, the Debtors on the basis of the commencement of these Chapter 11 Cases and/or any outstanding prepetition debts; and (iv) granting related relief, all as more fully set forth in the Motion.

52.      In the ordinary course of business, the Debtors obtain essential utility services (collectively, the "Utility Services") from a number of utility companies (collectively, the "Utility Companies").  A list of the Utility Companies and, where available, the Debtors' account number with each Utility Company is attached to the Utilities Motion as **Exhibit C**.  The Debtors rely on the Utility Companies to provide Utility Services in all their locations.  In locations with Utility Services, the Debtors rely on the Utility Companies to provide necessary support to their employees, vendors, and customers.  Accordingly, I believe preserving the Utility Services on an uninterrupted basis is essential to the Debtors' ongoing operations, and even a brief alteration or discontinuation of service would likely cause severe disruption to the Debtors' business.

53.      The Debtors have proposed to provide Utility Companies with Adequate Assurance of payment for Utility Services and customary procedures for resolving any disputes.  I understand such procedures are routinely approved in this district and would request the Court approve the Utilities Motion to ensure the Debtors maintain uninterrupted Utility Services.

**E.      Tax Motion**

54.      By the Tax Motion, the Debtors seek entry of an order (a) authorizing the Debtors to remit and pay (or use tax credits to offset) Taxes and Fees (as defined below) in the ordinary course of business that are payable or become payable during these Chapter 11 Cases (including

any obligations subsequently determined upon audit or otherwise to be owed for periods prior to the Petition Date); and (b) granting related relief.

55.    In the ordinary course of business, the Debtors collect, withhold, and incur sales, use, and income taxes, as well as other governmental taxes, fees, and assessments (collectively, the "Taxes and Fees").[2]  The Debtors pay or remit, as applicable, Taxes and Fees to various governmental authorities (each, an "Authority," and collectively, the "Authorities") on a periodic basis (monthly, quarterly, semi-annually, annually, and on an ad hoc basis depending on the Debtors' reporting calendar) depending on the nature and incurrence of a particular Tax or Fee and as required by applicable laws and regulations.  A schedule identifying the Authorities is attached to the Tax Motion as **Exhibit C**.  In addition, the Debtors seek authority to pay any fees that become due in the ordinary course owed to the third-party servicer they use to pay sales and use taxes.

56.    Any failure by the Debtors to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to):  (a) the Authorities may initiate audits of the Debtors, which would unnecessarily divert the Debtors' attention from the Chapter 11 Cases; (b) the Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, or pursue other remedies that will harm the estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' restructuring.  Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, or both.  The Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.  Accordingly, I submit that the relief requested in the Tax Motion should be approved.

---

[2]    The Tax Motion does not seek relief with respect to the Debtors' collection and remittance of employee-related taxes and withholdings, which are instead addressed in the Wage Motion.

F.        **DIP Motion**

57.        Prior to the Petition Date, the Debtors faced severe liquidity challenges and recognized a need for further outside financing to bridge the closing of a sale or sales.  The Debtors carefully considered their financing options given the existence of $44 million in prepetition senior secured debt.  Ultimately, the Debtors determined that the DIP Facility provides the Debtors with the best postpetition financing option available and should be approved by this Court.  Notably, while the DIP Facility is in part, a senior priming facility, Barings as the prepetition agent on the prepetition secured debt, has consented to being primed on the terms set forth in the Interim Order and Final Order.  After extended arms' length and good faith negotiations, the Debtors, in an exercise of their sound business judgment, determined that the terms of the proposed DIP Facility represent a fair and reasonable outcome for these estates and should be approved by this Court.  Importantly, Barings has agreed to the terms of the DIP Facility, including the consensual priming of its liens.

58.        The Debtors' estates will suffer immediate and irreparable harm if the relief requested in the DIP Motion is not granted.  The Debtors do not have sufficient cash on hand to fund these Chapter 11 Cases, and thus access to DIP Financing and the use of cash collateral is critical to ensure the Debtors' smooth entry into chapter 11.  The commencement of these Chapter 11 Cases will place increased demands on the Debtors' liquidity due to, among other things, the costs of administering the Chapter 11 Cases.  The relief requested is necessary to avoid the immediate and irreparable harm that would otherwise result if the Debtors are denied the proposed interim and final borrowings, including, among other things, frustrating the Debtors' ability to successfully navigate the Chapter 11 Cases.  The DIP Financing has been evaluated by the Debtors and their professionals, and it will provide sufficient liquidity to fund the Chapter 11 Cases.  The Debtors negotiated the DIP Financing, the use of cash collateral, and the adequate protection proposed in the DIP Motion in good faith and at arms' length, and I submit that the terms of the DIP Facility are reasonable and the best that could be obtained under the facts and circumstances of these Chapter 11 Cases.

59.     Accordingly, for the reasons set forth herein and expanded on in the DIP Motion, on behalf of the Debtors, I respectfully submit that the relief requested therein is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses in the Chapter 11 Cases with minimal disruption, thereby maximizing value for the estates.

## CONCLUSION

60.     I have reviewed each of the First Day Pleadings.  All of the facts set forth in the First Day Pleadings are true and correct to the best of my knowledge and belief based upon (a) my personal knowledge of the Debtors' operations and finances, (b) information learned from my review of relevant documents, (c) information supplied to me by other members of the Debtors' management team and the Debtors' advisors, and/or (d) my opinion based upon my knowledge and experience or information I have reviewed concerning the Debtors' operations and financial condition.  Accordingly, the Debtors respectfully request that the relief requested in each of the First Day Pleadings be granted because such relief is a critical element in stabilizing and facilitating the Debtors' operations during the pendency of the Chapter 11 Cases.

61.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that, to the best of my knowledge and after reasonable inquiry, the foregoing is true and correct.

Dated: January 16, 2023

Rian Branning
Chief Restructuring Officer