## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| GigaMonster Networks, LLC, *et al.*,[1] | ) Case No. 23-_____ (___) |
| | ) |
| Debtors. | ) (Joint Administration Requested) |
| | ) |
| | ) |

**MOTION OF THE DEBTORS FOR ENTRY OF ORDERS: (I)(A) APPROVING BIDDING PROCEDURES FOR THE SALE OF (X) STALKING HORSE ASSETS AND (Y) OTHER ASSETS, (B) AUTHORIZING THE DEBTORS TO ENTER INTO STALKING HORSE AGREEMENT FOR STALKING HORSE ASSETS AND TO PROVIDE BID PROTECTIONS THEREUNDER, (C) SCHEDULING AN AUCTION AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF, (D) APPROVING ASSUMPTION AND ASSIGNMENT PROCEDURES AND (E) SCHEDULING A SALE HEARING AND APPROVING THE FORM AND MANNER OF NOTICE THEREOF; (II)(A) APPROVING THE SALE OF ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES AND (B) APPROVING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (III) GRANTING RELATED RELIEF**

The above captioned debtors and debtors in possession (the "Debtors" or the "Company"), hereby file this motion (the "Motion") with the Court for the entry of: (i) an order substantially in the form attached hereto as **Exhibit A**, (the "Bidding Procedures Order"), (a) approving bidding procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 (the "Bidding Procedures"), to be used in connection with the sale (the "Sale") of certain of the Debtors' operating assets (collectively, the "Stalking Horse Assets") to Bel Air Internet LLC and Everywhere Wireless, LLC (collectively and severally but not jointly, the "Stalking Horse Bidder"), or alternatively, to such other bidder that submits the highest and best

---

[1] The Debtors, along with the last four (4) digits of each Debtor's federal tax identification number, are: GigaMonster Networks, LLC (2854); Gigasphere Holdings, LLC (0250); GigaMonster, LLC (3014); Fibersphere Communications, LLC (0163); and Fibersphere Communications of CA, LLC (5088). The Debtors' business address is 350 Franklin Gateway, Suite 300, Marietta, GA 30067.

bid for the Stalking Horse Assets at auction, and approving the bidding procedures in the form attached to the Bidding Procedures Order as <u>Exhibit 1-A</u> to be used in connection with the Sale of one or more groups of the Debtors' other assets not included in the sale of the Stalking Horse Assets (the "<u>Other Assets</u>") to one or more bidders, (b) authorizing the Debtors to provide a break-up fee and expense reimbursement, as provided in the Stalking Horse Agreement (defined below) and potential break-up fee and expense reimbursement for potential stalking horse purchasers of the Other Assets, (c) scheduling an auction of the Stalking Horse Assets and scheduling the hearing to approve the Sale, (d) approving the form and manner of notices of the proposed sale hearing, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u>, (e) authorizing procedures governing the potential assumption and assignment of the Debtors' certain executory contracts and unexpired leases in connection with the Sale(s), (each a "<u>Potential Assumed Contract</u>" and together, the "<u>Potential Assumed Contracts</u>"); and (f) approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under an applicable Potential Assumed Contract and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale(s), substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u>; and (ii) an order (a) authorizing the sale of the Stalking Horse Assets and Other Assets free and clear of all liens, claims, interests, and encumbrances provided with such liens, claims, interests and encumbrances to attach to the proceeds of such sale, (b) authorizing the assumption and assignment of Potential Assumed Contracts; and (c) granting related relief.

Concurrent with the ongoing marketing of the Stalking Horse Assets, the Debtors entered into that certain *Asset Purchase Agreement*, dated January 16, 2023 (the "Stalking Horse Agreement") with the Stalking Horse Bidder[2] attached as **Exhibit B** to this Motion and pursuant to which the Debtors have agreed to sell substantially all of their Assets, subject to higher and better offers.

In support of this Motion, the Debtors rely upon the *Declaration of Rian Branning in Support of the Debtors' Chapter 11 Petitions and First Day Relief* (the "First Day Declaration"). In further support of this Motion, the Debtors respectfully represent as follows:

## PRELIMINARY STATEMENT

1.      The Debtors believe the proposed Bidding Procedures will best facilitate a value maximizing sale of the Stalking Horse Assets and Other Assets for the benefit of the Debtors' estates.  The Bidding Procedures likewise will allow the Debtors additional time to continue to market the Stalking Horse Assets and Other Assets, receive and evaluate bids, and hold an auction (if necessary) to determine the highest or otherwise best bid.  In addition, the marketing process and the Bidding Procedures proposed herein are aligned with the milestones set forth in the proposed Interim DIP Order.[3]

2.      The Debtors believe that their continued marketing efforts aided by the Bidding Procedures will provide an efficient postpetition sale process for the Stalking Horse Assets and Other Assets, and that approval of the Bidding Procedures in the forms attached as Exhibit 1 and Exhibit 1-A to the Bidding Procedures Order and the related relief requested in this Motion is

---

[2] The Stalking Horse Bidder is an affiliate of the DIP Lenders.

[3] *Interim Order Pursuant to the Sections 105, 361, 362, 363, 364, and 507 of the Bankruptcy Code, Bankruptcy Rule 4001, and Local Rule 4001-2, (I) Authorizing Debtors to (A) Obtain Postpetition Financing and (B) Use Cash Collateral, (II) Granting Adequate Protection to Prepetition Secured Parties, (III) Scheduling Final Hearing, and (IV) Granting Related Relief* (the "Interim DIP Order").

3

in the best interests of the Debtors' estates and their stakeholders.  Accordingly, the Debtors respectfully request that the Court grant the relief requested herein.

## JURISDICTION AND VENUE

3.      The United States District Court for the District of Delaware has jurisdiction under 28 U.S.C. § 1334, which was referred to this Court under 28 U.S.C. § 157 pursuant to the *Amended Standing Order of Reference from the United States District Court for the District of Delaware*, dated February 29, 2012.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).

4.      The Debtors confirm their consent pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by the Court in connection with this motion to the extent that it is later determined that the Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

5.      Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

6.      The bases for the relief requested herein are sections 105(a), 363(b), 365, 503 and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Local Rules 2002-1, 6004-1, 9006-1 and 9013-1(m).

## INTRODUCTION

7.      On January 16, 2023 (the "Petition Date"), the Debtors commenced these cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors have continued in the possession of their property and have continued to operate and manage their

business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Debtors' chapter 11 cases. As of the date hereof, no committee has been appointed in the Debtors' chapter 11 cases.

8.     The Company develops and deploys universal access networks ("UANs") in multi-family and commercial real estate properties, providing internet, video and other network services to approximately 400 customer properties and nearly 35,000 end-user subscribers. The Company's differentiated UAN platform enables seamless connectivity across all Internet, mobile, nonstandard computing devices that connect wirelessly to a network, and smart home devices. Through the use of a common network in a building, the Company is able to provide connectivity solutions such as energy tools, smart door locks, and security systems. The Company's best-in-class sales & marketing and customer care practices drive strong relationships with property owners and result in top subscriber satisfaction.

9.     The factual background regarding the Debtors, including their current and historical business operations and the events precipitating their chapter 11 filings, is set forth in detail in the First Day Declaration and fully incorporated herein by reference.

**RELIEF REQUESTED**

10.     Pursuant to sections 105, 363, 365, 503 and 507 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9007, 9008 and 9014 of the Bankruptcy Rules and Rules 2002-1, 6004-1 and 9006-1 of the Local Rules, the Debtors hereby seek:

(a) entry of the Bidding Procedures Order, substantially in the form attached hereto as Exhibit A, granting the following relief:

(i)     authorizing and approving the Bidding Procedures, substantially in the form attached to the Bidding Procedures Order as Exhibit 1 and Exhibit 1-A, to be used in connection with the sale of Stalking Horse Assets and Other Assets, respectively, through the proposed Sale;

5

(ii)    establishing the following dates and deadlines in connection with the Bidding Procedures:

a. <u>Bid Deadline</u>: **February 24, 2023, at 4:00 p.m**. (prevailing Eastern time), as the deadline by which all bids to purchase the Stalking Horse Assets must be actually received by the Debtors pursuant to the Bidding Procedures (the "<u>Bid Deadline</u>");

b. <u>Auction</u>: **February 28, 2023 at 10:00 a.m.** (prevailing Eastern time), as the date by which the Debtors will conduct an auction pursuant to the Bidding Procedures (the "<u>Auction</u>"), if necessary; and

c. <u>Sale Objection Deadline</u>: **February 23, 2023, at 4:00 p.m**. (prevailing Eastern time), as the deadline for parties to file objections to proposed Sale to Stalking Horse Bidder or Successful Bidder.

d. <u>Sale Hearing</u>: **March 2, 2023**, as the date for the Court to consider approval of the Sale (the "<u>Sale Hearing</u>").

(iii)    authorizing the Debtors to provide the Stalking Horse Bidder and in accordance with the Stalking Horse Agreement, with (A) a breakup fee in the amount of $390,000 (the "<u>Break-Up Fee</u>") and (B) an expense reimbursement not to exceed $390,000 on account of expenses incurred by the Stalking Horse Bidder in connection with the Sale (the "<u>Expense Reimbursement</u>" and, together with the Break-Up Fee, the "<u>Bid Protections</u>"), and authorizing the Debtors to name one or more stalking horse bidders for the Other Assets;

(iv)    approving the form and manner of notice of the Bidding Procedures, the Auction, and the Sale Hearing, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 2</u> (the "<u>Sale Notice</u>");

(v)    approving procedures for the assumption and assignment of the Potential Assumed Contracts in connection with any Sale(s) (the "<u>Assumption and Assignment Procedures</u>");

(vi)    approving the form and manner of notice to each relevant non-debtor counterparty to a Potential Assumed Contract (each, a "<u>Counterparty</u>" and collectively, the "<u>Counterparties</u>") of (A) the Debtors' calculation of the amount necessary to cure any defaults required to be cured under section 365 of the Bankruptcy Code under the applicable Potential Assumed Contracts (the "<u>Cure Amounts</u>") and (B) certain other information regarding the potential assumption and assignment of Potential Assumed Contracts in connection with the Sale, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> (the

"Potential Assumption and Assignment Notice"); and

(b) following entry of the Bidding Procedures Order, approval of an applicable proposed order (each a "Sale Order")[4] at the Sale Hearing for the Stalking Horse Assets and/or the Other Assets, authorizing and approving the following:

(i)      the Sale of the Stalking Horse Assets to the Stalking Horse Bidder or, alternatively, to the Successful Bidder (as defined below) free and clear of all liens, claims, interests, and encumbrances to the extent set forth in the Stalking Horse Agreement or the asset purchase agreement with the otherwise Successful Bidder, as applicable;

(ii)     if applicable, the Sale of the Other Assets to one or more stalking horse bidders or to a Successful Bidder for the Other Assets, free and clear of all liens, claims, interests, and encumbrances to the extent set forth in any such stalking horse agreement or asset purchase agreement with the otherwise Successful Bidder, as applicable;

(iii)    authorizing the assumption and assignment of the Potential Assumed Contracts in connection with such Sale(s); and

(iv)    granting related relief.

## SALE TIMELINE

11.    The Bidding Procedures and the Debtors' proposed timeline for this sale process are a product of good-faith, arm's length negotiations and reflect the best option available for the Debtors to maximize the value of their Stalking Horse Assets and Other Assets under the circumstances.  Specifically, the Debtors have agreed to, among others, the following proposed

---

[4] The Debtors will file a proposed Sale Order for the Other Assets no later than fourteen (14) days before the Sale Objection Deadline. The Stalking Horse Sale Order is attached to this Motion as Exhibit C.

key dates and deadlines to govern the sale process in the proposed Interim DIP Order

(the "Milestones"):[5]

| STALKING HORSE ASSETS SALE PROCESS KEY DATES AND DEADLINES | |
| --- | --- |
| **January 30, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to object to proposed Bidding Procedures (including proposed Bid Protections) and entry of Bidding Procedures Order |
| **February 3, 2023** | Hearing to consider approval of Bidding Procedures (including proposed Bid Protections) and entry of Bidding Procedures Order |
| **On or before three (3) Business Days after entry of Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Notice |
| **On or before two (2) Business Days after entry of Bidding Procedures Order** | Deadline for Debtors to file and serve Potential Assumption and Assignment Notice for Potential Assumed Contracts |
| **As soon as practicable after entry of the Bidding Procedures Order, the Debtors will cause the information contained in the Sale Notice to be published once in either the national edition of *USA Today* or such publication with similar national circulation** | Deadline to publish notice of Sale |
| **February 17, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for potential bidders to deliver Preliminary Bid Documents |
| **February 23, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for parties to file objections to proposed Sale to Stalking Horse Bidder or Successful Bidder ("Sale Objection Deadline") |

---

[5] Capitalized terms used in this Motion but not previously defined herein shall have the respective meanings ascribed to such terms later in this Motion, either of the Bidding Procedures attached hereto as Exhibit 1 or Exhibit 1-A, the Bidding Procedures Order, or Stalking Horse Agreement, as applicable.  Unless otherwise noted, certain defined terms may be the same but are only intended to apply in the context of either SH Bidding Procedures or the Other Assets Bidding Procedures.

| | |
|---|---|
| **February 23, 2023 at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Counterparties to file objections to Potential Assumption and Assignment Notice for Potential Assumed Contracts |
| **February 24, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **February 26, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to select Qualified Bids |
| **February 27, 2023** | Deadline to notify Bidders if they are selected as Qualified Bidders and provide them with notice of Auction |
| **February 28, 2023 at 10:00 a.m. (prevailing Eastern Time)** | Auction (if necessary) |
| **As soon a reasonably practicable following the closing of the Auction but no later than one day following such closing** | Notice of Auction Results |
| **March 2, 2023** | Sale Hearing |

| OTHER ASSETS SALE PROCESS KEY DATES AND DEADLINES | |
|---|---|
| **January 30, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to object to proposed Bidding Procedures (including proposed Bid Protections) and entry of Bidding Procedures Order |
| **February 3, 2023** | Hearing to consider approval of Bidding Procedures (including proposed Bid Protections) and entry of Bidding Procedures Order |
| **On or before three (3) Business Days after entry of Bidding Procedures Order** | Deadline for Debtors to file and serve Sale Notice |

| | |
|---|---|
| **On or before two (2) Business Days after entry of Bidding Procedures Order** | Deadline for Debtors to file and serve Potential Assumption and Assignment Notice for Potential Assumed Contracts |
| **As soon as practicable after entry of the Bidding Procedures Order, the Debtors will cause the information contained in the Sale Notice to be published once in either the national edition of *USA Today* or such publication with similar national circulation** | Deadline to publish notice of Sale |
| **February 17, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for potential bidders to deliver Preliminary Bid Documents |
| **February 23, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline for parties to file objections to proposed Sale to Stalking Horse Bidder or Successful Bidder ("<u>Sale Objection Deadline</u>") |
| **February 23, 2023 at 4:00 p.m. (prevailing Eastern Time)** | Deadline for Counterparties to file objections to Potential Assumption and Assignment Notice for Potential Assumed Contracts |
| **February 22, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Bid Deadline |
| **February 26, 2023, at 4:00 p.m. (prevailing Eastern Time)** | Deadline to select Qualified Bids |
| **February 27, 2023** | Deadline to notify Bidders if they are selected as Qualified Bidders and provide them with notice of Auction |
| **February 28, 2023 at 10:00 a.m. (prevailing Eastern Time)** | Auction (if necessary) |
| **As soon a reasonably practicable following the closing of the Auction but no later than one day following such closing** | Notice of Auction Results |
| **March 2, 2023** | Sale Hearing |

10

12.    The Debtors, with the assistance of their advisors, will continue to market the Stalking Horse Assets and Other Assets to potential purchasers.  As such, the Debtors believe that prospective bidders will have sufficient time and information to conduct the necessary due diligence to submit binding bids in accordance with the timeline proposed herein.

13.    Completion of the sale process in a timely manner will also maximize the value of the Stalking Horse Assets and Other Assets obtained through the proposed Sale(s).  The proposed dates governing the Sale(s), marketing, and auction process are within the Milestones provided under the Interim DIP Order.  Failure to adhere to the Milestones with respect to the sale of the Stalking Horse Assets would constitute a default under the Interim DIP Order.  Accordingly, it is in the Debtors' and their stakeholders' best interests to complete a robust sale process as swiftly as possible to consummate the Sale(s) within the parameters set by the Milestones.  In view of the foregoing, the Debtors respectfully submit that the Court should grant the relief requested herein and approved proposed timeline for completing the sale, marketing, and auction process for the Stalking Horse Assets and Other Assets.

## **DESCRIPTION OF THE ASSETS**[6]

14.    The Stalking Horse Assets subject to this Motion generally include a significant portion of the Debtors' operating assets.   The Other Assets generally include all assets that are not within the category of the Stalking Horse Assets.

---

[6] The summary of the provisions of the Stalking Horse Agreement, either of the Bidding Procedures, and Bidding Procedures Order described in this Motion is provided for the convenience of the Court and parties in interest.  To the extent there is any conflict between the summary in this Motion and either the Stalking Horse Agreement, Bidding Procedures or Bidding Procedures Order, as applicable, those documents shall govern in all respects.

15.    A description of the Stalking Horse Assets that the Debtors propose to sell to the Stalking Horse Bidder, subject to higher and better bids, is summarized below from section 1.1 of the Stalking Horse Agreement:

(a)    All of the Purchased Contracts and Purchased Assets (collectively, the "Specified Assets");

(b)    all sales orders, customer orders, open bids, warranties, prepaid expenses, deposits, retentions and refunds to the extent directly associated with the Specified Assets;

(c)    to the extent transferrable and assignable, all Permits to the extent directly associated with the Specified Assets, including (for the avoidance of doubt) all right, title and interest in any internet protocol ("IP") addresses (i) related to any Specified Assets or the operations related thereto, (ii) not associated with any contract between any Seller and their respective customers and (iii) that are not otherwise purchased from the Sellers in connection with the sale of an Excluded Contract with which such IP address is associated with via an Auction (or a separate sale of assets outside of an Auction prior to Closing), in each case which are registered in the name of any Seller and/or under the ARIN numbers set forth on Exhibit 1.1(c) to the Stalking Horse Agreement; for the avoidance of doubt, Section 1.1(c) of the Stalking Horse Agreement shall not include any IP Addresses for which the IP Address Adjustment amount is utilized by Purchaser;

(d)    all of Sellers' data and information (whether in paper or electronic format or any other medium) including all books and records, technical data, financial, accounting and operating data, tax, marketing, sales and promotional data, advertising material, credit information, costs and price information to the extent directly associated with the Specified Assets; provided, that the Sellers shall be permitted to (i) redact or remove any such materials solely to the extent necessary to comply with applicable Legal Requirements relating to employee privacy or privacy of personal information, and (ii) withhold communications (whether written or oral) between any of the Sellers and their legal counsel and other materials prepared by Sellers' counsel (except to the extent such other materials were shared with other parties resulting in a waiver of a legally recognized privilege) (including, without limitation, attorney-client, attorney-client work product and similar privileges (collectively, "Privileged Matter")). Purchaser hereby acknowledges and agrees that (x) any transfer, conveyance, disclosure, or delivery (including on any servers or other equipment included in the Assets) of any Privileged Matter is entirely inadvertent and unintentional and shall neither be construed as, nor constitute, a waiver, modification, limitation, or impairment of the privileged or protected nature of such Privileged Matter, and (y) any Privileged Matter inadvertently held by the Purchaser shall, at the request of Seller, promptly be transferred and returned to Seller;

(e)    all claims, causes of action and rights of the Sellers (including all Included Avoidance Actions) against any natural person or corporation or other entity, whether matured or unmatured, direct or indirect, known or unknown or absolute or contingent to the extent directly associated with the Specified Assets;

(f)    all goodwill to the extent directly associated with the Specified Assets;

(g)    all accounts receivable to the extent directly associated with the Specified Assets;

(h)    (1) the following agreements between a Seller entity and Direcpath, LLC: (i) Dealer Service Agreement, dated as of May 31, 2019, by and between GigaMonster Networks, LLC (f/k/a GigaSphere International LLC) and Direcpath, LLC (ii) Support Center Services Agreement, dated as of January 1, 2017, by and between the GigaMonster, LLC and Direcpath, LLC, (iii) Master Services Agreement, dated as of May 31, 2019, by and between GigaMonster Networks, LLC (f/k/a GigaSphere International LLC) and Direcpath, LLC and (iv) Services Agreement, dated as of May 31, 2019, by and between GigaMonster Networks, LLC (f/k/a GigaSphere International LLC) and Direcpath, LLC as amended and (2) all rights, claims and causes of action arising thereunder, including the right to any accounts receivable or other amounts owed to any Seller or Affiliate thereof pursuant to any such agreements; provided further, that all such contracts between any Seller and Direcpath identified above shall be deemed "Purchased Contracts" for purposes of this Agreement, whether or not such contracts are listed on Appendix A, provided (i) that any transfer of Assets relating to Direcpath shall be governed by the terms of the DP Settlement (defined below) if entered and approved by the Bankruptcy Court on terms reasonably acceptable to Purchaser, (ii) subject to the terms of the DP Settlement, if any, the Sellers shall use commercially reasonable efforts to ensure that any "ROE" agreements assigned by DirecPath pursuant to a DP Settlement agreement that relate to the properties serviced by or pursuant to the Assets shall be assigned to the Purchaser and shall constitute "Purchased Contracts" and "Assets" hereunder and (iii) if the DP Settlement is entered into and approved by the Bankruptcy Court, then, notwithstanding anything to the foregoing, the Purchaser may remove the assets listed in Section 1.1(h)(1)-(2) of the Stalking Horse Agreement, and such assets will no longer be deemed Assets or Purchased Contracts, effective immediately upon written notice to the Sellers; provided further that in no event shall the failure to enter into and obtain approval of the DP Settlement, in and of itself, have any effect on the Purchaser's obligations to proceed with the Closing (subject to the terms and conditions of this Agreement) other than in respect of the application of the DP Adjustment Amount provided below; provided that, in all events, the terms of Section 1.1(h) of the Stalking Horse Agreement will be subject to the terms of the DP Settlement agreement, if any; and,

(i)    all Avoidance Actions, but solely to the extent the same relate to the Specified Assets, Assumed Liabilities, or any contract or business relationship between the Sellers and Purchaser or any of Purchaser's affiliates (including, without limitation, the Prior Transaction Agreement) (collectively, the "Included Avoidance Actions").

## PREPETITION MARKETING PROCESS

16.    As discussed in the First Day Declaration, despite its ambitions to continue to grow the Company through acquisition, the Company was unable to achieve the growth

13

necessary to increase profitability.  Growth was slower than anticipated and the Company did not generate revenues sufficient to offset the drain on cash occasioned by the fixed costs associated with the Debtors' business model.  In late 2021, the Company engaged The Bank Street Group LLC ("Bank Street") as investment banker to evaluate various avenues to improve the Debtors' liquidity and financial position and analyze strategic alternatives.

17.    Bank Street initiated a process in December 2021 in an effort to raise capital to support future growth or an outright sale of the Company or its assets.  Bank Street contacted 42 potential sponsors and strategic counterparties who either expressed interest or were in the niche market.  Of those contacted, 33 executed NDAs and received CIMs and access to diligence materials.  Bank Street's efforts resulted in 2 different non-binding expressions of interest.  Neither provided value at a high enough level to warrant further action.  This initial process concluded in April of 2022.

18.    In July 2022, Bank Street initiated a second round of marketing efforts. They contacted a mix of entities from the first round and all known strategic players in the industry. Bank Street received 3 offers from sponsor participants for different collections of assets.  The Stalking Horse Bidder's offer was selected as providing the highest value.

19.    By the summer of 2022, the Company was running out of cash and was unable to secure additional financing or investment capital to finance additional growth or support operations.  Faced with this liquidity crisis, the Company commenced difficult cost saving initiatives in an attempt to "right-size", including implementing a reduction in force of approximately 15% of its workforce.  In addition, in early November, 2022, BAI Connect PNW, LLC (an affiliate of the Stalking Horse Bidder) provided some short term liquidity to the Company by buying $3 million worth of buildings serviced by the Company.  The Company also sold certain

14

excess inventory to third parties to raise cash.  On top of the economic stressors, the Debtors also suffered the loss of several members of their senior leadership in the fall of 2022, which necessitated the hiring of a chief restructuring officer to oversee a sale process and stabilize operations.

20.    As Barings Asset-Based Income Fund (US), L.P. ("Barings") had indicated it would not provide additional funding, the Debtors and DIP Lender began negotiating the terms of a debtor in possession credit facility (the "DIP Facility") to provide the necessary runway, including funding the expenses of these Chapter 11 Cases (subject in all cases to the DIP Facility's approved budget), to complete the sale process.  The Debtors will seek this Court's approval of the DIP Facility as part of the requested first day relief.  Barings, as the Debtors' senior secured lender, has consented to the terms of the DIP Facility and the priming of its liens on the terms set forth in the documentation of the DIP Facility.

21.    Despite the robust process that Bank Street ran prior to the commencement of these Chapter 11 Cases – and that resulted in the Stalking Horse Bidder's offer - the Debtors fully intend to conduct a postpetition marketing and sale process.  The Debtors intend, with Bank Street's assistance, to reengage parties who originally showed interest in the Company's assets, along with any new potential buyers, and conduct an auction if sufficient interest is generated.  The Debtors will also pursue a sale of the assets not included in the sale to Stalking Horse Bidder, a process Bank Street commenced in November 2022 and will continue after the commencement of these Chapter 11 Cases.  The Debtors believe such actions represent their best option to preserve and maximize value for the benefit of all of their stakeholders.

22.    On January 16, 2023, the Debtors entered into the Stalking Horse Agreement with the Stalking Horse Bidder.  The Stalking Horse Agreement seeks to sell the

Stalking Horse Assets to the Stalking Horse Bidder, subject to higher and better bids, in consideration of payment to the Debtors of $14 million as the Purchase Price.

23.     The Debtors intend to broadly market their assets postpetition with the goal of fostering a robust bidding process and a competitive auction for the sale of the Stalking Horse Assets and Other Assets consistent with terms of the proposed forms of Bidding Procedures. The Debtors have and will continue to pursue interest from third parties to solicit offers for the sale of the Stalking Horse Assets and Other Assets.

24.     No later than three (3) Business Days after entry of the Bidding Procedures Order, the Debtors will (to the extent not already provided), send notice of this Motion or serve the Sale Notice to all parties that they believe may be potentially interested in acquiring the Stalking Horse Assets and Other Assets, including to the parties contacted prepetition. The Debtors will assist interested parties who either have, or will, execute confidentiality agreements acceptable to the Debtors to conduct diligence on the Stalking Horse Assets and Other Assets, in accordance with the Bidding Procedures. The Debtors believe that the marketing of the Stalking Horse Assets and Other Assets over the period contemplated by the Bidding Procedures, in addition to the marketing activities that have taken place to date, will result in the highest and best purchase price for the Stalking Horse Assets and Other Assets and maximize value for all of the Debtors' constituents.

25.     Given the Debtors' liquidity and operational constraints, the timing of the Sale proposed herein is reasonable under the circumstances in order to effectuate the sale of the Stalking Horse Assets and Other Assets. Thus, the Debtors believe that the Bidding Procedures proposed hereby will enable the efficient consummation of the sale of the Stalking Horse Assets and Other Assets at an auction to the highest or best bidder.

**THE PROPOSED BIDDING PROCEDURES AND THE
STALKING HORSE ASSETS AND OTHER ASSETS TO BE SOLD PURSUANT TO
THE SALE**

A.      **Summary of Proposed Bidding Procedures**

26.      The Bidding Procedures are designed to promote a competitive and expedient sale process to consummate the Sale.  If approved, the Bidding Procedures will allow the Debtors to solicit and identify bids from potential buyers that constitute the highest or best offer for the sales of the Stalking Horse Assets and Other Assets on a schedule consistent with the Milestones.

27.      As the Bidding Procedures are attached to the Bidding Procedures Order, they are not herein restated in their entirety.  Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding Procedures for the Stalking Horse Assets are highlighted in the chart below.

| MATERIAL TERMS OF THE BIDDING PROCEDURES | |
|---|---|
| **(STALKING HORSE ASSETS)** | |
| **Provisions Governing Qualification of Bidders** Local Rule 6004-1(c)(i)(A) | To receive due diligence information and to receive additional non-public information regarding the Debtors, a potential bidder must (x) not be in breach of any agreement with any Debtor and (y) deliver to each of: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones (ljones@pszjlaw.com); (b)(i) Novo Advisors, 401 N. Franklin, Suite 4 East, Chicago Illinois 60654, Attn: Rian Branning (rbranning@novo-advisors.com) and (ii) Bank Street Group LLC, 333 Ludlow Street, South Tower - Third Floor, Stamford, CT 06902, Attn: Timothy J. Murphy (tmurphy@bankstreet.com) (collectively, the "Debtors' Advisors"), the following documents (collectively, the "Preliminary Bid Documents") on or prior to **February 17, 2023 at 4:00 p.m. (prevailing Eastern time)**, unless otherwise waived by the Debtors in their discretion: <br><br> a.   an executed Confidentiality Agreement on terms acceptable to the Debtors, to the extent not already executed, which Confidentiality Agreement shall, among other terms, contain customary provisions regarding: (i) the nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a Transaction, (iii) covenant to not solicit employees of the Debtors, (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the Confidentiality Agreement; <br><br> b.   evidence by the potential bidder of its sufficient financial capacity to close a proposed transaction, which may include financial statements of, or verified financial commitments obtained by, the potential bidder (or, if the potential bidder is an entity formed for the purpose of acquiring the Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors, with the assistance of the Debtors' Advisors; <br><br> c.   written disclosure of any connections or agreements with the Debtors, the Stalking Horse Bidder, any other known potential bidder or Qualified Bidder (defined below), "insiders" of the Debtors (as that term is contemplated by section 101(31) of the Bankruptcy Code), and/or any manager or direct or indirect equity security holder of the Debtors; and <br><br> d.   identification of the potential bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction. |
| **Provisions** | Each Bid submitted by an Acceptable Bidder (a "Bidder") must be submitted |

| | |
|---|---|
| **Governing Qualification of Bidders**<br>Local Rule 6004-1(c)(i)(B) | in writing and satisfy the following requirements (collectively, the "<u>Bid Requirements</u>," unless otherwise modified by the Debtors (except for the requirement set forth in II(d) below), in their discretion:<br><br>a.  <u>Bid Deadline</u>. A Bid must be received no later than the Bid Deadline, unless otherwise extended by the Debtors in their sole discretion; *provided that* such modification shall be subject to the Sale Milestones (as defined in the DIP Order).<br><br>b.  <u>Marked Agreement</u>.  A Bid must include an executed asset purchase agreement (a "<u>Competing APA</u>"), together with all exhibits and schedules (the "<u>Transaction Documents</u>"), pursuant to which the Acceptable Bidder proposes to effectuate the contemplated transaction, which Competing APA must be similar in form and substance to the Stalking Horse Agreement and be marked to reflect the differences between the Stalking Horse Agreement and the Bidder's Competing APA, including, without limitation, specification of the proposed purchase price, any assumed liabilities, and any changes to any exhibits or schedules to the Competing APA. A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Transaction Documents. The Transaction Documents must include a commitment to close by no later than the closing date provided in the Stalking Horse Agreement.  A Bid should propose a contemplated transaction involving all or substantially all of the Assets; *provided, however*, that the Debtors in their discretion may consider proposals for less than substantially all the Assets, *provided further* that the Debtors will evaluate all Bids, in their sole discretion, to determine whether such Bid or combination of Bids maximizes the value of the Debtors' estates as a whole in light of any factors regarding such bid which the Debtors, in their discretion, determine are appropriate to be considered in evaluating Bids.<br><br>c.  <u>Purpose</u>. Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Assets and state which Assets with reasonable specificity.  Each Acceptable Bid must clearly identify the following: (i) contracts to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; (ii) the liabilities, if any, to be assumed; (iii) leases of equipment or stores to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; and (iv) which employees or groups thereof will be offered employment.<br><br>d.  <u>Purchase Price</u>. The consideration proposed by a Bid may include cash and/or other consideration acceptable to the Debtors in an amount of no less than the sum of (i) the Purchase Price (as defined in the Stalking Horse Agreement) <u>plus</u> (ii) the Break-Up Fee and Expense Reimbursement (as defined in the Stalking Horse Agreement) <u>plus</u> (iii) $250,000; *provided that* the Bid must include sufficient cash to pay all DIP Obligations (as defined in the DIP Order) in full upon closing, in addition to the Break-Up Fee and Expense Reimbursement.<br><br>e.  <u>Forms of Consideration</u>. Each Bid must (a) indicate (x) whether it is an |

all-cash offer (including confirmation that the cash component of the Bid is based in U.S. Dollars) or consists of certain non-cash components, such as a credit bid and/or the assumption of liabilities; and (y) the liabilities to be assumed, if applicable; and (b) provide sufficient cash consideration specifically designated for the payment of the Break-Up Fee and Expense Reimbursement.  The Debtors may request that any Bid include the allocation of the Purchase Price among the Assets to be acquired.

f.   Deposit.   Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration (with the deposit amount for the non-cash consideration determined by the Debtors in their discretion) of the Bid to be held in an escrow account to be identified and established by the Debtors (the "Deposit"); *provided that* that the Debtors reserve the right to increase the amount of the Deposit in their discretion, including, without limitation, the right to request an additional Deposit in the event an Acceptable Bidder increases the amount of its Bid.  For the avoidance of doubt, the Stalking Horse Bidder shall not be required to provide a Deposit.

g.   Irrevocable.   All Bids must be irrevocable until the Debtors' selection of the Successful Bid and Backup Bid; *provided however*, that the Bids selected as either the Successful Bid or the Backup Bid (defined below) must be irrevocable and remain open for acceptance by the Debtors until three (3) Business Days after the closing of the Transaction with the Successful Bidder or the Backup Bidder, as applicable.

h.   Committed Financing.   To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's purchase price and other obligations under its Bid.   Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

i.   Unconditional Offer / Contingencies.  A statement that the Bid is formal, binding, and unconditional and is not subject to any further due diligence or financing contingency, and is irrevocable until the Debtors notify the Bidder that such Bid is not a Successful Bid or a Backup Bid.

j.   Non-Reliance.   A Bid must include a written acknowledgement and representation of the Qualified Bidder that it has had an opportunity to conduct any and all due diligence regarding the Assets and Assumed Liabilities (as defined in the Stalking Horse Agreement) prior to making its Bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied,

| | |
|---|---|
| | statutory or otherwise, regarding the Assets, the financial performance of the Assets or the physical condition of the Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction. |
| | k.  <u>Identity</u>.  Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Transaction contemplated by such Bid), and the complete terms of any such participation.  Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid.  Each Bid must also include contact information for the specific person(s), counsel and other advisors whom the Debtors' Advisors should contact regarding such Bid.  Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein. |
| | l.  <u>Adequate Assurance</u>.  Each Bid must contain evidence acceptable to the Debtors in their discretion that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under section 365(b)(1) and 365(b)(3) of the Bankruptcy Code.  Such evidence may include audited and unaudited financial statements, tax returns, bank account statements, a description of the proposed business to be conducted at the premises and/or any other documentation that the Debtors further request. |
| | m.  <u>Authorization</u>.  Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the closing of the Transaction contemplated in such Bid. |
| | n.  <u>No Fees Payable to Qualified Bidder</u>.  Except with respect to the Break-Up Fee and Expense Reimbursement payable to the Stalking Horse Bidder in accordance with the Stalking Horse Agreement, a Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue any break-up fee, termination fee, expense reimbursement or similar type of payment, or substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bidding Procedures. |
| **Provisions Providing Bid Protections to Stalking Horse Bidder** Local Rule 6004- 1(c)(i)(C) | To provide the Stalking Horse Bidder with an incentive to participate in a competitive process and to compensate the Stalking Horse Bidder for (i) performing substantial due diligence and incurring the expenses related thereto and (ii) entering into the Stalking Horse Agreement with the knowledge and risk that arises from participating in the sale and subsequent bidding process, the Debtors have agreed, and the Court has approved in the Bidding Procedures Order, that the Stalking Horse Bidder from the proceeds of a transaction |

| | |
|---|---|
| | consummated pursuant to a Successful Bid (defined below) with the Successful Bidder (defined below) and is subject to the terms of the Stalking Horse Agreement and pursuant to the terms thereof, to: (A) the Break-Up Fee of $390,000 (the "Break-Up Fee") and (B) the Expense Reimbursement (the "Expense Reimbursement") subject to a cap of $390,000.   As set forth below, payment of the Break-Up Fee and Expense Reimbursement (to the extent payable under the Stalking Horse Agreement and Bidding Procedures Order) shall be a component of any Qualified Bid submitted by a Qualified Bidder (other than the Stalking Horse Bidder).   The Break-Up Fee and Expense Reimbursement shall be payable as provided for pursuant to the terms of the Bidding Procedures Order, the Sale Order (as defined in the Bidding Procedures Order) and the Stalking Horse Agreement and the Interim DIP Order. |
| **Modification of Bidding Procedures** Local Rule 6004-1(c)(i)(D) | The Debtors reserve their rights to modify these Bidding Procedures in their business judgment in any manner that will best promote the goals of these Bidding Procedures or impose at or prior to the Auction, additional customary terms and conditions on a Transaction, including, without limitation:   (a) extending the deadlines set forth in these Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids (other than the Stalking Horse Bid in existence as of the Effective Date ). Notwithstanding the foregoing, the Debtors shall not be permitted to modify these Bidding Procedures in any way that (i) permits the submission of Bids after the close of the Auction, (ii) permits the Prepetition Lenders to credit bid the Prepetition Secured Obligations unless such credit bid includes an amount sufficient in cash to repay the DIP Obligations in full, and (iii) permits Qualified Bids that propose consideration that does not include cash sufficient and specifically designated to pay (1) the Break-Up Fee and Expense Reimbursement (as defined in the Stalking Horse Agreement) and (2) the DIP Obligations. |
| **Closing with Alternative Backup Bidders** Local Rule 6004-1(c)(i)(E) | a.       Notwithstanding anything in these Bidding Procedures to the contrary, if the Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the conclusion of the Auction for the Assets or any sub-group thereof, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder") with respect to the Assets until the earlier of (i) such time that the Transaction is consummated and (ii) 30 days from entry of the Sale Order, subject to the terms of such Backup Bidder's Competing APA. Each Qualified Bidder shall agree and be deemed to agree to be a Backup Bidder if so designated by the Debtors, subject to the terms of such Backup Bidder's Competing APA. |
| | b.       The identity of a Backup Bidder and the amount and material terms of the Qualified Bid of such Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder related thereto.  Such Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (i) the closing of the Approved Transaction (defined below) and (ii) 30 days from entry |

| | |
|---|---|
| | of the Sale Order; provided, if the Stalking Horse Bidder is selected as the Backup Bidder, such date shall not be later than the Outside Date (as defined in the Stalking Horse Agreement).  Each Backup Bidder's Deposit shall be held in escrow (which may be held in escrow by Pachulski Stang Ziehl & Jones LLP) until the earlier of (i) three (3) Business Days after the closing of the Approved Transaction or (ii) 30 days from entry of the Sale Order, subject to the terms of such Backup Bidder's Competing APA. |
| | c.      If a Successful Bidder fails to consummate the Approved Transaction contemplated by its Successful Bid, the Debtors may select the Backup Bidder with respect to the Assets or sub-group of the Debtors' Assets or business as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party.  In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance. |
| **Provisions Governing the Auction** Local Rule 6004-1(c)(ii) | If no Qualified Bid (other than the Stalking Horse Bid) is received by the Bid Deadline, the Stalking Horse Bidder shall be deemed the Successful Bidder; provided however, the Debtors may, in their discretion, open the Auction solely for the purpose of reflecting on the record that no other Qualified Bids were received other than the Stalking Horse Bid. |
| | If the Debtors receive more than one Qualified Bid for the Assets (other than the Stalking Horse Bid), the Debtors will conduct the Auction to determine both the Successful Bidder and the Backup Bidder with respect to such Assets.  The Auction shall take place **February 28, 2023, at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE. 19801 (or by video conference to the live proceeding at this location), or such later date and time as selected by the Debtors (following consultation with the Consultation Parties); provided that such modification shall be subject to the Sale Milestones (as defined in the DIP Order). |
| | No later than the day before the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, or, if multiple bids are received in respect of non-overlapping Assets, the highest or best Qualified Bid(s) received in relation to each group of Assets, in each case as determined in the Debtors' business judgment (each such bid, a "Baseline Bid"), and provide copies of the documents supporting the Baseline Bid(s) to all Qualified Bidders and the Consultation Parties.  The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation of the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things: (a) the type and amount of Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the tax consequences of such |

23

Qualified Bid; (f) the assumption of obligations, including contracts and leases; (g) the cure amounts to be paid; and (h) the impact on employees, including the number of employees proposed to be transferred and employee-related obligations to be assumed (collectively, the "Bid Assessment Criteria").

The Auction shall be conducted pursuant to the following procedures:

a.     The Debtors Shall Conduct the Auction

The Debtors and the Debtors' Professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid(s).  All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders and the Consultation Parties.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, the Successful Bid(s), and any Backup Bid(s).

Only (i) Qualified Bidders, (ii) the Consultation Parties, and (iii) the members of the Committee, and each of their respective legal and financial advisors, shall be entitled to attend the Auction, and the Qualified Bidders shall appear at the Auction in person (live or on videoconference) and may speak or bid themselves or through duly authorized representatives.  Only Qualified Bidders shall be entitled to make any subsequent bids at the Auction.

b.     Terms of Overbids

"Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid.  Each Overbid must comply with the following conditions:

(i)     Minimum Overbid Increment.  Any Overbid to the initial Baseline Bid at the start of the Auction shall be in increments of no less than a value equal to $100,000 unless otherwise determined by the Debtors in an exercise of their business judgment; provided, however, that to the extent that the Baseline Bid constitutes the Stalking Horse Bid, the bidding for such Assets at the first round of bidding will start at an amount equal to the sum of:  (i) the value of the Baseline Bid, (ii) the amount of the Breakup Fee and Expense Reimbursement, and (iii) $100,000.

(ii)     Conclusion of Each Overbid Round.  Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

(iii)     Overbid Alterations.    An Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Bidding Procedures.

(iv)     No Round-Skipping.  Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent

24

a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Assets.

(v)     Announcing Highest Bid.  With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors in consultation with the Consultation Parties have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the Assets that are the subject of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

c.     Consideration of Overbids

For the purpose of evaluating the value of the consideration provided by any Bid subsequent to the Baseline Bid, the Debtors will at each round of bidding, give effect to the Breakup Fee and Expense Reimbursement payable to the Stalking Horse under the Stalking Horse Agreement.

The Debtors reserve the right, in their business judgment, to adjourn the Auction one or more times, to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require that the Qualified Bidder has sufficient internal resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Transaction at the prevailing Overbid amount; provided that such adjournment shall be subject to the Sale Milestones (as defined in the DIP Order).

d.     Closing the Auction

The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their discretion following consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid for the Assets.  Such Qualified Bid shall be declared the "Successful Bid," and such Qualified Bid, the "Successful Bidder," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of such Successful Bid is conditioned upon approval by the Court of such Successful Bid.  For the avoidance of doubt, nothing in these Bidding Procedures shall prevent the Debtors from exercising their fiduciary duties under applicable law.  As soon as reasonably practicable after closing the Auction, the Debtors shall finalize

25

| | |
|---|---|
| | definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Court. |
| | e.    No Collusion; Good Faith Bona Fide Offer |
| | Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any bids submitted or not submitted in connection with the Sale, and (ii) its Qualified Bid is a good faith bona fide offer and it intends to consummate the proposed Transaction if selected as the Successful Bidder. |

28.    Pursuant to Local Rule 6004-1(c), certain of the key terms of the Bidding

Procedures for the Other Assets are highlighted in the chart below:

| MATERIAL TERMS OF THE BIDDING PROCEDURES (OTHER ASSETS) | |
|---|---|
| **Provisions Governing Qualification of Bidders** Local Rule 6004-1(c)(i)(A) | To receive due diligence information and to receive additional non-public information regarding the Debtors, a potential bidder must (x) not be in breach of any agreement with any Debtor and (y) deliver to each of: (a) proposed counsel to the Debtors, Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE 19801, Attn: Laura Davis Jones and ljones@pszjlaw.com; (b)(i) Novo Advisors, 401 N. Franklin, Suite 4 East, Chicago Illinois 60654, Attn: Rian Branning (rbranning@novo-advisors.com) and (ii) Bank Street Group LLC, 333 Ludlow Street, South Tower - Third Floor, Stamford, CT 06902, Attn: Timothy J. Murphy (tmurphy@bankstreet.com) (collectively, the "Debtors' Advisors"), the following documents (collectively, the "Preliminary Bid Documents") on or prior to **February 17, 2023, at 4:00 p.m. (prevailing Eastern Time)** unless otherwise waived by the Debtors in their discretion: |
| | a.    an executed Confidentiality Agreement on terms acceptable to the Debtors, to the extent not already executed, which Confidentiality Agreement shall, among other terms, contain customary provisions regarding: (i) the nondisclosure of confidential information, (ii) prohibitions on contacting third parties in connection with a Transaction, (iii) covenant to not solicit employees of the Debtors; (iv) prohibitions on purchasing or otherwise acquiring the Debtors' debt and equity securities, and (v) the survival of certain provisions of the Confidentiality Agreement; |

| | |
|---|---|
| | b. evidence by the potential bidder of its sufficient financial capacity to close a proposed transaction, which may include financial statements of, or verified financial commitments obtained by, the potential bidder (or, if the potential bidder is an entity formed for the purpose of acquiring the Other Assets, the party that will bear liability for a breach), the adequacy of which will be assessed by the Debtors, with the assistance of the Debtors' Advisors;<br><br>c. written disclosure of any connections or agreements with the Debtors, any selected Other Assets Stalking Horse Bidder, any other known potential bidder or Qualified Bidder (defined below), "insiders" of the Debtors (as that term is contemplated by section 101(31) of the Bankruptcy Code), and/or any manager or direct or indirect equity security holder of the Debtors; and<br><br>d. identification of the potential bidder, its principals, and the representatives thereof who are authorized to appear and act on its behalf for all purposes regarding the contemplated transaction. |
| **Provisions Governing Qualification of Bidders**<br>Local Rule 6004-1(c)(i)(B) | Each Bid submitted by an Acceptable Bidder must be submitted in writing and satisfy the following requirements (collectively, the "<u>Bid Requirements</u>," unless otherwise modified by the Debtors, in their discretion:<br><br>a. <u>Bid Deadline</u>. A Bid must be received no later than the Bid Deadline, unless otherwise extended by the Debtors in their sole discretion.<br><br>b. <u>Specific Identification of Other Assets</u>. A Bid must identify with reasonable specificity the nature, type, and extent of the Other Assets that are encompassed within the Bid.<br><br>c. <u>Marked Agreement</u>. A Bid must include an executed asset purchase agreement (a "<u>Other Assets APA</u>"), together with all exhibits and schedules (the "<u>Transaction Documents</u>"), pursuant to which the Acceptable Bidder proposes to effectuate the contemplated transaction, which Other Assets APA must be similar form and substance, as modified, to the form of Asset Purchase Agreement (the "<u>Form of Other Assets APA</u>") that the Debtors will provide through a data room and be marked to reflect the differences between the Form of Other Assets APA, including, without limitation, specification of the proposed purchase price, any assumed liabilities, and any changes to any exhibits or schedules to the Form of Other Assets APA. A Bid must identify with particularity each and every condition to closing and all executory contracts and unexpired leases to be assumed and assigned pursuant to the Transaction Documents. The Transaction Documents must include a commitment to close by no later than the closing date provided in the Form of Other Assets APA. A Bid should propose a contemplated transaction involving all or substantially all of the Other Assets; *provided, however*, that the Debtors in their discretion, may consider proposals for less than all the Other Assets, *provided further* that the Debtors will evaluate all Bids, in their sole discretion, subject to prior consultation with the Consultation Parties, to determine whether such Bid or combination of Bids maximizes the value of the |

Debtors' estates as a whole in light of any factors regarding such bid which the Debtors, in their discretion, determine are appropriate to be considered in evaluating Bids.

d.   <u>Purpose</u>.  Each Acceptable Bidder must state that the Bid includes an offer by the Acceptable Bidder to purchase some or all of the Other Assets and state which Other Assets with reasonable specificity.  Each Acceptable Bid must clearly identify the following: (i) contracts to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof; (ii) the liabilities, if any, to be assumed; and (iii) leases of equipment or stores to be assumed, including cure amounts to be paid, if any, and parties responsible for payment thereof.

e.   <u>Purchase Price</u>.  The consideration proposed by a Bid may include cash and/or other consideration acceptable to the Debtors in an amount of no less than the sum of (i) the proposed purchase price <u>plus</u> (ii) the Break-Up Fee and Expense Reimbursement (if any) under a Other Assets Stalking Horse Agreement with a potential Bidder for any Other Assets) <u>plus</u> (iii) an initial overbid, in an amount to be determined by the Debtors in their discretion.  Each Bid must clearly set forth the terms of any proposed Other Transaction, including and identifying separately any cash and non-cash components of the proposed Other Transaction consideration, including, for example, any liabilities to be assumed by the Acceptable Bidder.

f.   <u>Deposit</u>.  Each Bid must be accompanied by a cash deposit in the amount equal to 10% of the aggregate value of the cash and non-cash consideration (with the deposit amount for the non-cash consideration determined by the Debtors in their discretion) of the Bid to be held in an escrow account to be identified and established by the Debtors (the "<u>Deposit</u>"); *provided that* that the Debtors reserve the right to modify the amount of the Deposit in their discretion to request an additional Deposit in the event an Acceptable Bidder increases the amount of its Bid.

g.   <u>Irrevocable</u>.  All Bids must be irrevocable until the Debtors' selection of the Successful Bid and Backup Bid; *provided however*, that the Bids selected as either the Successful Bid or the Backup Bid (defined below) must be irrevocable and remain open for acceptance by the Debtors until three (3) Business Days after the closing of the Transaction with the Successful Bidder or the Backup Bidder, as applicable.

h.   <u>Committed Financing</u>.  To the extent that a Bid is not accompanied by evidence of the Acceptable Bidder's capacity to consummate the Other Transaction set forth in its Bid with cash on hand, each Bid must include committed financing documented to the Debtors' satisfaction, that demonstrates that the Acceptable Bidder has received sufficient debt and/or equity funding commitments to satisfy the Acceptable Bidder's purchase price and other obligations under its Bid.  Such

funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Debtors.

i. <u>Unconditional Offer / Contingencies</u>. A statement that the Bid is formal, binding, and unconditional and is not subject to any further due diligence or financing contingency, and is irrevocable until the Debtors notify the Acceptable Bidder that such Bid is not a Successful Bid or a Backup Bid.

j. <u>Non-Reliance</u>. A Bid must include a written acknowledgement and representation of the Acceptable Bidder that it has had an opportunity to conduct any and all due diligence regarding the Other Assets prior to making its Bid, that it has relied solely upon its own independent review, investigation and/or inspection of any documents and/or the Other Assets in making its bid, and that it did not rely upon any written or oral statements, representations, warranties, or guaranties, express, implied, statutory or otherwise, regarding the Other Assets, the financial performance of the Other Assets or the physical condition of the Other Assets, the Assumed Liabilities, or the completeness of any information provided in connection therewith or the Auction.

k. <u>Identity</u>. Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Acceptable Bidder, including if such Acceptable Bidder is an entity formed for the purpose of consummating the proposed Other Transaction contemplated by such Bid), and the complete terms of any such participation. Under no circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific person(s), counsel and other advisors whom the Debtors' Advisors should contact regarding such Bid. Nothing herein shall preclude multiple Acceptable Bidders from submitting a joint Bid, subject to the Debtors' prior written consent to such submission and the disclosure requirements set forth herein.

l. <u>Adequate Assurance</u>. To the extent applicable, each Bid must contain evidence acceptable to the Debtors in their discretion that the Acceptable Bidder has the ability to perform thereunder and otherwise complies with the requirements of adequate assurance of future performance under section 365(b)(1) and 365(b)(3) of the Bankruptcy Code. Such evidence may include audited and unaudited financial statements, tax returns, bank account statements, a description of the proposed business to be conducted at the premises and/or any other documentation that the Debtors further request.

m. <u>Authorization</u>. Each Bid must contain evidence that the Acceptable Bidder has obtained authorization or approval from its board of

|  | directors (or a comparable governing body acceptable to the Debtors) with respect to the submission of its Bid and the closing of the Other Transaction contemplated in such Bid.<br><br>n.   Immediate Payment of the Breakup Fee.  A Bid must allow for the immediate payment of the Breakup Fee and Expense Reimbursement, if any, to the Other Assets Stalking Horse Bidder, if any, from the first proceeds of the cash portion of the purchase price of such Bid, upon the closing or immediately thereafter of the applicable proposed Sale.<br><br>o.   No Fees Payable to Qualified Bidder.  Except with respect to any Break-Up Fee and Expense Reimbursement payable to an Other Assets Stalking Horse Bidder selected by the Debtors for all or some of the Other Assets, a Bid may not request or entitle the Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment.  Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue any break-up fee, termination fee, expense reimbursement or similar type of payment, or substantial contribution claim under section 503 of the Bankruptcy Code related in any way to the submission of its Bid or the Bidding Procedures. |
|---|---|
| **Provisions Providing Bid Protections to Stalking Horse Bidder** Local Rule 6004- 1(c)(i)(C) | As set forth above, the Debtors have not selected a Stalking Horse Bidder for the Other Assets, but may designate one or more Stalking Horse Bidders in accordance with the terms of the Bid Procedures Order and provide such bidders with payment of a breakup fee and expense reimbursement not to exceed in the aggregate more than 3% of the cash amount of any sale and shall be subject to entry of an order approving such bid protections by the Court. |
| **Modification of Bidding Procedures** Local Rule 6004-1(c)(i)(D) | The Debtors reserve their rights, subject to prior consultation with the Consultation Parties, to modify the Other Assets Bidding Procedures, in their business judgment in any manner that will best promote the goals of these Other Assets Bidding Procedures or impose at or prior to the Auction, additional customary terms and conditions on a Other Assets Transaction, including, without limitation:  (a) extending the deadlines set forth in these Other Assets Bidding Procedures; (b) adjourning the Auction at the Auction; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any or all Bids or Qualified Bids (other than any Other Assets Stalking Horse Agreement in existence as of the date of execution of such agreement). |
| **Closing with Alternative Backup Bidders** Local Rule 6004-1(c)(i)(E) | Notwithstanding anything in these Other Assets Bidding Procedures to the contrary, if the Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Qualified Bid at the conclusion of the Auction for the Other Assets or any sub-group thereof, as determined by the Debtors in the exercise of their business judgment, shall be required to serve as a backup bidder (the "Backup Bidder") with respect to the Other Assets until the earlier of (i) such time that the Other Assets Transaction is consummated and (ii) 30 days from entry of the Sale Order, subject to the terms of the asset purchase agreement entered into by the Backup Bidder. Each Qualified Bidder shall agree and be deemed to agree to be a Backup Bidder if so designated by the Debtors, |

<table>
<tr><td></td><td>subject to the terms of the asset purchase agreement entered into by the Backup Bidder.

The identity of a Backup Bidder and the amount and material terms of the Qualified Bid of such Backup Bidder shall be announced by the Debtors, at the conclusion of the Auction at the same time the Debtors announce the identity of the Successful Bidder related thereto.  Such Backup Bidder shall be required to keep its Qualified Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable until the earlier of (i) the closing of the Approved Other Assets Transaction (defined below) and (ii) 30 days from entry of the Sale Order; *provided*, if the Other Assets Stalking Horse Bidder is selected as the Backup Bidder, such date shall not be later than the Outside Date (as defined in the Other Assets Stalking Horse Agreement).  Each Backup Bidder's Deposit shall be held in escrow (which may be held in escrow by Pachulski Stang Ziehl & Jones LLP) until the earlier of (i) three (3) Business Days after the closing of the Approved Other Assets Transaction or (ii) 30 days from entry of the Sale Order, subject to the terms of the asset purchase agreement entered into by the Backup Bidder.

If a Successful Bidder fails to consummate the Approved Other Assets Transaction contemplated by its Successful Bid, the Debtors may select the Backup Bidder with respect to the Other Assets or sub-group of the Debtors' Other Assets or business as the Successful Bidder, and such Backup Bidder shall be deemed a Successful Bidder for all purposes. The Debtors will be authorized, but not required, to consummate all transactions contemplated by the Bid of such Backup Bidder without further order of the Court or notice to any party. In such case, the defaulting Successful Bidder's Deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available remedies against the defaulting Successful Bidder, including with respect to specific performance.</td></tr>
<tr><td>**Provisions Governing the Auction**
Local Rule 6004-1(c)(ii)</td><td>If the Debtors receive more than one Qualified Bid for the Other Assets, the Debtors will conduct the Auction to determine both the Successful Bidder and the Backup Bidder with respect to such Other Assets.  The Auction shall take place **February 28, 2023, at 10:00 a.m. (prevailing Eastern Time)**, at the offices of Pachulski Stang Ziehl & Jones LLP, 919 North Market Street, 17th Floor, Wilmington, DE. 19801 (or, following consultation with the Consultation Parties, by videoconference link to the live proceedings at this location provided that if the Debtors provide a videoconference link to such live proceedings, they will indicate when the Auction goes on the record and shall, upon request, provide a videoconference link to those parties participating in the Auction via videoconference).

The Debtors, in their discretion, may continue the Auction with respect to the Other Assets.

No later than the day before the Auction, the Debtors will notify all Qualified Bidders of the highest or otherwise best Qualified Bid, or, if multiple bids are received in respect of non-overlapping Other Assets, the highest or best Qualified Bid(s) received in relation to each group of Other Assets, in each case as determined in the Debtors' business judgment (each such bid, a "<u>Baseline Bid</u>"), and provide copies of the documents supporting the Baseline</td></tr>
</table>

31

Bid(s) to all Qualified Bidders and the Consultation Parties.  The determination of which Qualified Bid(s) constitutes the Baseline Bid(s) and which Qualified Bid(s) constitutes the Successful Bid(s) shall take into account any factors the Debtors, in consultation of the Consultation Parties, reasonably deem relevant to the value of the Qualified Bid(s) to the Debtors' estates, which may include, among other things: (a) the type and amount of Other Assets sought to be purchased in the Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Baseline Bid; (e) the tax consequences of such Qualified Bid; (f) the assumption of obligations, including contracts and leases; and (g) the cure amounts to be paid (collectively, the "Bid Assessment Criteria").

The Auction shall be conducted pursuant to the following procedures:

a.   The Debtors Shall Conduct the Auction

The Debtors and the Debtors' Professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the Baseline Bid(s).  All incremental Bids made thereafter shall be Overbids (as defined herein) and shall be made and received on an open basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders and the Consultation Parties.  The Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid(s), all Overbids, the Successful Bid(s), and any Backup Bid(s).

Only (i) Qualified Bidders, (ii) the Consultation Parties, and (iii) the members of the official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"), and each of their respective legal and financial advisors, shall be entitled to attend the Auction; provided, however, that any party who wishes to physically attend the Auction (other than (i) the parties set forth in above, and (ii) such other parties the Debtors deem appropriate), shall provide at least five (5) days' notice of such attendance prior to the Auction by sending an email to proposed counsel to the Debtors.

b.   Terms of Overbids

"Overbid" means any bid made at the Auction by a Qualified Bidder subsequent to the Debtors' announcement of the Baseline Bid.  Each Overbid must comply with the following conditions:

Minimum Overbid Increment.  The Debtors reserve the right, in an exercise of their business judgment and in the Debtors' sole discretion, to determine an Overbid to the initial Baseline Bid at the start of the Auction.

Conclusion of Each Overbid Round.  Upon the solicitation of each round of Overbids, the Debtors may announce a deadline (as the Debtors may, in their business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Debtors.

Overbid Alterations.   An Overbid may contain alterations, modifications,

additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Qualified Bid or Overbid, as determined in the Debtors' business judgment, but shall otherwise comply with the terms of these Other Assets Bidding Procedures.

No Round-Skipping.    Round-skipping, as described herein, is explicitly prohibited.  To remain eligible to participate in the Auction, in each round of bidding, (i) each Qualified Bidder must submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding and (ii) to the extent a Qualified Bidder fails to bid in such round of bidding or to submit a Bid in such round of bidding that is a higher or otherwise better offer than the immediately preceding Bid submitted by a Qualified Bidder in such round of bidding, as determined by the Debtors in their reasonable business judgment, such Qualified Bidder shall be disqualified from continuing to participate in the Auction for the Other Assets.

Announcing Highest Bid.  With respect to the Auction, the Debtors shall, subsequent to each Overbid Round Deadline, announce whether the Debtors in consultation with the Consultation Parties have identified (a) in the initial Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid in respect of the Other Assets that are the subject of the Auction or (b) in subsequent rounds, an Overbid as being higher or otherwise better than the Overbid previously designated by the Debtors as the prevailing highest or otherwise best Bid (the "Prevailing Highest Bid").  The Debtors shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Debtors as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid based on, among other things, the Bid Assessment Criteria.

c.  Consideration of Overbids

The Debtors reserve the right, in their business judgment, to adjourn the Auction one or more times to, among other things, (i) facilitate discussions between the Debtors and Qualified Bidders, (ii) allow Qualified Bidders to consider how they wish to proceed, and (iii) provide Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors, in their business judgment, may require that the Qualified Bidder has sufficient internal approvals and resources or has received sufficient non-contingent debt and/or equity funding commitments to consummate the proposed Other Assets Transaction at the prevailing Overbid amount.

d.  Closing the Auction

The Auction shall continue until there is only one Qualified Bid that the Debtors determine, in their discretion following consultation with the Consultation Parties, to be the highest or otherwise best Qualified Bid for the Other Assets.  Such Qualified Bid shall be declared the "Successful Bid," and such Qualified Bidder, the "Successful Bidder," at which point the Auction will be closed.  The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the

Auction to the then Prevailing Highest Bid.  Such acceptance by the Debtors of such Successful Bid is conditioned upon approval by the Court of such Successful Bid.  For the avoidance of doubt, nothing in these Other Assets Bidding Procedures shall prevent the Debtors from exercising their fiduciary duties under applicable law.  As soon as reasonably practicable after closing the Auction, the Debtors shall finalize definitive documentation to implement the terms of the Successful Bid, and, as applicable, cause such definitive documentation to be filed with the Court.

e.    No Collusion; Good Faith *Bona Fide* Offer

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that (i) it has not engaged in any collusion, within the meaning of section 363(n) of the Bankruptcy Code with respect to any bids submitted or not submitted in connection with the Sale, and (ii) its Qualified Bid is a good faith *bona fide* offer and it intends to consummate the proposed Other Assets Transaction if selected as the Successful Bidder.

B.    **Description of the Assets to Be Sold Pursuant to the Sale[7]**

29.    The pertinent terms of the Stalking Horse Agreement for the Stalking Horse Assets including the provisions required by Local Rule 6004-1(b), are summarized below.  The description below only summarizes certain provisions of the Stalking Horse Agreement.  The terms of the Stalking Horse Agreement control in the event of any inconsistency.

| **Sale to Insider** Local Rule 6004-1(b)(iv)(A) | The Stalking Horse Bidder is not an insider of the Debtors. Bidding Procedures Order, Recital N. |
|---|---|
| **Agreements with Management** Local Rule 6004-1(b)(iv)(B) | The Stalking Horse Agreement contemplates the ability of the Stalking Horse Bidder to solicit and hire certain of Debtors' employees. Stalking Horse Agreement, § 1.10. |
| **Releases** Local Rule 6004-1(b)(iv)(C) | The Stalking Horse Agreement provides for certain mutual releases between the Stalking Horse Bidder and the selling Debtors. Stalking Horse Agreement, § 5.3. |

---

[7] Unless otherwise noted, capitalized terms used in this section of the Motion have the meanings ascribed in the Stalking Horse Agreement.

34

| | |
|---|---|
| **Private Sale/No Competitive Bidding** Local Rule 6004-1(b)(iv)( D) | The Bidding Procedures Order provides for a potential auction if the Debtors receive at least another Qualified Bid (in addition to the Stalking Horse Agreement). Stalking Horse Agreement, § 4.3. |
| **Closing** Local Rule 6004-1(b)(iv)(E) | The Stalking Horse Agreement provides that the outside Closing Date is 60 days from the Petition Date. Stalking Horse Agreement, § 1.9. |
| **Deposit** Local Rule 6004-1(b)(iv)(F) | The Stalking Horse Agreement provides that the Stalking Horse Bidder is not required to post a deposit.  However, if the selling Debtors terminate the Stalking Horse Agreement pursuant to section 7.1(c) thereof, the Debtors are entitled to damages against the Stalking Horse Bidder through cancellation of DIP Obligations in an amount not to exceed $1.3 million. Stalking Horse Agreement, § 7.2. |
| **Interim Arrangements with Proposed Purchaser** Local Rule 6004-1(b)(iv)(G) | The Stalking Horse Agreement provides for a Transition Services Agreement ("TSA"). Stalking Horse Agreement, § 1.9(b). |
| **Use of Proceeds** Local Rule 6004-1(b)(iv)(H) | The Sale Order for the Stalking Horse Agreement provides that cash proceeds derived from the sale of the Stalking Horse Assets will be used by the Debtors to fund the Wind-Down Reserve in accordance with the provisions of the Interim Order and Final DIP Order. Sale Order, ¶39. |
| **Tax Exemption** Local Rule 6004-1(b)(iv)(I) | The Sale Motion and the Stalking Horse Agreement do not seek to have any taxes declared exempt under section 1146(a) of the Bankruptcy Code. |
| **Record Retention** Local Rule 6004-1(b)(iv)(J) | The TSA includes provisions on records retention and that the Debtors shall have the right to retain a copy of such records for archival, administrative and as necessary to comply with any applicable legal requirements. TSA, §1.6. |
| **Sale of Avoidance Actions** Local Rule 6004-1(b)(iv)(K) | The Stalking Horse Agreement provides that the Purchased Assets include "all Avoidance Actions, but solely to the extent the same relate to the Specified Assets, Assumed Liabilities, or any contract or business relationship between the Sellers and Purchaser or any of Purchaser's affiliates (including, without limitation, the Prior Transaction Agreement) (collectively, the "Included Avoidance Actions")." Stalking Horse Agreement, § 1.1. |

DOCS_DE:241695.10 31213/001

| | |
|---|---|
| **Requested Findings as to Successor Liability** Local Rule 6004-1(b)(iv)(L) | The Stalking Horse Agreement provides for a requirement that the Sale Order include free and clear language. Stalking Horse Agreement, § 5.4. The Sale Order includes findings and provisions providing that there is no successor liability.  Sale Order, Recital O and ¶13. |
| **Sale Free and Clear of Unexpired Leases** Local Rule 6004-1(b)(iv)(M) | The Sale Order includes provisions providing for the free and clear sale of interests.  Sale Order, ¶8. |
| **Credit Bid** Local Rule 6004-1(b)(iv)(N) | The Bidding Procedures Order provides for credit bidding rights. Bidding Procedures Order, ¶¶ 19-21 |
| **Relief From Bankruptcy Rule 6004(h)** Local Rule 6004-1(b)(iv)(O) | Any proposed Sale Order may provide, that notwithstanding Bankruptcy Rules 6004 and 6006, the Sale Order shall be effective and enforceable immediately upon entry. |
| **Assumed Liabilities** | The Stalking Horse Agreement provides for the assumption of certain Assumed Liabilities. Stalking Horse Agreement, § 1.4. |
| **Termination of Stalking Horse Agreement** | The Stalking Horse Agreement provides for certain termination rights by both the Stalking Horse Bidder and the Debtors. Stalking Horse Agreement, § 7.1. |
| **Conditions to Parties' Performance Obligations** | The Stalking Horse Agreement provides for conditions precedent to closing for both the Stalking Horse Bidder and the Debtors. Stalking Horse Agreement, § 6.1. |

30.     The Debtors have determined that, in light of their financial situation, liquidity needs, a more viable alternative to a sale of the Stalking Horse Assets does not exist and that the Stalking Horse Agreement is the best option, subject to the process under the Bidding Procedures.   The Debtors believe that the Sale of the Stalking Horse Assets and Sale of the Other Assets pursuant to this Motion optimizes value for their economic stakeholders.

**C.      Sale Noticing and Objection Procedures**

31.      The "Sale Process Key Dates and Deadlines" chart set forth above summarizes the proposed noticing and objection procedures and requirements with respect to service of the Sale Notice, the Sale Objection Deadline, and the deadline to publish the Sale Notice (collectively, the "Sale Noticing and Objection Procedures").  The Debtors submit that the Sale Noticing and Objection Procedures constitute adequate and reasonable notice of the key dates and deadlines and other important information regarding the sale process, including the Sale Objection Deadline and the Sale Hearing.  The Sale Notice also provides parties with information on how to obtain copies of the Motion, sets forth the Bid Deadline and the time and place of the Auction.  No later than three (3) Business Days after entry of the Bidding Procedures Order, the Debtors will serve the Sale Notice on the following parties: (i) counsel to any statutory committee of unsecured creditors appointed in the Chapter 11 Cases (the "Committee"); (ii) the U.S. Trustee; (iii) counsel to DIP Lenders and Stalking Horse Bidder; (iv) counsel to the Prepetition Lenders; (v) all known creditors of the Debtors (for whom identifying information and addresses are available to the Debtors); (vi) the Internal Revenue Service; (vii) all applicable federal, state, and local taxing authorities; (viii) all persons and entities known by the Debtors to have expressed an interest to the Debtors in the Stalking Horse Assets and Other Assets; (ix) all persons and entities known by the Debtors to have asserted any lien, claim, interest or encumbrance in the Stalking Horse Assets or Other Assets (for whom identifying information and addresses are available to the Debtors); (x) Counterparties to Potential Assumed Contracts; (xi) any governmental authority known to have a claim against the Debtors in the Chapter 11 Cases; (xii) the United States Securities and Exchange Commission; (xiii) the United States Attorney's Office for the District of Delaware; (xiv) United States Attorney General's Office for the District of Delaware; (xv) the Office of the Attorney

General and the Secretary of State in each state in which the Debtors operate; (xvi) all of the parties entitled to notice pursuant to Bankruptcy Rule 2002; and (xvii) all other parties as directed by the Court.

32.     The Debtors also propose that any objections to the Sale must be in writing, state, with specificity, the legal and factual bases thereof, be filed with the Court by the Sale Objection Deadline and be served on the following parties: (1) proposed counsel for the Debtors; (2) counsel to any statutory committee; (3) the United States Trustee; (4) counsel to DIP Lenders and Stalking Horse Bidder; (5) counsel to the Prepetition Lenders; and (6) any other party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Objection Notice Parties").

33.     The Sale Notice also provides information on how to obtain copies of the Motion and other sale related information directly from the case website maintained by the Debtors' claims agent (the "Case Management Website"), Kroll at https://cases.ra.kroll.com/GigaMonster.  Accordingly, the Debtors request that the Court approve the form of Sale Notice, substantially in the form attached to the Bidding Procedures Order as Exhibit 2, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 2002 and Local Rule 2002-1.

D.     **Potential Assumption and Assignment Notice and Proposed Assumption and Assignment Procedures for Contracts**

34.     At the closing of the Sale, the Debtors may seek to assume and assign to the Successful Bidder all or certain of the Potential Assumed Contracts.[8]  For any Potential Assumed

---

[8] The inclusion of any agreement in the list of Potential Assumed Contracts does not constitute an admission by the Debtors that such agreement actually constitutes an executory contract or unexpired lease under section 365 of the Bankruptcy Code, and the Debtors expressly reserve the right to challenge the status of any agreement included in the list of Potential Assumed Contracts.

Contract that is listed in the Contracts Schedule (defined below) for the Stalking Horse Assets, the Successful Bidder may decide to (i) assume and assign the Potential Assumed Contract or (ii) not to assume and assign the Potential Assumed Contract.

35.    The Debtors will serve the Potential Assumption and Assignment Notice substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u> on all Counterparties to Potential Assumed Contracts.  The Assumption Assignment Notice provides notice of, *inter alia*, the possible assumption and assignment of the Potential Assumed Contracts, the Debtors' proposed Cure Amounts, the applicable deadlines to object to the assumption and assignment of the Potential Assumed Contracts with respect to disputed Cure Amounts and/or on the basis of adequate assurance of future performance. The Potential Assumption and Assignment Notice also provides information on how to access the Bidding Procedures and Bidding Procedures Order from the Case Management Website.  Accordingly, the Debtors request that the Court approve the form of Potential Assumption and Assignment Notice, substantially in the form attached to the Bidding Procedures Order as <u>Exhibit 3</u>, and find that the Sale Noticing and Objection Procedures comply with the requirements of Bankruptcy Rule 6006 and Local Rule 2002-1.

36.    Except as set forth in the Stalking Horse Agreement, the Successful Bidder shall be responsible for payment of any Cure Amounts that may be owed to any counterparty to the Potential Assumed Contracts.  The Successful Bidder shall also be responsible for satisfying any requirements regarding adequate assurances of future performance that may be imposed under section 365(b)(1) of the Bankruptcy Code in connection with the proposed assignment of any Potential Assumed Contracts.  The Debtors propose that the Court make its determinations concerning adequate assurance of future performance under the Potential Assumed Contracts

39

pursuant to section 365(b)(1) of the Bankruptcy Code at the Sale Hearing, or as such other hearing as may be scheduled by the Court.

37.    The Debtors request that the Court approve the proposed Assumption and Assignment Procedures, including with respect objections by any Counterparty to:  the proposed assumption or assignment of its Potential Assumed Contract, the Debtors' proposed Cure Amounts with respect to such Potential Assumed Contract, if any, or the ability of the Stalking Horse Bidder or any other potential bidder to provide adequate assurance of future performance (collectively, an "Assumption and Assignment Objection").   The Debtors propose that all Assumption and Assignment Objections must be in writing, comply with the Bankruptcy Code, Bankruptcy Rules and Local Rules, state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amount the Counterparty believes is required to cure defaults (as that concept is contemplated by section 365(b)(1) of the Bankruptcy Code) under the relevant Potential Assumed Contract, and be filed by the Assumption and Assignment Objection Deadline.

38.    If a Counterparty files a timely Assumption and Assignment Objection, the Debtors propose that the Court hear and determine such objection either at the Sale Hearing or such other date that the Debtors and the Successful Bidder shall determine (subject to the Court's calendar).   If a Counterparty fails to file with the Court and serve a timely Assumption and Assignment Objection, the Counterparty shall be barred from asserting any such objection with regard to the assumption or assignment of its Potential Assumed Contract. In such event, notwithstanding anything to the contrary in the Potential Assumed Contract, or any other document, the Debtors request that the Cure Amounts set forth in the Potential Assumption and Assignment Notice be controlling and shall be the only amount necessary to cure outstanding defaults under the applicable Potential Assumed Contract under section 365(b)(1) of the

40

Bankruptcy Code arising out of or related to the Potential Assumed Contract following the assumption and assignment of the Potential Assumed Contract. Moreover, if a Counterparty fails to file with the Court and serve a timely Assumption and Assignment Objection, the Debtors request that the Counterparty be forever barred from asserting any cure or other pre-assignment amounts in excess of the Cure Amount set forth in the applicable Potential Assumption and Assignment Notice with respect to such Potential Assumed Contract against the Debtors, the Successful Bidder or the property of any of them.

39.     The Debtors may, subject to the agreement with the Stalking Horse Bidder or other successful bidder, add supplemental Potential Assumed Contracts to the schedule of Potential Assumed Contracts (the "Contracts Schedule") or modify previously-noticed Cure Amounts in accordance with the Stalking Horse Agreement or agreement with such other Successful Bidder. In such an event, the Debtors will promptly serve a supplemental assumption and assignment notice, by overnight mail and, if known, e-mail, on the applicable Counterparties (collectively, a "Supplemental Assumption and Assignment Notice"). Each Supplemental Assumption and Assignment Notice will include the same information with respect to the applicable Potential Assumed Contract as is required to be included in the Potential Assumption and Assignment Notice. The procedures listed herein for the Supplemental Assumption and Assignment Notice apply to any Sale(s) of the Stalking Horse Assets and the Other Assets.

40.     The Debtors propose that any Counterparty listed on a Supplemental Assumption and Assignment Notice whose Potential Assumed Contract is proposed to be assumed and assigned and was not included in the Potential Assumption and Assignment Notice may object to the proposed assumption or assignment of its Potential Assumed Contract, the Debtors' proposed Cure Amounts with respect to its Potential Assumed Contract, if any, or the ability of

41

the Successful Bidder to provide adequate assurance of future performance (collectively, a "Supplemental Assumption and Assignment Objection"). The Debtors request that all Supplemental Assumption and Assignment Objections must state, with specificity, the legal and factual bases thereof, including, if applicable, the Cure Amounts the Counterparty believes is required to cure defaults (as that concept is contemplated by section 365 of the Bankruptcy Code) under the relevant Potential Assumed Contract and be filed by no later than ten (10) calendar days after the date of service of such Supplemental Assumption and Assignment Notice. If a Potential Assumed Contract was listed in the Potential Assumption and Assignment Notice and the previously-stated Cure Amount is modified in the Supplemental Assumption and Assignment Notice, the Counterparties to such Potential Assumed Contract may file a Supplemental Assumption and Assignment Objection only if such objection is to the modified Cure Amount.

41.      If a Counterparty fails to file with the Court and serve a timely Supplemental Assumption and Assignment Objection, the Counterparty shall be barred from asserting any such objection with regard to the assumption or assignment of its Potential Assumed Contract. In such event, notwithstanding anything to the contrary in the Potential Assumed Contract, or any other document, the Debtors request that the Cure Amounts set forth in the Supplemental Assumption and Assignment Notice be controlling and shall be the only amount necessary to cure outstanding defaults under the applicable Potential Assumed Contract under section 365(b)(1) of the Bankruptcy Code arising out of or related to the Potential Assumed Contract following the assumption and assignment of the Potential Assumed Contract. Moreover, if a Counterparty fails to file with the Court and serve a timely Supplemental Assumption and Assignment Objection, the Debtors request that the Counterparty be forever barred from asserting any cure or other pre-assignment amounts in excess of the Cure Amount set forth in the applicable Supplemental

42

Assumption and Assignment Notice with respect to such Potential Assumed Contract against the Debtors, the Successful Bidder or the property of any of them.

42.     Any Successful Bidder for the Stalking Horse Assets or the Other Assets will be responsible for providing evidence of "adequate assurances of future performance" to the extent required in connection with the assumption and assignment of any Potential Assumed Contract.

43.     Finally, the Debtors request that, following any Auction, if the Stalking Horse Bidder is not the Successful Bidder, each Counterparty may raise any objections to such Successful Bidder's ability to provide adequate assurances of future performance under section 365(b)(1) at the Sale Hearing provided that any objections relating to (i) the ability of the Stalking Horse Bidder to provide adequate assurance of future performance with respect to any Potential Assumed Contract or (ii) the Cure Amounts that must be cured by either the Stalking Horse Bidder or any Successful Bidder that is not the Stalking Horse Bidder with respect to the Potential Assumed Contract, must be filed by Assumption and Assignment Objection Deadline as provided above.

44.     The Debtors submit that the proposed procedures governing the assumption and assignment of Potential Assumed Contracts are reasonable and should be approved.

**E.     Bid Protections for Potential Stalking Horse Bidder(s) for Other Assets**

45.     The Debtors have not selected an Other Assets Stalking Horse Bidder for the Other Assets, but seek the authority to designate one or more Other Assets Stalking Horse Bidders in accordance with the terms of the Bid Procedures Order and provide such bidders with payment of a breakup fee and expense reimbursement not to exceed in the aggregate more than

43

3% of the cash amount of any sale and shall be subject to entry of an order approving such bid protections by the Court (together, the "Other Assets Breakup Fee and Expense Reimbursement"). The Debtors propose that they be able to seek approval of the Other Assets Breakup Fee and Expense Reimbursement, either prior to or after any Auction, by filing a motion seeking a hearing on shortened notice.

46.    The Other Assets Breakup Fee and Expense Reimbursement, if any, shall be payable to the designated Other Assets Stalking Horse Bidder only if: (i) the Other Assets Stalking Horse Bidder is not approved by the Court as the purchaser of the Other Assets on which it bid, (ii) the Other Assets Stalking Horse Bidder is not in default of its obligations under its Other Assets Stalking Horse Agreement with the Debtors, and (iii) the assets on which the Other Assets Stalking Horse Bidder bid are thereafter sold to a Successful Bidder(s) at the Auction for consideration in excess of the purchase price provided for in the Other Assets Stalking Horse Agreement notwithstanding the Other Assets Stalking Horse Bidder's willingness and ability to consummate the transactions contemplated by its Other Assets Stalking Horse Agreement. Such payments shall be made to the designated Other Assets Stalking Horse Bidder solely out of the proceeds of closing with the Successful Bidder(s) of the Other Assets on which the Other Assets Stalking Horse Bidder bid.

47.    Payment of the Other Assets Breakup Fee and Expense Reimbursement (to the extent payable under the terms of any asset purchase agreement with an Other Assets Stalking Horse Bidder (each, a "Other Assets Stalking Horse Agreement") and Bidding Procedures Order) shall be a component of any Qualified Bid submitted by a Qualified Bidder (other than by a Other Assets Stalking Horse Bidder). The Other Assets Breakup Fee and Expense Reimbursement shall

be payable as provided for pursuant to the terms of the Bidding Procedures Order, the Other Assets Stalking Horse Agreement, and Interim DIP Order.

48.     The Debtors may solicit a stalking horse bid and a stalking horse agreement from one or more interested parties for one or more groups of the Other Assets.  On or before **February 20, 2023**, to the extent that the Debtors have selected a stalking horse bidder for the Other Assets, the Debtors will announce the designation of such stalking horse bidder by filing an "Other Assets Stalking Horse Bid Notice" on the Court's docket identifying the stalking horse bidder and the Other Assets that are the subject of the stalking horse bid, and attaching any agreement accompanying the stalking horse bid.  The Other Assets Stalking Horse Bid Notice shall be filed no later than two (2) business days prior to the date the Debtors seek to hold a hearing for approval of the bid protections, or as close to such deadline as is reasonably practicable under the circumstances in light of the shortened notice.

## ARGUMENT

A.     **The Bidding Procedures Are Fair, Appropriate, and in the Best Interests of the Debtors and Their Stakeholders**

49.     The Bidding Procedures are specifically designed to promote what courts have deemed to be the paramount goal of any proposed sale of a debtor's property—maximizing the value of sale proceeds received by the estate.  *See Burtch et al. v. Ganz, et al. (In re Mushroom Co.)*, 382 F.3d 325, 339 (3d Cir. 2004) (finding that debtor "had a fiduciary duty to protect and maximize the estate's assets"); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003) (debtor has "fiduciary duty to maximize the value of the bankruptcy estate"); *In re Food Barn Stores, Inc.*, 107 F.3d 558, 564- 65 (8th Cir. 1997) ("a primary objective of the Code [in asset sales is] to enhance the value of the estate at hand.") (citing

45

*Metro. Airports Comm'n v. Northwest Airlines, Inc. (In re Midway Airlines, Inc.)*, 6 F.3d 492, 494

(7th Cir. 1993) ("Section 365 . . . advances one of the Code's central purposes, the maximization

of the value of the bankruptcy estate for the benefit of creditors.")).  Courts uniformly recognize

that procedures established for the purpose of enhancing competitive bidding are consistent with

the fundamental goal of maximizing the value of a debtor's estate.  *See Calpine Corp. v. O'Brien*

*Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999) (noting

that bidding procedures that promote competitive bidding provide a benefit to a debtor's estate);

I*n re Fin'l News Network, Inc.*, 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1992) ("[C]ourt-imposed

rules for the disposition of assets . . .  [should] provide an adequate basis for comparison of offers,

and [should] provide for fair and efficient resolution of bankrupt estates.").

50.     The Bidding Procedures provide for an orderly, uniform and appropriately

competitive process through which interested parties may submit offers in connection with the

Sale of the Stalking Horse Assets and Sale of Other Assets.  The Debtors, with the assistance of

their advisors, have structured the Bidding Procedures to promote active bidding by interested

parties and to confirm the highest or otherwise best offer reasonably available for the Stalking

Horse Assets and Other Assets.  The Bidding Procedures will allow the Debtors to conduct any

Auction in a fair and transparent manner that will encourage participation by financially capable

bidders with demonstrated ability to consummate a timely sale or sales.

51.     Courts in this District and other districts routinely approve procedures

substantially similar to the proposed Bidding Procedures. *See*, *e.g.*, *In re RTI Holding Co., LLC*,

Case No. 20-12456 (JTD) (Bankr. D. Del. Nov. 20, 2020); *In re BL Restaurants Holding, LLC*,

Case No. 20-10156 (MFW) (Bankr. D. Del. Feb. 28, 2020); *In re Forever 21, Inc.*, Case No. 19-

12122 (KG) (Bankr. D. Del. Feb. 4, 2020); *In re Consolidated Infrastructure Group, Inc.*, No. 19-

10165 (BLS) [Docket No. 151] (Bankr. D. Del. Apr. 24, 2019) (authorizing designation of stalking horse bidders and provision of bid protections without further hearing with consent of United States Trustee and consultation parties)**;** *In re Hobbico, Inc.*, No. 18-10055 (KG) [Docket No. 243] (Bankr. D. Del. Mar. 14, 2018) (same); *In re California Proton Treatment Center, LLC*, No. 17-10477 (LSS) [Docket No. 158] (Bankr. D. Del. Apr. 12, 2017) (same); *In re United Road Towing, Inc.*, No. 17-10249 (LSS) [Docket No. 131] (Bankr. D. Del. Mar. 6, 2017) (same); *In re Constellation Enterprises LLC*, No. 16-11213 (CSS) [Docket No. 260] (Bankr. D. Del. Jun. 15, 2016) (same); *See also, e.g., In re Mabvax Therapeutics Holdings, Inc.*, No. 19-10603 (CSS) [Docket No. 78] (Bankr. D. Del. Apr. 8, 2019) (approving bidding procedures with a bid deadline 18 days after entry of bidding procedures order); *In re Things Remembered, Inc.*, No. 19-10248 (CSS) [Docket No. 100] (Bankr. D. Del. Mar. 13, 2019) (approving bidding procedures with bid deadline 7 days after entry of order and auction scheduled for 26 days after entry of order); *In re Charlotte Russe Holding, Inc.*, No. 19-10210 (LSS) [Docket No. 199] (Bankr. D. Del. Feb. 21, 2019) (approving bidding procedures with bid deadline 10 days after entry of order and auction scheduled for 29 days after entry of order); *In re Maurice Sporting Goods, Inc.*, No. 17-12481 (CSS) [Docket No. 125] (Bankr. D. Del. Dec. 12, 2017) (entering bidding procedures order 22 days after petition date, approving bid deadline 10 days after entry of order); *In re Golfsmith Int'l Holdings, Inc.*, No. 16-12033 (LSS) [Docket No. 196] (Bankr. D. Del. Oct. 6, 2016) (approving bidding procedures with a bid deadline 11 days after entry of order and auction scheduled for 13 days after entry of order).

52.     Accordingly, the Bidding Procedures should be approved, not just because they are aligned with the circumstances of the Debtors' chapter 11 cases, but also because they are consistent with procedures approved by courts in this District in cases of similarly-situated debtors

47

and are otherwise reasonable, appropriate, and in the best interests of the Debtors, their estates and all parties in interest.

**B.      The Proposed Bid Protections Are Necessary, Reasonable, and Appropriate**

53.     As indicated above, the Debtors hereby request that the Court approve the Break-Up Fee and Expense Reimbursement.  The Debtors and Stalking Horse Bidder believe that the amount of the Break-Up Fee is reasonable, given the benefits to the Debtors' estates of having a "stalking horse" bidder by virtue of the definitive Stalking Horse Agreement, and the risk to the Stalking Horse Bidder that a third-party offer may ultimately be accepted, and that approval of the Break-Up Fee and Expense Reimbursement under the terms of the Stalking Horse Agreement are necessary to preserve and enhance the value of the Debtors' estates.  The Debtors believe that the agreement to pay the Break-Up Fee and Expense Reimbursement on the terms of the Stalking Horse Agreement is necessary to induce the Debtors to enter into the transactions encompassed by the Stalking Horse Agreement and sets an appropriate floor for the value of the Stalking Horse Assets, thus enabling the Debtors to obtain the highest and best possible price for the Stalking Horse Assets.  Finally, the Debtors believe that the Break-Up Fee and Expense Reimbursement are each fair and reasonable under the circumstances of these cases.

54.     The Bidding Procedures are reasonably calculated to encourage a buyer to submit a final bid within the range of reasonably anticipated values.  The Break-Up Fee will encourage competitive bidding and will potentially lead to further competition and the establishment of a baseline against which higher or otherwise better offers can be measured.  The Debtors believe that the Expense Reimbursement is also reasonable under the circumstances in light of the expenses incurred by the Stalking Horse Bidder.

48

55.     Providing a stalking horse bidder with certain bidding protections in connection with a sale of significant assets under section 363 of the Bankruptcy Code has become standard practice in chapter 11 cases.   In the Third Circuit, break-up fees and expense reimbursements are considered administrative expenses and must be necessary to preserve the value of a debtor's estate.   *See Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999).   In *O'Brien*, the Third Circuit provided two examples of a potential benefit accruing from the payment of a break-up fee.   *See id.*   First, a benefit to the estate may arise if, "assurance of a break-up fee promoted [a] more competitive bidding [process], such as by inducing a bid that otherwise would not have been made and without which bidding would have been limited." *Id.* at 537.   Second, bidding protections encourage potential bidders to evaluate thoroughly a debtor's value, thereby "increasing the likelihood that the price at which the debtor is sold will reflect its true worth." *Id.*   Termination and similar fees are effective mechanisms for protecting bidders in connection with an asset sale and can be "important tools to encourage bidding and to maximize the value of the [d]ebtors' assets." *Official Comm. of Subordinated Bondholders v. Integrated Res., Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993).   Put differently, these bidding protections enable a debtor to assure a sale to a contractually committed bidder at a price the debtor believes is fair and reasonable, while providing the debtor with the opportunity to generate even greater value through an auction process.   *See In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may be "legitimately necessary to convince a white knight to enter the bidding by providing some form of compensation for the risks it is undertaking.") (citation omitted) (internal quotation marks omitted).

56.     In *O'Brien*, the Third Circuit reviewed the following nine factors set forth by the lower court as relevant in deciding whether to award a break-up fee:

a.      the presence of self-dealing or manipulation in negotiating the break-up fee;

b.       whether the fee harms, rather than encourages, bidding;

c.      the reasonableness of the break-up fee relative to the purchase price;

d.      whether the unsuccessful bidder placed the estate property in a "sale configuration mode" to attract other bidders to the auction;

e.      the ability of the request for a break-up fee to serve to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders or attract additional bidders;

f.      the correlation of the fee to a maximum value of the debtor's estate;

g.      the support of the principal secured creditors and creditors' committees of the break-up fee;

h.      the benefits of the safeguards to the debtor's estate; and

i.      the substantial adverse impact of the break-up fee on unsecured creditors, where such creditors are in opposition to the break-up fee.

*See In re O'Brien Envtl. Energy, Inc.*, 181 F.3d at 536.

57.     As set forth above, the Bid Protections are necessary to preserve the value of the Debtors' estates because they will enable the Debtors to secure an adequate floor for the Stalking Horse Assets and to therefore insist that competing bids be materially higher or otherwise better than as provided under the Stalking Horse Agreement—a clear benefit to the Debtors' estates.

58.     The Debtors submit that the Bid Protections for the Stalking Horse Agreement reflect market terms for a transaction of this size and nature. *See, e.g.*, *In re The Rockport Co., LLC*, (No. 18-11145) (LSS) [Docket No. 146] (Bankr. D. Del. June 5, 2018) (approving break-up fee and expense reimbursement equal to approximately 4.3% of the purchase

price); *In re Orexigen Therapeutics, Inc.*, (No. 18-10518) (KG) [Docket No. 231] (Bankr. D. Del. April 23, 2018) (approving break-up fee and expense reimbursement equal to approximately 7.3% of the purchase price); *In re The Weinstein Company Holdings LLC*, (No. 18-10601) (MFW) [Docket No. 190] (Bankr. D. Del. Apr. 6, 2018) (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re ATopTech, Inc.*, (No. 17-10111) (MFW) [Docket No. 234] (Bankr. D. Del. Apr. 21, 2017) (approving break-up fee and expense reimbursement equal to approximately 5% of the purchase price); *In re Phoenix Brands LLC*, (No. 16-11242) (BLS) [Docket No. 136] (Bankr. D. Del. June 8, 2016) (approving break-up fee and expense reimbursement greater than 5% of the purchase price).

59.     Most importantly, absent approval of the Bid Protections, the Debtors may lose the opportunity to obtain the highest and otherwise best offers for the Stalking Horse Assets and Other Assets through the Auction process.  If the Court does not approve the proposed Bid Protections, the success of the sale process could be compromised, the competitive nature of any Auction could be undermined, and the estates could suffer accordingly.  The Bid Protections were negotiated at arm's length and in good faith with the Stalking Horse Bidder.  Moreover, the Stalking Horse Bidder is not an "insider" or "affiliate" of any of the Debtors, as those terms are defined in section 101 of the Bankruptcy Code, and no common identity of incorporators, directors, officers, or controlling stockholders exists between the Stalking Horse Bidder and the Debtors. Accordingly, the Debtors request that the Court approve the Bid Protections pursuant to and in accordance with the terms of the Bidding Procedures Order and the Stalking Horse Agreement, as such bid protections will be in the best interest of the Debtors and their estates.

C.     **Approval of the Proposed Sale Is Warranted Under Section 363 of the Bankruptcy Code**

51

60.     Section 363 of the Bankruptcy Code provides, in relevant part, that the debtor may, "after notice and a hearing . . . use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  While the Bankruptcy Code does not specify the appropriate standard for approving the sale of property under section 363, courts routinely authorize a sale if it is based upon the debtor's sound business judgment.  *See*, *e.g.*, *Meyers v. Martin (In re Martin)*, 91 F.3d 389, 395 (3d Cir. 1996) (citing *In re Schipper*, 933 F.2d 513 (7th Cir. 1991)); *In re Chateaugay Corp.*, 973 F.2d 141, 143 (2d Cir. 1992); *Stephen Indus., Inc. v. McClung*, 789 F.2d 386, 390 (6th Cir. 1986); *Comm. of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1071 (2d Cir. 1983).

61.     Courts typically consider the following factors in determining whether a sale under section 363 of the Bankruptcy Code passes muster under the business judgment standard:  (a) whether a sound business justification exists for the sale; (b) whether adequate and reasonable notice of the sale was provided to interested parties; (c) whether the sale will produce a fair and reasonable price for the property; and (d) whether the parties have acted in good faith. *See In re Decora Indus., Inc.*, No. 00-4459, 2002 WL 32332749, at *2 (D. Del. May 20, 2002) (adopting *Lionel* factors) (citing *Guilford Transp. Indus., Inc. v. Delaware & Hudson Ry. Co. (In re Delaware & Hudson Ry. Co.)*, 124 B.R. 169, 176 (D. Del. 1991) (listing non-exclusive factors that may be considered by a court in determining whether there is a sound business purpose for an asset sale)).  As such, it follows that when a debtor demonstrates a valid business justification for a decision, the presumption is that the business decision was made "on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res., Inc.)*, 147 B.R. 650, 656 (S.D.N.Y. 1990) (quoting *Smith v. Van Gorkom*, 488 A.2d 858, 872 (Del. 1985)).

### D.    The Debtors Have Demonstrated a Sound Business Justification for the Proposed Sale

62.    A sound business justification exists where the sale of a debtor's assets are necessary to preserve the value of the debtor's estate for the benefit of creditors and interest holders.  *See*, *e.g.*, *Cumberland Farms Diary, Inc. v. Abbotts Dairies of Penn., Inc. (In re Abbotts Diaries of Penn., Inc.)*, 788 F.2d 143 (3d Cir. 1986); *In re Delaware & Hudson Ry. Co.*, 124 B.R. at 179 (approving the sale of the debtor as a going concern upon a showing of "a valid business purpose . . . ."); *In re Lionel Corp.*, 722 F.2d at 1071 (adopting a rule "requiring that a judge determining a § 363(b) application expressly find from the evidence presented before him . . . a good business reason to grant" the sale).

63.    As set forth above, a strong business justification exists for a sale of the Stalking Horse Assets and Other Assets.  In light of the Debtors' financial condition, an orderly but expeditious Sale of the Stalking Horse Assets and Other Assets is critical to maximizing recoveries for all of the Debtors' stakeholders.  Moreover, a timely closing of the Sale(s) are necessary under the Interim DIP Order, without which Debtors would not have been able to execute an orderly and value-maximizing sale process or fund these chapter 11 cases.

### E.    The Proposed Sale(s) Will Yield a Fair and Reasonable Purchase Price for the Assets

64.    As set forth above, the Debtors believe that the Sale(s) governed by the Bidding Procedures will yield a fair and reasonable price for the Stalking Horse Assets and Other Assets.  The Bidding Procedures were designed to facilitate a robust and competitive bidding process and provide significant flexibility to do so.  The Debtors also constructed the Bidding Procedures to promote transparency, good faith and fairness throughout the entire sale process within the parameters of the Milestones.  The Bidding Procedures provide an appropriate

framework for the Debtors to review, analyze and compare one or more bids for the Stalking Horse Assets and Other Assets and to engage with bidders on an arm's length basis to work to improve the quality of their bids for the benefit of all parties in interest.

65.     A sale or sales governed by the Bidding Procedures undoubtedly will serve the important objectives of obtaining not only a fair and reasonable purchase price for the Stalking Horse Assets and Other Assets, but also the highest or best value for the Stalking Horse Assets and Other Assets.  This is a critical feature of the Bidding Procedures, which will inure to the benefit of all parties in interest in the chapter 11 cases.

**F.     The Successful Bidder(s) Should be Entitled to the Protections of Section 363(m) of the Bankruptcy Code.**

66.     Section 363(m) of the Bankruptcy Code is designed to protect the sale of a debtor's assets to a good-faith purchaser.  Specifically, section 363(m) provides the following:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal.

11 U.S.C. § 363(m).  Section 363(m) embodies the "policy of not only affording finality to the judgment of the bankruptcy court, but particularly to give finality to those orders and judgments upon which third parties rely." *See Reloeb Co. v. LTV Corp. (In re Chateaugay Corp.)*, No. 92 Civ. 7054 (PKL), 1993 U.S. Dist. LEXIS 6130, at *9 (S.D.N.Y. May 10, 1993) (quoting *Abbotts Dairies*, 788 F.2d at 147)); *see also Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal").

54

67.     While the Bankruptcy Code does not define "good faith," the Third Circuit has held that indicia of bad faith typically include "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders." *Abbotts Diaries*, 788 F.2d 143, 147 (3d Cir. 1986) (quoting *Hoese Corp. v. Vetter Corp. (In re Vetter Corp.)*, 724 F.2d 52, 55 (7th Cir. 1983)) (other citations omitted); *see also Kabro Assoc. of West Islip, L.L.C. v. Colony Hill Assocs. (In re Colony Hill Assocs.)*, 111 F.3d 269, 276 (2d Cir. 1997).

68.     As set forth above, the Bidding Procedures were designed with the goal of producing a fair and transparent sale process that will yield the highest or otherwise best value for the Stalking Horse Assets and Other Assets. The Stalking Horse Bidder has engaged separate counsel to represent its interests in the negotiation of the Stalking Horse Agreement and in the sale process generally for the Stalking Horse Assets. The Debtors submit, and the testimony presented at the Sale Hearing will demonstrate, that the terms and conditions of the Sale(s) will have been negotiated by the Debtors and the Stalking Horse Bidder or Successful Bidder for the Stalking Horse Assets and Other Assets, as applicable, at arm's length and in good faith, with the assistance of the Debtors' professional advisors, and that the parties did not engage in any conduct that would cause or permit the Sale to be avoided under section 363(n) of the Bankruptcy Code.

69.     The Debtors submit that the Stalking Horse Bidder is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code.  Further, as set forth above, the Bidding Procedures are designed to produce a fair and transparent competitive bidding process. Each Qualified Bidder participating in the Auction will be required confirm that it has not engaged in any collusion with respect to the bidding or the sale of any of the Stalking Horse Assets or the Other Assets.  Any purchase agreement with a Successful Bidder executed by the Debtors

will be negotiated at arm's length and in good faith.  As such, the Debtors request a finding that any Successful Bidder (including the Stalking Horse Bidder if it is the Successful Bidder) is a good-faith purchaser and is entitled to the full protections afforded under section 363(m) of the Bankruptcy Code.

70.     In view of the foregoing, the Debtors have demonstrated that the proposed sale of their Stalking Horse Assets and Other Assets should be approved as a sound exercise of their business judgment.

### G.     The Sale of the Assets Free and Clear of Liens, Claims, Interests and Encumbrances Is Appropriate under Section 363(f) of the Bankruptcy Code

71.     In the interest of attracting the best offers, the Court should authorize the Debtors to sell the Stalking Horse Assets and Other Assets free and clear of any liens, claims, interests and other encumbrances, in accordance with section 363(f) of the Bankruptcy Code. Section 363(f) of the Bankruptcy Code authorizes a debtor to sell assets free and clear of all liens, claims, interests and encumbrances of an entity other than the estate if any one of the following conditions is met:

> (a)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;
>
> (b)     such entity consents;
>
> (c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (d)     such interest is in bona fide dispute; or
>
> (e)     such entity could be compelled, in legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1) – (5); *see also In re Kellstrom Indus., Inc.*, 282 B.R. 787, 793 (Bankr. D. Del. 2002) ("Section 363(f) is written in the disjunctive, not the conjunctive, and if any of the five

conditions are met, the debtor has the authority to conduct the sale free and clear of all liens.");

*Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot)*, 94 B.R. 343, 345 (E.D. Pa. 1988) (same);

*Mich. Emp't Sec. Comm'n v. Wolverine Radio Co. (In re Wolverine Radio Co.)*, 930 F.2d 1132,

1147 n.24 (6th Cir. 1991) (same); *In re Zeigler*, 320 B.R. 362, 381 (Bankr. N.D. Ill. 2005) (same);

*In re Bygaph, Inc.*, 56 B.R. 596, 606 n.8 (Bankr. S.D.N.Y. 1986) (same).

72.    Section 363(f) of the Bankruptcy Code is supplemented by section 105(a)

of the Bankruptcy Code, which provides that "[t]he Court may issue any order, process, or

judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]."

11 U.S.C. §105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White*

*Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales

[free and clear of claims] is within the court's equitable powers when necessary to carry out the

provisions of [the Bankruptcy Code].").

73.    The Debtors submit, and to the extent necessary will demonstrate at the Sale

Hearing, that the sale of the Stalking Horse Assets and Other Assets free and clear of all liens,

claims, interests, and encumbrances will satisfy one or more of the requirements under section

363(f) of the Bankruptcy Code.  The proposed Sale(s) satisfies one or more of the requirements

under section 363(f) of the Bankruptcy Code to permit a "free and clear" sale of the Stalking Horse

Assets and Other Assets.  For example, the Stalking Horse Assets and Other Assets are subject to

the liens of the Debtors' prepetition and postpetition secured lenders, each of whom either have

consented or are expected to consent to the Sale(s).  Additionally, any parties with junior liens on

the Stalking Horse Assets and Other Assets can be compelled to accept a money satisfaction of

their interests, but also would be adequately protected by such liens attaching to the proceeds of

the applicable Sale in the order of their respective priority.

74.     Moreover, the Debtors will send the Sale Notice to any other purported prepetition lienholders. If such lienholders do not object to the proposed Sale(s), then their consent should reasonably be presumed. Accordingly, the Debtors request that, unless a party asserting a prepetition lien, claim, or encumbrance on any of the Stalking Horse Assets and Other Assets timely objects to this Motion as it relates to the Sale (and not the Bidding Procedures), such party shall be deemed to have consented to any Sale approved at the Sale Hearing. *See Hargave v. Twp. of Pemberton*, 175 B.R. 855, 858 (Bankr. D.N.J. 1994) (by not objecting to a sale motion, a creditor is deemed to consent to the relief requested therein). Accordingly, the Debtors request that the Court authorize the sale of the Stalking Horse Assets and Other Assets free and clear of any liens, claims, interests, and encumbrances, in accordance with section 363(f) of the Bankruptcy Code, subject to such liens, claims, interests, and encumbrances attaching to the proceed thereof in the same order of relative priority, with the same validity, force, and effect as prior to such.

75.     It is also appropriate to sell the Stalking Horse Assets and Other Assets free and clear of successor liability relating to the Debtors' business. Such limitations on successor liability ensure that the Successful Bidder is protected from any claims or lawsuits premised on the theory that the Successful Bidder is the successor in interest to one or more of the Debtors. Courts have consistently held that a buyer of a debtor's assets pursuant to a section 363 sale takes free and clear from successor liability relating to the debtor's business. *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *In re Leckie Smokeless Coal Co.*, 99 F.3d 573, 585 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *In re Ormet*, 2014 WL 3542133 (Bankr. D. Del. July 17, 2014) (permitting a sale free and clear of successor liability claims relating to an under-

funded pension plan); *In re Insilco Techs., Inc.*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory).

76.    The purpose of a sale order purporting to authorize the transfer of assets free and clear of all claims, liens, and encumbrances would be defeated if claimants could thereafter use the transfer as a basis to assert claims against a purchaser arising from a seller's pre-sale conduct. Moreover, without such assurances, potential bidders may choose not to participate in the Auction or, if they did, would submit reduced bid amounts. To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Stalking Horse Assets or Other Assets free and clear.

77.    Accordingly, the Debtors request that the Court authorize the sale of any of the Stalking Horse Assets or Other Assets free and clear of any liens, claims, interests and encumbrances, to the fullest extent permitted by section 363(f) of the Bankruptcy Code.

**H.    The Debtors' Assumption and Assignment of Executory Contracts and Unexpired Leases Are Appropriate under Section 365 of the Bankruptcy Code**

78.    Section 365(a) of the Bankruptcy Code provides that a debtor "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a).    Courts employ the business judgment standard in determining whether to approve a debtor's decision to assume or reject an executory contract or an unexpired lease.    *See*, *e.g.*, *In re Market Square Inn, Inc.*, 978 F.2d 116, 121 (3d Cir. 1992) (finding that assumption or rejection of a lease "will be a matter of business judgment . . . ."); *In re HQ Global Holdings, Inc.*, 290 B.R. 507, 511 (Bankr. D. Del. 2003) (finding debtor's decision to assume or reject executory contract is governed by business judgment standard and can only be overturned

if decision was product of bad faith, whim or caprice).  In this context, the business judgment test only requires that a debtor demonstrate that assumption or rejection of an executory contract or unexpired lease benefits the estate.  *See Sharon Steel Corp. v. Nat'l Fuel Gas Distrib. Corp.*, 872 F.2d 36, 40 (3d Cir. 1989); *Wheeling-Pittsburgh Steel Corp. v. West Penn Power Co., (In re Wheeling-Pittsburgh Steel Corp.)*, 72 B.R. 845, 846 (Bankr. W.D. Pa. 1987).

79.    The proposed Sale(s) will provide a Successful Bidder with the opportunity to designate the Potential Assumed Contracts for assumption and assignment.  Assumption and assignment of any Potential Assumed Contracts is an exercise of the Debtors' sound business judgment because the transfer of such contracts in connection with any Sale is an essential element in the Debtors' ability to maximize the value of the Stalking Horse Assets—particularly so when a Potential Assumed Contract is integral to the ownership or operation of the Stalking Horse Assets to be acquired.  Further, the ability to assume and assign necessary Potential Assumed Contracts will increase the likelihood that the Debtors will be able to sell the Stalking Horse Assets, thereby avoiding needless value-destruction through a liquidation of otherwise marketable operating assets. To the extent the Sale of the Other Assets implicate Potential Assumed Contracts, the same Assumption and Assignment Procedures will apply.

80.    The consummation of any Sale involving the assignment of a Potential Assumed Contract will be contingent upon the Debtors' compliance with the applicable requirements of section 365 of the Bankruptcy Code.  Section 365(b)(1) requires that any outstanding defaults under the Potential Assumed Contracts to be assumed be cured or that the Debtors provide adequate assurance that such defaults will be promptly cured.  *See* 11 U.S.C. § 365(b)(1).  The Debtors' assumption and assignment of any Potential Assumed Contracts will be dependent upon payment of Cure Amounts and effective only upon the closing of an applicable

Sale.  As set forth above, subject to the Court's approval, the Debtors will file with the Court and serve on each Counterparty a Potential Assumption and Assignment Notice setting forth the Debtors' calculation of the Cure Amounts for each Potential Assumed Contract that could be assumed in connection with a Sale.

81.    Section 365(f) of the Bankruptcy Code requires, in part, that the assignee of any executory contract provide "adequate assurance of future performance ... whether or not there has been a default in such contract." 11 U.S.C. § 365(f)(2).  While the Bankruptcy Code does not define "adequate assurance," courts have held that what constitutes "adequate assurance" should be determined by "a practical, pragmatic construction based upon the facts and circumstances of each case." *See Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.)*, 103 B.R. 524, 538 (Bankr. D. N.J. 1988) (quoting *In re Bon Ton Rest. & Pastry Shop, Inc.*, 53 B.R. 789, 803 (Bankr. N.D. Ill. 1985)); *see also In re Alipat, Inc.*, 36 B.R. 274, 276-77 (Bankr. E.D. Mo. 1984) (recognizing that the term adequate assurance "borrowed its critical language ... from Section 2609 of the Uniform Commercial Code" which "suggest[s] that adequate assurance is to be defined by commercial rather than legal standards . . . [and] factual considerations.").  While no single standard governs every case, adequate assurance "will fall considerably short of an absolute guarantee of performance."  *In re Carlisle Homes, Inc.*, 103 B.R. at 538 (citations omitted); *In re Natco Indus., Inc.*, 54 B.R. 436, 440 (Bankr. S.D.N.Y. 1985) (adequate assurance of future performance does not mean absolute assurance that debtor will thrive and pay rent).

82.    Adequate assurance may be provided by demonstrating, among other things, the assignee's financial health and experience in managing the type of enterprise or property assigned.  *See, e.g., In re Bygaph, Inc.*, 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986)

(finding that industrial expertise, past success in running a similar business, and financial wherewithal satisfied the adequate assurance requirement of section 365 of the Bankruptcy Code).

83.     The Bidding Procedures expressly specify that for a bid to qualify as a Qualified Bid a prospective bidder must include with its bid adequate assurance information regarding the prospective bidder's ability to perform the applicable obligations under any Potential Assumed Contracts that may be included in the bid.  Accordingly, the proposed Assumption and Assignment Procedures are carefully designed to ensure that Counterparties receive timely and sufficient notice with respect to the disposition of their Potential Assumed Contracts.  In light of the foregoing, the Debtors' assumption and assignment of any Potential Assumed Contracts in accordance with the proposed Assumption and Assignment Procedures would satisfy the requirements of section 365 of the Bankruptcy Code and should be approved.

84.     Finally, in order to facilitate the assumption and assignment of Potential Assumed Contracts in furtherance of maximizing the value of the Stalking Horse Assets, the Debtors further request that the Court find that any anti-assignment provision included in any Potential Assumed Contract, whether such provision expressly prohibits, or has the effect of restricting or limiting assignment of a Potential Assumed Contract, is unenforceable and prohibited pursuant to section 365(f) of the Bankruptcy Code.[9]

---

[9] Section 365(f)(1) provides in pertinent part that, "notwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease .... " 11 U.S.C. § 365(f)(1).  Further, section 365(f)(3) provides that "[n]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law that terminates or modifies, or permits a party other than the debtor to terminate or modify, such contract or lease or a right or obligation under such contract or lease on account of an assignment of such contract or lease, such contract, lease, right, or obligation may not be terminated or modified under such provision because of the assumption or assignment of such contract or lease by the trustee." 11 U.S.C. § 365(f)(3).

### REQUESTS FOR IMMEDIATE RELIEF & WAIVER OF STAY

85.    Pursuant to Bankruptcy Rules 6004(h) and 6006(d), the Debtors seek a waiver of any stay of the effectiveness of the Bidding Procedures Order, and any Sale Order, as well as any other separate order authorizing the assumption or assumption and assignment of a Potential Assumed Contract in connection with the Sale.  Bankruptcy Rule 6004(h) provides that "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h).  Bankruptcy Rule 6006(d) provides that "[a]n order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after entry of the order unless the court orders otherwise." Fed. R. Bankr. P. 6006(d).

86.    As set forth above, the relief requested herein is necessary and appropriate to maximize the value of the Debtors' estates for the benefit of their economic stakeholders. Accordingly, the Debtors submit that ample cause to justify the waiver of the 14-day stay imposed by Bankruptcy Rules 6004(h) and 6006(d), in each case, to the extent that such stay applies to the relief requested herein.

### NOTICE

87.    The Debtors have or will provide notice of this Motion to:  (a) the Office of the U.S. Trustee for the District of Delaware; (b) the holders of the 30 largest unsecured claims against the Debtors (on a consolidated basis); (c) counsel to the DIP Lenders; (d) counsel to the Prepetition Lenders; (e) the United States Attorney's Office for the District of Delaware; (f) the state attorneys general for all states in which the Debtors conduct business; (g) any known party asserting a lien on the Debtors' assets; (h) all persons and entities known by the Debtors to have

expressed an interest to the Debtors in the Stalking Horse Assets; and (i)  any party that requests service pursuant to Bankruptcy Rule 2002.

## **NO PRIOR REQUEST**

88.    No prior request for the relief sought herein has been made to this Court or any other court in connection with the chapter 11 cases.

WHEREFORE, the Debtors respectfully request that the Court grant the relief requested in this Motion, enter the Bidding Procedures Order, substantially in the form attached hereto as <u>Exhibit A</u>, and grant such other and further relief to the Debtors as the Court may deem proper.

Dated:   January 16, 2023

**PACHULSKI STANG ZIEHL & JONES LLP**

*/s/ Laura Davis Jones*
Laura Davis Jones (DE Bar No. 2436)
David M. Bertenthal (CA Bar No. 167624)
Timothy P. Cairns (DE Bar No. 4228)
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, Delaware  19899 (Courier 19801)
Telephone:  (302) 652-4100
Facsimile:  (302) 652-4400
Email: ljones@pszjlaw.com
         dbertenthal@pszjlaw.com
         tcairns@pszjlaw.com

Proposed Counsel to the Debtors and Debtors in Possession