RECEIVED

Jason P. Gardiner
15 Vickwood Court
Marietta, GA 30068
Phone: 678-993-8646
Email: jgardiner9297@gmail.com

2024 MAR 28  AM II: 15

CLERK
U.S. BANKRUPTCY COURT
DISTRICT OF DELAWARE

27 March 2024

Office of the Clerk of the United States Bankruptcy Court for the District of Delaware
824 North Market Street,
Wilmington, Delaware 19801

Re: Case 23-10051(JKS), Response to the Objection

To the Office of the Clerk of the United States Bankruptcy Court for the District of
Delaware:

In response to the document received: "Debtors' First Omnibus Objection (Substantive)
To Certain Claims", I am sending this Response to the Objection.

Below, you will find the information required for this Response to the Objection per
section 20 of the received document, and the supporting documentation is attached.

  i.  a caption setting forth the name of the Court, the name of the Debtors, the case
      number, and the title of the Objection to which the Response is directed;
        • **Name of the Court:** United States Bankruptcy Court for the District of
          Delaware
        • **Name of the Debtors:** Gigamonster Networks, LLC, et al., Debtors
        • **Case number:** 23-10051 (JKS)
        • **Title of the Objection to which the Response is directed**: "Debtors'
          First Omnibus Objection (Substantive) to certain claims (No Liability
          Claims; Reduce Claims; Reclassify Claims".

  ii. the name of the claimant, the claim number, and a description of the basis for the
      amount of the claim;
        • **Name of the Claimant:** Jason Gardiner
        • **Claim ID:** 56675548
        • **Claim No./Scheduled:** 112
        • **Claim Amount:** $68,750.00 USD

Response to the Objection, case 23-10051 (JKS), Claim ID 56675548 (J. Gardiner)

- **Description of the basis for the amount of the claim:** This is the amount that is owed to me by GigaMonster based on my Employment Agreement dated 19 June 2020, based on page 12 of this agreement in the Severance Period section.

iii. the specific factual basis and supporting legal argument upon which the party will rely in opposing this Objection;

The documents and basis below provide the legal foundation for the opposition to the Objection. These funds are due, and should be on the GigaMonster "books".

- Employment Agreement between GigaMonster Networks, LLC and Jason Gardiner, effective 19 June 2020, on page 12 "Severance Period", detailed the amount that would be paid
- This Severance payment would be governed by page 12 of the "Employment Agreement" noted above, section 11 "Good Reason", section c: "(c) A material reduction in the authority, duties or responsibilities of Executive;"
- The details supporting resignation for "Good Reason" can be found in these documents:
  - Letter "Re: Jason Gardiner - Termination of Employment", sent by Ney Rhein Trial Attorneys (William Brent Ney) to GigaMonster Networks, LLC (Attn: Chuck Staufer) on 17 October 2022. To date, there has been no response to this letter, despite numerous attempts.
  - Letter sent with original Claim documentation from Jason Gardiner (15 May 2023)

iv. any supporting documentation, to the extent that it was not included with the proof of claim previously filed with the clerk or the claims agent, upon which the party will rely to support the basis for and amounts asserted in the proof of claim; and

Names of documents and purpose, in chronological order, earliest first:

- Employment Agreement between GigaMonster Networks, LLC and Jason Gardiner, effective 19 June 2020.

Response to the Objection, case 23-10051 (JKS), Claim ID 56675548 (J. Gardiner)

- Resignation letter, dated 4 October 2022, noting 1 month of notice, with the last day to be 4 November 2022.
- Letter from GigaMonster to Jason Gardiner, dated 6 October 2022, claiming his resignation was without good reason. This letter details what GigaMonster claimed was their understanding: that Jason would be paid for the notice period without working and that would include unused vacation hours.
- 6 October 2022 and 7 October 2022 Emails from Chuck Stauffer to Jason Gardiner confirming receipt of company computer assets. This email chain also includes Jason's assertion that the Separation paperwork verbiage that Jason resigned "without good reason" was not correct. Chuck Stauffer advises that Tanya Dickerson from GigaMonster will address this. There was never any response in writing from Tanya to this matter.
- Letter: "Re: Jason Gardiner - Termination of Employment", sent by Ney Rhein Trial Attorneys (William Brent Ney) to GigaMonster Networks, LLC (Attn: Chuck Staufer) on 17 October 2022. To date, there has been no response to this letter. This details the basis and timeline for this Objection.
- Letter sent with original Claim from Jason Gardiner on 15 May 2023. This includes the timeline and basis for the Claim and the Objection. This letter also includes facts for the significant changes to roles and duties within the company assertion.
- Proof of Claim that was submitted 15 May 2023.

v.  the name, address, telephone number, email address, and fax number of the person(s) (which may be the claimant or the claimant's legal representative) with whom counsel for the Debtors should communicate with respect to the claim or the Objection and who possesses authority to reconcile, settle, or otherwise resolve the Objection to the disputed claim on behalf of the claimant.
- Name: Jason Gardiner
- Address: 15 Vickwood Court, Marietta GA 30068
- Phone: 404-557-4007
- Email: jgardiner9297@gmail.com
- Fax number is not available, all communications must be in writing via either email or certified mail.

If you have questions, or require additional documentation to process this Response to the Objection, please contact me via email at jgardiner9297@gmail.com.

Response to the Objection, case 23-10051 (JKS), Claim ID 56675548 (J. Gardiner)

Sincerely,

Jason Gardiner

Cc:

Pachulski Stang Ziehl & Jones LLP
919 North Market Street, 17th Floor
P.O. Box 8705
Wilmington, DE 19899 (Courier 19801)

Attn: James E. O'Neill (joneill@pszjlaw.com)

# EMPLOYMENT AGREEMENT

This Employment Agreement (this "Agreement"), is entered into between GigaMonster Networks, LLC, a Delaware limited liability company (the "Company"), which is a wholly-owned subsidiary of GigaSphere Holdings LLC, a Delaware limited liability company ("Parent"), and Jason Gardiner ("Executive" or "You"). This Agreement is effective on June 19, 2020 (the "Effective Date").

## R E C I T A L S:

WHEREAS, the Company desires to continue to employ Executive pursuant to the terms and conditions set forth in this Agreement, and Executive desires to be employed by the Company pursuant to such terms and conditions, effective as of the Effective Date; and

WHEREAS, the parties agree to terminate any and all former employment agreements Executive may have had with Parent and any of its subsidiaries (including the Company) and desire that such termination will be effective as of the Effective Date;

NOW, THEREFORE, for and in consideration of the mutual promises, covenants and obligations contained herein, the Company and Executive agree as follows:

1.   Position; Term of Employment; Location.

(a)   Position. The Company shall employ Executive, and Executive shall serve, as the VP of Network Operations of the Company, reporting to the Chief Technology Officer of the Company ("Supervisor").

(b)   Term of Employment. Beginning on the Effective Date, the Company shall continue to employ Executive, and Executive shall serve the Company, for a continuous term beginning on the Effective Date and ending on the third anniversary of the date hereof ("Initial Term") under the terms and conditions herein. The Initial Term shall be extended automatically for additional one-year periods (each a "Renewal Term"), on the same terms and conditions as set forth in this Agreement (as modified in writing from time to time by the parties), beginning on the third anniversary of the date hereof unless either party gives the other party written notice ("Non-Renewal Notice") of its or his decision not to renew the term of this Agreement at least thirty (30) days prior to the end of the Initial Term or any Renewal Term. The Initial Term, together with all Renewal Terms, are collectively referred to in this Agreement as the "Term of Employment." Notwithstanding anything to the contrary herein contained, either party may terminate this Agreement prior to the expiration of the Term of Employment pursuant to, and with the effect set forth in, Section 6.

(c)   Location. The principal location at which Executive shall perform services for the Company shall be 350 Franklin Gateway, Suite 300, Marietta, GA 30067.

2.      Duties and Responsibilities.

(a)      Duties. You agree to perform all duties that are consistent with your position and that may be assigned to You by Supervisor and/or the board of directors of Parent (the "Board") from time to time.

(b)      Devotion of Time. You will be employed on a full-time basis. You shall devote Your best efforts and Your full business time and attention (except for permitted vacation periods) to promote the business and/or interests of the Company. You shall perform Your obligations under this Agreement faithfully and to the best of your ability in a diligent, trustworthy, businesslike and efficient manner. Without limiting the generality of the foregoing, You shall not engage, directly or indirectly, in any other business or activity (including serving on a board of directors), whether or not similar to that of the Company, except with the prior consent of the Board (which may be granted or denied or withdrawn in the Board's sole discretion), after full written disclosure by You of the nature of the business or activity.

(c)      Other Employment; Board Seats. Without limiting the foregoing, prior to the Effective Date of this Agreement, Executive shall disclose to the Board in Exhibit A each (i) current position held and/or employment (with or without compensation) in other entities, including without limitation DirecPath, LLC ("DirecPath") or any DirecPath entity; (ii) right Executive may have to receive, directly or indirectly, compensation from any entity other than the Company or Parent which is paid based in whole or in part on the financial or other business performance of such entity ("Outside Incentives"); and (iii) equity interest, including any convertible debt or equity security, or other ownership interest, or right to acquire any of the foregoing, in an entity that is not publicly traded ("Outside Holdings"). Executive shall not hold any Outside Incentives or Outside Holdings during the Term of Employment without prior approval by the Board after full written disclosure by Executive, which approval may be granted or denied or withdrawn in the Board's sole discretion. If the Board disapproves of an Outside Incentive or Outside Holding, Executive shall promptly divest himself/herself of the disapproved Outside Incentive or Outside Holding. Additionally, during the Term of Employment, Executive shall not acquire any Outside Incentives or Outside Holdings without prior approval by the Board after full disclosure. Notwithstanding any other provision of this Agreement, Executive agrees that the Board may assign Executive to serve in a position with DirecPath (including on the board of directors), and that such assignment shall not constitute Good Reason (as defined below).

(d)      Company Policies. You shall comply with the policies and procedures of the Company as may be adopted and changed from time to time, including those described in the Company's employee handbook. If this Agreement conflicts with such policies or procedures, this Agreement shall control.

3.      Compensation and Benefits. Subject to Section 16, as full compensation for the services to be rendered to or on behalf of the Company and the other obligations undertaken by Executive, during the period of Executive's employment with the Company pursuant to this Agreement, the Company shall pay Executive the following compensation and benefits:

(a)      Base Salary. The Company shall pay to Executive, minus applicable withholdings, in accordance with the Company's policies and practices in effect from time to time,

2

an annual base salary of U.S. $145,000 ("Base Salary"), pro-rated for any partial periods. Your Base Salary may be increased annually at the sole and absolute discretion of the Board based upon Your performance and/or the Company's performance.

(b)     Annual Bonus. Executive may be eligible for an annual bonus, the payment and amount of which, if any, is determined at the sole discretion of the Board.

(c)     Incentive Awards. Executive shall be eligible for incentive unit grants with respect to Parent, which will be subject to the terms and conditions of the governing documents entered into between Executive and Parent in connection therewith.

(d)     Employee Benefits. Executive shall be entitled to participate in the Company's employee benefit plans and programs for which he is eligible and receive all benefits and perquisites for which salaried employees of the Company generally are eligible under any plan or program now existing or established later by the Company ("Additional Benefits"). The Additional Benefits will in all respects be paid or provided in accordance with the then-existing plans, policies, programs and/or arrangements establishing or governing such Additional Benefits. The Company reserves the right to add, terminate and/or amend any existing plans, policies, programs and/or arrangements so long as any such actions do not have the effect of reducing the aggregate value of the benefits granted to Executive as of the date hereof, unless such addition, termination or amendment is generally applicable to all executive employees of the Company.

(e)     Vacation. Executive is entitled to paid vacation each calendar year, pro-rated for any partial periods, and such other fringe benefits, including paid holidays, for which Executive is eligible, in accordance with the policies of the Company in effect from time to time.

(f)     Electronic Devices. The Company shall provide to Executive suitable electronic devices, including smart phone and laptop, for conducting Company business, and the Company shall pay reasonable data transmission service charges for such devices. These devices shall be the property of the Company and shall promptly be returned to the Company upon termination of Executive's employment (regardless of the reason for such termination) or upon the Company's request.

(g)     Expenses. The Company will provide Executive with Company credit cards, or the Company will reimburse Executive for business-related charges which Executive personally incurs,   in accordance with, and subject to, the Company's policies and procedures for the payment of  reasonable expenses, including travel expenses, necessarily incurred in the performance of duties hereunder, provided that Executive provides appropriate receipts and vouchers indicating the specific business purpose for each such expenditure in accordance with the Company's policies and procedures. All expenses incurred in one calendar year must be reimbursed no later than the last day of the next calendar year. Executive's right to reimbursement is not subject to liquidation or exchange for any other benefit.

(h)     Professional Education and Development. Subject to the written approval of the Board, the Company will pay (or reimburse Executive for payment of) all costs related to the maintenance of any applicable licenses and certifications required of his or her position; approved continuing education conferences and industry meetings (including travel expenses per

3

applicable Company expense and travel policies); technical and professional organization memberships; and any applicable liability insurance for current employment and tail coverage.

4.    Development of Inventions, Improvements or Know-How.

(a)    Disclosure Obligation. Executive and his or her heirs, assigns and representatives shall disclose fully and promptly to the Company, Parent and their respective subsidiaries any and all Work Product, including, without limitation, any and all facts, test data, findings, designs, formulas, processes, sketches, drawings, models and figures.

(b)    Assignment. All Work Product is deemed a work for hire in accordance with the U.S. Copyright Act and is owned exclusively by the Company, Parent and their respective subsidiaries. If and to the extent any of the Work Product is not considered a work for hire, Executive hereby irrevocably assigns and transfers to the Company and shall, without further compensation, confirm any such assignment or transfer to the Company Executive's entire right, title and interest in and to all Work Product. At the Company's expense and at the Company's request, Executive shall provide reasonable assistance and cooperation, including, without limitation, the execution of documents in order to obtain, enforce and/or maintain the Company's (or any Affiliate's) proprietary rights in the Work Product throughout the world. Executive appoints the Company as his or her agent and grants the Company a power of attorney for the limited purpose of executing all such documents, which power, being coupled with an interest, is irrevocable. Executive and Company further agree that the foregoing assignment of Work Product will not apply to any Excluded Inventions. Executive shall inform the Company before incorporating any Excluded Inventions into any Work Product or otherwise utilizing any such Excluded Inventions in the course of Executive's employment. If Executive incorporates an Excluded Invention into Work Product (or otherwise utilizes such Excluded Invention in the course of Executive's employment), Executive hereby grants the Company a nonexclusive, royalty-free, perpetual, irrevocable, transferable worldwide license (with the right to grant and authorize sublicenses through multiple tiers of sublicensees) to make, have made, use, import, offer for sale, sell, reproduce, distribute, modify, adapt, prepare derivative works of, display, perform, and otherwise exploit such Excluded Invention, without restriction, including, without limitation, as part of or in connection with such Excluded Invention, and to practice any method related thereto.

(c)    Publication. Except as required for performance of Executive's work for the Company, Parent or their respective subsidiaries or as authorized in writing by the Company, Parent or their respective subsidiaries, as applicable, Executive (i) shall not publish or submit for publication, or otherwise disclose to any Person other than the Company, Parent or their respective subsidiaries any data or results from Executive's work on behalf of the Company, Parent or their respective subsidiaries, as applicable, without the prior written consent of the Company or Parent, as applicable; and (ii) shall hold all Work Product in trust for the Company, Parent and their respective subsidiaries, as applicable, and deliver it to the Company, Parent and their respective subsidiaries, as applicable, upon request and in any event at the end of the Term of Employment.

(d)    Ventures. If during the Term of Employment, Executive is engaged in or associated with the planning or implementing of any project, program or venture involving the Company, Parent or their respective subsidiaries and another Person, all rights in the project, program or venture shall belong to the Company, Parent or their respective subsidiaries and shall

4

constitute a corporate opportunity belonging exclusively to the Company, Parent or their respective subsidiaries, as applicable. Executive shall not be entitled to any interest in such project, program or venture or to any commission, finder's fee or other compensation in connection therewith (other than the compensation to be paid to Executive pursuant to <u>Section 3</u>).

(e) <u>Return or Destruction</u>. Upon termination of Executive's employment with the Company (regardless of the reason) or upon the earlier request of the Company for any reason, Executive shall return in good condition, all the property of the Company, Parent and their respective subsidiaries, including all tangible embodiments of the Confidential Information, and shall not remove from any premises at which the Business is conducted any property of the Company, Parent and their respective subsidiaries, including any Confidential Information.

5. <u>Restrictive Covenants</u>.

(a) <u>Non-Competition</u>. Executive hereby covenants and agrees that, during the Term of Employment and for a period of six (6) months following the termination of Executive's employment with the Company under this Agreement or any other subsidiary of Parent, Executive will not, anywhere in the Restricted Territory, directly or indirectly, without the written permission of the Board (which shall be granted or denied in its sole discretion), engage in any of the following activities, where Executive's action or involvement relates to the activities or services that Executive provided during his or her employment with Parent or any of its subsidiaries (including the Company) or involves Executive's knowledge of Confidential Information:

(i) carry on or engage, on Executive's own behalf or on behalf of any other Person, in the Business as conducted during Executive's employment with the Company or any other subsidiary of Parent; or

(ii) own, manage, operate, control, act as an agent for, be employed by or participate in the management, ownership, operation or control of, or be connected in any manner with, any business (whether as director, officer, employee, agent, representative, partner, security holder, consultant or otherwise) engaged in a business that is the same as or substantially similar to the Business as conducted during Executive's employment with the Company or any other subsidiary of Parent.

Notwithstanding the foregoing, Executive shall be permitted to acquire as a passive investment not more than 10% of the outstanding equity securities of any company engaged in such competitive activities, the equity securities of which are traded on a national securities exchange, so long as such acquisition or holding otherwise complies or does not interfere with <u>Section 2</u> hereof.

(b) <u>Non-Solicitation</u>. Executive covenants that, during the Term of Employment and for a period of twelve (12) months following the termination of Executive's employment with the Company under this Agreement, Executive will not, either directly or indirectly, for himself or on behalf of any other Person: (i) solicit for employment, or otherwise induce, persuade or encourage the departure of, an individual with whom Executive has had material contact who is currently employed or engaged by Parent or its subsidiaries (including the Company) or was employed at any time during the twelve (12) months prior to the termination of

Executive's employment with the Company; or (ii) induce, persuade or encourage an individual or entity with whom Executive has had material contact who was a service provider, customer, client, agent or representative of Parent or its subsidiaries (including the Company) who currently has a business relationship with Parent or any of its subsidiaries (including the Company) or at any time during the twelve (12) months' prior to the termination of Executive's employment with the Company had a business relationship with Parent or any of its subsidiaries (including the Company), to terminate, reduce, or alter in a manner adverse to the Company or its Affiliates any business relationship with Parent or its subsidiaries (including the Company).

(c)    Non-Disparagement. Executive shall not, during or after his or her employment, make to any Person any disparaging, defamatory or derogatory statements or comments about the Company, Parent or any of their Affiliates, or any of its or their respective directors, officers, employees, products or services.

(d)    Non-Disclosure of Confidential Information. Executive agrees that any Confidential Information gained by Executive during his or her employment with the Company or any subsidiary of Parent has been developed by the Company, Parent and their respective subsidiaries through substantial expenditures of time and money and constitutes valuable and unique property of the Company, Parent and their respective subsidiaries. During the Term of Employment and at all times thereafter, Executive shall keep in strict confidence and shall not and shall cause each of his or her Affiliates not to disclose, furnish, disseminate, make available or use (except in the course of performing his or her duties of employment under this Agreement in accordance with the terms hereof) any Confidential Information, without limitation as to when or how Executive may have acquired such information. Executive specifically acknowledges that: (i) the Confidential Information, whether reduced to writing, maintained on any form of electronic media, or maintained in the mind or memory of Executive and whether compiled by the Company, Parent or their respective subsidiaries and/or Executive derives independent economic value from not being readily known to or ascertainable by proper means by others who can obtain economic value from their disclosure or use; (ii) reasonable efforts have been put forth by the Company, Parent and their respective subsidiaries to maintain the secrecy of such information; (iii) such information is and will remain the sole property of the Company, Parent and their respective subsidiaries; and (iv) any retention and use of the Confidential Information during or after the termination of his or her employment with the Company will constitute a misappropriation of the Company's, Parent's and their respective subsidiaries' trade secrets.

(e)    Acknowledgements. Executive acknowledges and agrees that the definition of the Business, the length of the time periods and the geographical area applicable to the restrictive covenants set forth in Section 5 are appropriate and reasonable, in view of the nature of the Company's, Parent's and their respective subsidiaries' business and Executive's employment with the Company and knowledge of its, Parent's and their respective subsidiaries' business. Executive acknowledges that Executive has carefully considered the terms of this Agreement, including the restrictive covenants set forth in Section 5. Executive also acknowledges that the restrictive covenants set forth in Section 5 are a vital part of and intrinsic to the ongoing operations of the Company, Parent and their respective subsidiaries, in light of the nature of the Business and the unique position, skills and knowledge of Executive with the Company and Parent. Notwithstanding the foregoing, if any provision or portion of this Section 5 is held to be unenforceable because of the scope, duration, territory or terms thereof, the parties agree that the

6

court making such determination shall have the power, consistent with applicable law, to reduce the scope, duration, territory and/or terms of such provision, and/or to delete specific words or phrases in such provision, so that the provision is enforceable by the court, and such provision as amended shall be enforced by the court.

(f)     <u>Direct or Indirect Violations</u>. Executive will be in violation of <u>Section 5</u> if he engages in any or all of the activities set forth in that Section directly as an individual on his or her own account, or indirectly for any other Person, whether as partner, joint venturer, employee, agent, salesperson, employee, officer, manager, equity holder and/or director of any Person.

(g)     <u>Tolling of Covenants</u>. If it is judicially determined that Executive has violated any of his or her obligations under <u>Section 5,</u> then the period applicable to each obligation that Executive has been determined to have violated automatically will be extended by a period of time equal in length to the period during which such violation(s) occurred.

(h)     <u>Remedies</u>. Executive acknowledges that should Executive violate any of the covenants contained in <u>Section 5</u>, it will be difficult to determine the resulting damages to the Company, Parent and their respective subsidiaries and, in addition to any other remedies they may have, the Company, Parent and their respective subsidiaries shall be entitled to temporary and permanent injunctive relief or other equitable remedy without the necessity of proving actual damage and without posting a bond. The Company, Parent and/or the applicable subsidiary may elect to seek one or more of these remedies at its sole discretion on a case by case basis. Failure to seek any or all remedies in one case does not restrict the Company, Parent and/or the applicable subsidiary from seeking any remedies in another situation. Such action by the Company, Parent and/or the applicable subsidiary shall not constitute a waiver of any of its rights. The exclusive venue for any actions brought pursuant to this subparagraph shall be the state or federal courts in and for Cobb County, Georgia or the state or federal courts in the state in which (i) Executive resides; (ii) Executive works; or (iii) Executive has accepted or is negotiating an offer of employment.

6.     <u>Termination of Executive's Employment with the Company</u>. Your employment and this Agreement may be terminated by any of the following events:

(a)     Expiration of the Term of Employment due to the Company's election not to renew pursuant to <u>Section 1(b)</u> above;

(b)     Expiration of the Term of Employment due to Your election not to renew pursuant to <u>Section 1(b)</u> above;

(c)     Mutual written agreement between You and the Company at any time;

(d)     Your death;

(e)     Your becoming Disabled (as defined in <u>Section 11</u> below);

(f)     By the Company for "<u>Cause</u>," which shall mean a termination by the Company because of any of the following events:

(i)        Your gross negligence, willful misconduct, fraud, embezzlement or material dishonesty involving the Company, Parent, or any of their Affiliates;

(ii)       Your conviction of, or entry of a plea of guilty or no contest to, indictment for, or being named a subject of investigation of, (x) a felony, or (y) a crime involving moral turpitude, fraud, misrepresentation, embezzlement or theft;

(iii)      Your material breach of this Agreement or of a material policy of Company, Parent, or any of their Affiliates;

(iv)      Your breach of Your fiduciary duty or duty of loyalty to the Company, Parent, or any of their Affiliates;

(v)       Your willful, intentional or grossly negligent failure to follow the lawful direction of the Board or Supervisor;

(vi)      Your engaging in any activity that is harmful (including, without limitation, sexual or other workplace harassment, or any alcoholic or other self-induced affliction), in a material respect, to the Company, Parent or any of their Affiliates or subsidiaries, whether monetarily or otherwise, as determined by the Board in its reasonable discretion;

(vii)     Your voluntary or involuntary bankruptcy;

provided, however, that (x) for any such conduct listed in subsections (iii) through (vi) above, the Board shall first provide You with written notice which specifies in reasonable detail the events that the Company claims constitute Cause (a "Cause Notice") and thirty (30) days following Your receipt of such Cause Notice to cure such conduct, to the extent such conduct is reasonably capable of being cured (the "Cure Period"), (y) any such conduct cured prior to expiration of the Cure Period as determined in the reasonable discretion of the Board shall not constitute Cause, and (z) the Company may not rely on any evidence allegedly supporting "Cause" unless such evidence is disclosed in the applicable Cause Notice;

(g)       Your resignation without Good Reason (as defined in Section 11 below) with at least thirty (30) days advance written notice to the Board.  During those thirty (30) days, Executive may be relieved  of his or  her duties, but will be paid during that said notice period consistent with the provisions of this Agreement;

(h)       Your resignation for Good Reason (subject to the procedures set forth in the definition of Good Reason); or

(i)        By the Company Without Cause. Without Cause shall mean any termination of employment by the Company which is not defined in subsections (a) through (h) above.

7.     Company's Post-Termination Payment Obligations.

(a)       If this Agreement terminates for any of the reasons set forth in Sections 6(b) through 6(g) above, then the Company shall pay You all earned but unpaid wages, and any accrued

8

and unused vacation to the extent payable under the Company's policies, through the date of termination, based on Your then current Base Salary, and the Company shall have no other obligations to You under this Agreement.

(b)     If the Executive's employment with the Company is terminated because of Executive's death, then, in addition to the amounts set forth in <u>Section 7(a)</u>, the Company shall pay to Executive's estate, in accordance with the Company's payroll policies and practices as then in effect, all accrued and unpaid installments of the Base Salary through the end of the month in which Executive's death occurs, and the Company shall have no other obligations to You or your estate under this Agreement.

(c)     If this Agreement terminates for any of the reasons set forth in <u>Sections 6(a)</u>, <u>6(h)</u>, or <u>6(i)</u> above (resignation for Good Reason and termination by the Company Without Cause), then the Company shall (i) pay You all earned but unpaid wages through the date of termination, and any accrued and unused vacation to the extent payable under the Company's policies, based on Your then current Base Salary, (ii) reimburse You and Your eligible dependents' COBRA premium under the Company's major medical group health plans on a monthly basis through the end of the applicable Severance Period (in either case for so long as You remain eligible for such coverage) (the "<u>COBRA Reimbursement</u>"), and (iii) continue to pay Your then current Base Salary (in accordance with the Company's payroll practices then in effect) through the end of the applicable Severance Period (subclause (iii) being referred to as the "<u>Separation Payments</u>"; and together with the COBRA Reimbursement, the "<u>Separation Benefits</u>"). The Separation Benefits shall be subject to all applicable withholdings and paid in accordance with the Company's payroll practices then in effect, beginning on the first Company payroll date that is at least sixty (60) days after the date of Your separation (the "<u>Payment Date</u>"), including a catch-up payment of any amounts otherwise due during such sixty (60) day period, provided that You have complied with the Conditions set forth below as of the Payment Date and subject to compliance with Your post-termination covenants set forth in this Agreement. Except as set forth in this <u>Section 7</u>, the Company shall have no other obligations to You under this Agreement.

(d)     Notwithstanding the foregoing or anything to the contrary herein, if this Agreement or Your employment with the Company is terminated in connection with an Approved Sale, then, except to the extent such amounts constitute "deferred compensation" under Code Section 409A, the aggregate Separation Benefits payable by the Company shall be reduced (but not below zero) by the amount of the aggregate cash proceeds received (or to be received) at the closing of such Approved Sale by You or your Affiliates in respect of any equity securities of Parent held by You (or Your Affiliates); provided that, for any other purposes set forth herein, any such termination shall be treated as a termination Without Cause.

(e)     The Company's obligation to provide the Separation Benefits shall be conditioned upon the following (the "<u>Conditions</u>"):

(i)     Your execution, delivery and non-revocation of, within sixty (60) days following Your separation from service, a general release of all claims that You may have or assert against the Company and its Affiliates in a form satisfactory to the Company (which shall not materially modify the restrictive covenants in <u>Section 5 hereof except for the sole purpose of bringing them into compliance with changes in applicable law</u>).

(ii)    Your compliance with all of Your surviving post-termination obligations to the Company as set forth in this Agreement.

Such release must become effective (i.e., Executive must execute the release and any revocation period must expire without Executive revoking the release) within sixty (60) days, or such shorter period specified in the release, after Executive's date of termination. For the avoidance of doubt, for purposes of this Section 7, the Company's election to not renew this Agreement (including by delivery of a Non-Renewal Notice) shall not be deemed to be a termination of Executive's employment Without Cause, and no Separation Benefits or any other severance benefits shall be paid in connection therewith.

8.    Additional Post-Termination Payment Obligations.

(a)    Return of Materials/Property. Upon the termination of Your employment for any reason or upon the Company's request at any time, You shall return to the Company all of the Company's property, including, but not limited to, computers, computer equipment, office equipment, mobile phones, keys, passcards, calling cards, credit confidential or proprietary lists (including, but not limited to, customer, supplier, licensor and client lists), rolodexes, tapes, software, computer files, marketing and sales materials and any other property, record, document or piece of equipment belonging to the Company. You shall not (i) retain any copies of the Company's property, including any copies existing in electronic form, which are in Your possession, custody or control, or (ii) destroy, delete or alter any Company property, including, but not limited to, any files stored electronically without the Company's prior written consent. The obligations contained in this Section shall also apply to any property which belongs to a third party, including, but not limited to, (i) any entity which is affiliated or related to the Company, or (ii) the Company's customers, licensors or suppliers.

(b)    Set-Off. If You have any outstanding obligations to Parent, the Company, or any other subsidiaries of Parent, upon the termination of Your employment for any reason, You hereby authorize the Company to deduct any amounts owed to the Company from Your final paycheck and any other amounts that would otherwise be due to You, except to the extent such amounts constitute "deferred compensation" under Code Section 409A, or to the extent such deductions would be prohibited by law. Nothing in this Section 8(b) shall limit the Company's right to pursue means other than or in addition to deduction to recover the full amount of any outstanding obligations to the Company.

9.    Additional Post-Termination Obligations of Executive. In addition to Executive's other obligations following termination provided herein, Executive shall immediately:

(a)    Discontinue the use of any and all of the Company's trademarks, service marks, slogans or logos ("Marks"), including the use of all telephone numbers, advertising products, etc., which contain such Marks.

(b)    Upon request of the Company, reasonably assist and cooperate with and provide all information and documentation to the Company in and concerning matters in which Executive was involved in any capacity while employed by the Company.

10.     Executive's Representations. Executive hereby represents and warrants to the Company that: (a) the execution, delivery and performance of this Agreement by Executive does not and will not conflict with, breach, violate or cause a default under any contract, agreement, instrument, order, judgment or decree to which Executive is a party or by which he is bound; and (b) upon the execution and delivery of this Agreement by the Company, this Agreement shall be the valid and binding obligation of Executive, enforceable in accordance with its terms.

11.     Definitions. The following terms have the meanings set forth in this <u>Section 11</u>:

"<u>Affiliate</u>" with respect to any Person means any other Person that directly or indirectly controls, is controlled by or is under common control with the first Person. For the purposes of this definition, "control" when used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise, and the terms "controlling" and "controlled" have meanings correlative to the foregoing.

"<u>Approved Sale</u>" has the meaning ascribed to that term in the Second Amended and Restated Limited Liability Company Agreement of Parent, as amended and in effect from time to time.

"<u>Business</u>" means any business or activity that competes in any material respect with any respect of the business or activities of Parent or its subsidiaries (including the Company) conducted or actively planned on or prior to the termination of Your employment, including, without limitation, the following activities: developing, operating and providing telecommunications systems and services intended for use by multiple users.

"<u>Confidential Information</u>" includes all information: (a) that constitutes a trade secret under the Uniform Trade Secrets Act or that otherwise is not generally known to the public and that is developed, owned or obtained by the Company, Parent or any of their respective subsidiaries (including information developed by Executive in the course of performing service to the Company, Parent or any of their respective subsidiaries); (b) regarding the Company's, Parent's and their respective subsidiaries' marketing strategy and efforts, direct and indirect owners, financing arrangements, financial position and prospects, operating methods and procedures, sales volume and proposals, customers and prospective customers, vendors and service providers, and key employees and consultants; and (c) regarding the Company's, Parent's and their respective subsidiaries' computer systems, software (including source code and object code), machines, system documentation, manuals, formulae, processes, improvements, inventions, compositions, ideas and other proprietary information of the Company, Parent or any of their respective subsidiaries.

"<u>Disabled</u>" means Executive is unable, by reason of accident or illness (including mental illness), to perform his or her duties with the Company or any of its Affiliates for sixty (60) consecutive days or for ninety (90) cumulative days during any one hundred and eighty (180)-day period even with reasonable accommodation, as determined in good faith by the Board.

"<u>Excluded Inventions</u>" means any inventions, discoveries, ideas, original works of authorship, developments, improvements, trade secrets and other proprietary information or

intellectual property rights owned by Executive or in which Executive has an interest prior to, or separate from, Executive's employment with or services provided to the Company, including, without limitation, any such inventions that are not assignable under the law of a state where Executive works. Executive has provided a true and complete list of Excluded Inventions attached hereto as <u>Exhibit B</u>. Executive represents and warrants that if any Excluded Inventions are included on <u>Exhibit B</u>, they will not affect Executive's ability to fully perform all obligations under this Agreement. Executive further represents that if <u>Exhibit B</u> is not attached or is blank, that no Excluded Inventions exist.

"<u>Good Reason</u>" means that Executive resigns his or her employment within sixty (60) days after obtaining knowledge for the first time that one of the following conditions has come into existence without Executive's consent, so long as Executive provides the Board with written notice of such event having occurred, which event is not remedied within thirty (30) days of such notice:

        (a)     The Company's failure to pay Executive any material amounts otherwise vested and due under this Agreement in accordance with this Agreement;

        (b)     A material reduction in the current salary or title of Executive, except a reduction that applies to all other executive officers and other full-time employees;

        (c)     A material reduction in the authority, duties or responsibilities of Executive;

        (d)     The Company's requirement that Executive relocate to any place other than within thirty (30) miles of the location set forth in <u>Section 1(c)</u>; or

        (e)     Any material breach by the Company of this Agreement.

"<u>Person</u>" means any natural person, general partnership, limited partnership, corporation, trust, limited liability company or other association or entity, or the United States of America or any other nation, state or other political subdivision thereof, or any entity exercising executive, legislative, judicial, regulatory or administrative functions of government.

"<u>Restricted Territory</u>" means any state within the United States of America.

"<u>Severance Period</u>" means three (3) months plus one (1) month for each full calendar year from the Effective Date to the date of the termination of Your employment, up to a maximum of six (6) months.

"<u>Work Product</u>" means any and all promotional and advertising materials, catalogs, brochures, plans, customer lists, supplier lists, manuals, handbooks, inventions, discoveries, improvements, trade secrets, secret processes and compositions and any technology, know-how or intellectual property made or developed or conceived of by Executive, in whole or in part, alone or with others, which results from any work he has done or may do for, or at the request of, the Company, Parent or any of their respective subsidiaries or which relates to the business, operations, activities, research, investigations or obligations of the Company, Parent or any of their respective subsidiaries.

12.    <u>Entire Agreement</u>. This Agreement sets forth the entire understanding of the parties regarding this subject matter and supersedes all prior contracts, agreements, arrangements, communications, discussions, representations and warranties, whether oral or written, between the Executive and the Company, Parent, or any of their respective subsidiaries regarding this subject matter (including any letters of intent and any prior employment or similar agreement between the parties).

13.    <u>Assignment</u>. This Agreement is binding upon and inures to the benefit of the heirs, successors, representatives and assigns of each party, but no rights, obligations or liabilities of Executive under this Agreement will be assignable without the prior written consent of the Company.

14.    <u>Amendment; Waivers</u>. This Agreement may be amended or modified only by a writing executed by the parties to this Agreement. None of the terms of this Agreement will be deemed to be waived or amended by either party unless such a waiver or amendment specifically references this Agreement and is in writing signed by an authorized representative of the party to be bound. Any such signed waiver will be effective only in the specific instance and for the specific purpose for which it was made or given.

15.    <u>Notices</u>. Any notice provided for in this Agreement must be in writing and must be either personally delivered, mailed by first class mail (postage prepaid and return receipt requested), sent by reputable overnight courier (charges prepaid) or sent by confirmed facsimile or email (and followed with an additional copy send by one of the first three methods) to the recipient at the address indicated on the signature page to this Agreement, or to such other persons and/or at such other addresses as may be designated by a party by written notice served in accordance with the provisions of this <u>Section 15</u>.

16.    <u>Partnership Caveat</u>. Notwithstanding any other provision of this Agreement, should Executive be treated as a partner of Parent and/or its wholly-owned pass-through subsidiaries, the provisions of this Agreement and the tax treatment of Executive's compensation will be adjusted to comply with applicable law and the Second Amended and Restated Limited Liability Company Agreement of Parent, as amended and in effect from time to time. For example, Executive's status as a partner may impact Executive's income tax treatment (e.g., K-1 versus W-2) and benefit plan participation (e.g., limitation on the plans in which Executive may participate and the tax implications of participation). The Company does not make any specific representations regarding tax treatment, and Executive is encouraged to consult with Executive's own counsel or tax advisor on these issues. For the avoidance of doubt, no gross-up or similar payments are due to Executive.

17.    <u>Severability</u>. Each Section and subsection of this Agreement constitutes a separate and distinct provision of this Agreement. It is the intent of the parties that the provisions of this Agreement be enforced to the fullest extent permissible under the laws and public policies applicable in each jurisdiction in which enforcement is sought. Accordingly, if any provision of this Agreement is adjudicated to be invalid, ineffective or unenforceable, the remaining provisions will not be affected by such adjudication. The invalid, ineffective or unenforceable provision will, without further action by the parties, be automatically amended to effect the original purpose and intent of the invalid, ineffective or unenforceable provision; <u>provided</u>, <u>however</u>, that such

13

amendment will apply only with respect to the operation of such provision in the particular jurisdiction with respect to which such adjudication is made.

18.    Applicable Law; Remedies. This Agreement will in all respects be governed by, and construed in accordance with, the laws of the State of Georgia, without regard to conflict of laws principles that would require the application of the laws of any other jurisdiction. Executive agrees that Company will be entitled to enforce its rights under this Agreement specifically, to recover damages and costs (including reasonable attorney's fees) caused by any breach of any provision of this Agreement and to exercise all other rights existing in its favor with respect to this Agreement.

19.    Arbitration. Any and all controversies between the parties arising out of or relating to this Agreement (each, a "Disputed Issue") shall be submitted to binding arbitration in Atlanta, Georgia by a party's giving written notice to such effect to the other party and the Atlanta, Georgia office of the American Arbitration Association ("AAA"). If the parties involved in the controversy cannot agree within fifteen (15) days from service of such notice of binding arbitration upon the other party in accordance with the terms of this Agreement upon the selection of a single arbitrator, the arbitrator shall be selected or designated by the AAA upon the written request of either party. Such arbitrator must be a member of the State Bar of Georgia actively engaged in the practice of law. Arbitration of such Disputed Issues shall be conducted in accordance with the Employment Law rules of AAA. The decision of the arbitrator shall be final and binding upon all parties and shall be enforceable in a court of competent jurisdiction. The arbitration award shall be in writing, delivered within five (5) business days of the hearing and shall specify the factual and legal bases for the award. Each party shall bear all costs and expenses incurred by it in connection with any arbitration; provided, that, the arbitrator is hereby authorized to award to the prevailing party the costs (including reasonable attorneys' fees and expenses) of any such arbitration, unless contrary to an applicable state or federal statute. Notwithstanding anything herein to the contrary, a party may apply to a court of competent jurisdiction for injunctive relief in respect to a breach or threatened breach hereof.

20.    Income Tax Reporting; Withholding. Executive shall report the Base Salary, any bonus and all other payments made to Executive under this Agreement as ordinary income for Federal, State and local tax income tax purposes, and subject to Section 16 all such compensation and other payments shall be subject to withholding.

21.    Compliance with 409A. This Agreement is intended to be interpreted and operated to the fullest extent possible so that the payments and benefits under this Agreement are either exempt from the requirements of Section 409A of the Internal Revenue Code of 1986, as amended ("Code Section 409A") under Treasury Regulation Section 1.409-1(b)(4) or Section 1.409A-1(b)(9)(iii) or otherwise comply with the requirements of Code Section 409A; provided, however, that notwithstanding anything to the contrary in this Agreement, in no event shall the Company, Parent or any of their respective subsidiaries be liable to Executive for or with respect to any taxes, penalties or interest which may be imposed upon Executive pursuant to Code Section 409A. In accordance with the preceding sentence, the date on which a "separation from service" pursuant to Code Section 409A occurs shall be treated as the termination of employment date for purposes of determining the timing of payments and benefits under this Agreement to the extent necessary to have such payments and benefits under this Agreement be exempt from the requirements of

14

Code Section 409A or comply with the requirements of Code Section 409A. Each payment made under this Agreement shall be treated as a separate payment, and the right to a series of installment payments under this Agreement shall be treated as a right to a series of separate payments. With regard to any provision in this Agreement that provides for reimbursement of expenses or in-kind benefits, except for any expense, reimbursement or in-kind benefit provided pursuant to this Agreement that does not constitute a "deferral of compensation," within the meaning of Treasury Regulation Section 1.409A-1(b), (i) the amount of expenses eligible for reimbursement, or in-kind benefits provided, during any calendar year shall not affect the expenses eligible for reimbursement, or in-kind benefits to be provided, in any other calendar year, (ii) such payments shall be made on or before the last day of the calendar year following the calendar year in which the expense was incurred, and (iii) the right to reimbursement or in-kind benefits shall not be subject to liquidation or exchange for another benefit. Notwithstanding any provision in this Agreement to the contrary, if Executive is or becomes a "specified employee" as defined in Code Section 409A, any payments or benefits provided under this Agreement which are subject to Code Section 409A shall not be paid prior to the date that is 6 months after the date of termination and any such payments shall be accumulated and paid on the first business day after such 6 month period; provided that if Executive dies following the date of separation from service and prior to the payment of any payments, distributions or benefits delayed on account of Code Section 409A, such payments, distributions or benefits shall be paid or provided to the personal representative of Executive's estate within thirty (30) days after the date of Executive's death.

22.    No Strict Construction. Each party hereby agrees and acknowledges that it has had full opportunity to consult with counsel and tax advisors of its selection in connection with the preparation and negotiation of this Agreement. The parties hereto jointly participated in the negotiation and drafting of this Agreement. The language used in this Agreement shall be deemed to be the language chosen by the parties hereto to express their collective mutual intent. This Agreement shall be construed as if drafted jointly by the parties hereto, and no rule of strict construction shall be applied against any person.

23.    Life Insurance. The Company may, in its discretion, at any time apply for and obtain, as owner and for its own benefit or the benefit of the Company's lenders, insurance on the life of Executive in such amounts and in such form or forms as the Company may choose. In connection therewith, at the request of the Company, Executive shall submit to such medical examinations, supply such information and execute such documents as may be requested by the insurance company or companies to which the Company has applied for such insurance. Executive shall have no interest whatsoever in any such policy or policies.

24.    Interpretation. Whenever the term "include" or "including" is used in this Agreement, it shall mean "including, without limitation," (whether or not such language is specifically set forth) and shall not be deemed to limit the range of possibilities to those items specifically enumerated. The words "hereof", "herein" and "hereunder" and words of similar import refer to this Agreement as a whole and not to any particular provision. Terms defined in the singular have a comparable meaning when used in the plural and vice versa. As used in this Agreement, the masculine, feminine or neuter gender shall be deemed to include the others whenever the context so indicates or requires.

25.    <u>Delivery by Electronic Means</u>. This Agreement and any amendments hereto, to the extent signed and delivered by means of a facsimile machine or other electronic transmission, shall be treated in all manner and respects as an original contract and shall be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. At the request of any party hereto or to any such contract, each other party hereto or thereto shall re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such contract shall raise the use of a facsimile machine or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of facsimile machine or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

26.    <u>Counterparts</u>. This Agreement may be executed in counterparts, each of which shall be deemed to be an original and all of which, when taken together, shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or in electronic (i.e., "pdf" or "tif") format shall be effective as delivery of a manually executed counterpart of this Agreement.

[<em>Signature Page Follows</em>]

IN WITNESS WHEREOF, the parties have executed this Employment Agreement on the dates indicated below.

COMPANY:

GIGAMONSTER NETWORKS LLC

By: *William K. Dodd*
Name: William K. Dodd
Title: Chief Executive Officer
Date: 7/17/2020


EXECUTIVE:

By: *Jason Gardiner*
Name: Jason Gardiner
Date: 7/15/2020

**Exhibit A**
**Other Employment, Outside Incentives, Outside Holdings**

None

**Exhibit B**
**Excluded Inventions**

| Title | Date | Identifying Number or Brief Description |
|---|---|---|
| None | N/A | N/A |

___ Additional Sheets Attached

EXECUTIVE:

By: _Jason Gardiner_____

Name: Jason Gardiner

Date: 7/15/2020_____

*Resignation letter*

4 October 2022

To Whom It May Concern:

This letter serves as notice of my resignation as Vice President, Network of GigaMonster Networks, LLC. My last day will be 4 November 2022.

## Separating from GigaMonster Networks

10/6/2022

Jason Gardiner

15 Vickwood Ct
Marietta, GA 30068

Dear Jason,

This letter is to acknowledge receipt of your voluntary resignation dated October 4, 2022, resigning without good reason from your position as VP, Network Operations with GigaMonster Networks with an effective date of November 4, 2022.

We accept your resignation without good reason and have decided that we will not require you to work through the duration of your notice period. Therefore, your last day with GigaMonster Networks will be October 6, 2022.

**Final Compensation**
You will be paid your accrued entitlements and any outstanding pay through November 4, 2022. This includes the balance of any accrued unused vacation hours. All compensation shall be subject to customary withholding tax and other employment tax and deductions as required by law.

**Benefits**
Your medical, dental and vison insurance will terminate November 30, 2022. After that date, you may become eligible for COBRA. You can expect a separate benefits status letter that will outline the status of your benefits upon termination. The letter will include information about your eligibility for Consolidated Omnibus Budget Reconciliation Act (COBRA) continuation of group health coverage.

**401k**
You may elect to have your vested account balance distributed to you as soon as administratively feasible by logging into your account at https://participant.empower-retirement.com/participant/#/login.

**Company Property**
We ask that you return all GigaMonster Networks property immediately.

**Changes to Address**
Please keep the company informed of your contact information so that we can provide information you may need in the future such as your W-2 form. You will still have access to your personal payroll information via Paychex.

The Employee Agreement Regarding Non-Disclosure and Confidentiality of Trade Secrets and Confidential and Proprietary Information, executed on September 20, 2019, remains in effect. If you have any information about our customers, employees or other stakeholders stored on paper or on your personal devices, you must delete it immediately.

Please feel free to contact Human Resources at HumanResources@gigamonster.net should you have any questions.

*Email*
- Asset receipt
- Jason <u>not</u> agreeing with C. Stauffer's comment that he resigned without good cause

Subject: Re: Separation Agreement
From: Chuck Stauffer <cstauffer@gigamonster.net>
Date: 10/7/22, 11:38 AM
To: Jason Gardiner <jgardiner9297@gmail.com>

Thank you sir!

CHUCK STAUFFER
Chief Operating Officer
OPERATIONS

401.595.5829
cstauffer@gigamonster.net
www.gigamonster.net

GigaMonster

The information in this e-mail (including attachments, if any) is confidential. Any review, use, disclosure, distribution or copying of this e-mail is prohibited except by or on behalf of the intended recipient. If you have received this email in error, please notify the sender immediately and delete it. Thank you.

---

**From:** Jason Gardiner <jgardiner9297@gmail.com>
**Date:** Friday, October 7, 2022 at 11:25 AM
**To:** Chuck Stauffer <cstauffer@gigamonster.net>
**Subject:** Re: Separation Agreement

CAUTION! This email originated from outside of GigaMonster. Do not send confidential information, click links or open attachments unless you recognize the sender and know the content is safe.

It was delivered to Nick last night.

Chuck Stauffer wrote on 10/7/22 10:09 AM:

Jason –

Checking in on the status of your company laptop.  Can you confirm if this was delivered to Nick or the office.

Thank you.

**Chuck STauffer**

Chief Operating Officer

**OPERATIONS**

401.595.5829
cstauffer@gigamonster.net
www.gigamonster.net



The information in this e-mail (including attachments, if any) is confidential. Any review, use, disclosure, distribution or copying of this e-mail is prohibited except by or on behalf of the intended recipient. If you have received this email in error, please notify the sender immediately and delete it. Thank you.

**From:** Chuck Stauffer <cstauffer@gigamonster.net>
**Date:** Thursday, October 6, 2022 at 1:13 PM
**To:** Jason Gardiner <jgardiner9297@gmail.com>
**Subject:** Re: Separation Agreement

If this could be done no later than tomorrow, I would appreciate it.

**Chuck STauffer**
Chief Operating Officer

**OPERATIONS**

401.595.5829
cstauffer@gigamonster.net
www.gigamonster.net

The information in this e-mail (including attachments, if any) is confidential. Any review, use, disclosure, distribution or copying of this e-mail is prohibited except by or on behalf of the intended recipient. If you have received this email in error, please notify the sender immediately and delete it. Thank you.

**From:** Jason Gardiner <jgardiner9297@gmail.com>
**Date:** Thursday, October 6, 2022 at 1:11 PM
**To:** Chuck Stauffer <cstauffer@gigamonster.net>
**Subject:** Re: Separation Agreement

CAUTION! This email originated from outside of GigaMonster. Do not send confidential information, click links or open attachments unless you recognize the sender and know the content is safe.

I'll give it to NIck or drop it by in the morning.

Chuck Stauffer wrote on 10/6/22 1:08 PM:

Jason –

I have Tanya to handle the below request and we will respond shortly. Separately, would you be able to let me know where your company laptop was left? I checked your office and with Craig but I could not locate it.

Thank you.

**Chuck STauffer**
Chief Operating Officer
*OPERATIONS*

401.595.5829
cstauffer@gigamonster.net
www.gigamonster.net



The information in this e-mail (including attachments, if any) is confidential. Any review, use, disclosure, distribution or copying of this e-mail is prohibited except by or on behalf of the intended recipient. If you have received this email in error, please notify the sender immediately and delete it. Thank you.

---

**From:** Jason Gardiner <jgardiner9297@gmail.com>
**Date:** Thursday, October 6, 2022 at 1:06 PM
**To:** Tanya Dickerson <tdickerson@gigamonster.net>
**Cc:** Chuck Stauffer <cstauffer@gigamonster.net>
**Subject:** Separation Agreement

CAUTION! This email originated from outside of GigaMonster. Do not send confidential information, click links or open attachments unless you recognize the sender and know the content is safe.

Tanya,

Please use this email address for any future correspondence. I received, but did not sign, the separation agreement. I have questions and concerns.

In the section titled Final Compensation, there appears to be some ambiguity. "You will be paid your accrued entitlements and any outstanding pay through November 4, 2022. This includes the balance of any accrued unused vacation hours." Can you please affirm that the accrued vacation is in addition to my normal pay and not in lieu of said pay?

Additionally, there is a point of contention. The letter also states that I am resigning without good reason. There was no conversation with any executive or board member regarding my reasons for resignation. Therefore, it is inappropriate for GigaMonster to make that determination. Indeed, had there been any conversation whatsoever, that would have been clear.

In section 11(c), good reason is defined as "a material reduction in the authority, duties, or responsibilities of Executive." Barings took over making network decisions, which is one of my primary duties. Nor I have not been apprised, much less able to participate, in any executive decisions affecting GigaMonster. There has been nothing but silence when I've reached out, and that behavior continued after tendering my resignation.

The remaining executives are all well aware of my concerns along these lines. Therefore, I consider my resignation to be WITH good reason.

I look forward to your response,

Jason Gardiner

Attachments:

| | |
|---|---|
| image.png | 0 bytes |
| image.png | 0 bytes |
| image.png | 0 bytes |
| image.png | 0 bytes |
| image001.png | 0 bytes |
| image002.png | 0 bytes |

10/11/22, 12:39 PM



**WILLIAM BRENT NEY**

Direct: (404) 842-7232
Fax: (770) 637-5057
Email: william@neyrhein.com

October 17, 2022

BY U.S. MAIL
AND EMAIL

GigaMonster Networks, LLC
ATTN: Chuck Staufer, Chief Operations Officer
350 Franklin Gateway
Suite 300
Marietta, Georgia 30067

> **Re:**    ***Jason Gardiner – Termination of Employment***

Mr. Stauffer:

My firm has been retained to represent Jason Gardiner with respect to issues which have arisen out of termination of his employment with your company. According to Mr. Gardiner and the documents which he has provided, Mr. Gardiner was hired as VP of Network Operations for GigaMonster Networks, LLC (the "Company") on or about June 19, 2020. Implicit in this title is the duty to make decisions regarding the network and, in fact, this was Mr. Gardiner's primary duty. During the course of Mr. Gardiner's employment, the Company shifted network decision making authority to another employee. Mr. Gardiner has not been kept apprised of, much less permitted to take part in, executive decisions regarding the Company.

Given the apparent reduction in Mr. Gardiner's authority and duties within, and his responsibilities to, the Company, Mr. Gardiner tendered his resignation. In a letter dated October 6, 2022, the Company's Human Resource Department noted Mr. Gardiner's resignation as "voluntary . . . without good reason." Mr. Gardiner immediately contested this designation. More importantly, this designation is contrary to Mr. Gardiner's Employment Agreement and the facts of this matter and affects his severance benefits. According to Section 11 of the Employment Agreement, "Good Reason exists when there is "[a] material reduction in the authority, duties or responsibilities of the executive."

We understand that Mr. Gardiner also received an automatic deposit of funds which contained some sort of associated release language. Mr. Gardiner **is not** agreeing to release any rights. Please provide us with instructions, so that we can tender those funds back to the company pending resolution of this dispute.

U:\Autotask Workplace\Webase Core Files\MATTERS\GARDINER, Employment issue\CORRESPONDENCE\DRAFT soy  to  gigamonster.docx

Chuck Stauffer, COO
October 17, 2022
Page 2

Considering the foregoing, it is difficult to comprehend how the Company has determined Mr. Gardiner's resignation to be without good reason. Mr. Gardiner's only interest is correcting his employment record and receiving the severance benefits which he is owed. He would prefer to do so without intervention, and I am hopeful we can resolve this matter quickly and confidentially. If you believe that there are documents or facts of which I am unaware, please contact my office so that we can work this out. Otherwise, please reclassify Mr. Gardiner's resignation as "with good reason," and contact my office before Friday, October 21, 2022 to let me know that this has been done and his severance package has been reinstated.

I look forward to working with you to resolve this matter.

Sincerely,

William Brent Ney

WBN/bn

C:    Jason Gardiner                                                                                  By Email

5/05/2023
letter submitted with
electronic claim

Greetings,

My name is Jason Gardiner. I was employed as an executive of GigaMonster Networks, LLC. My title was Vice President, Network. One of my primary job responsibilities was overseeing the entire network. This included the infrastructure, as well as the core network and property networks. As an executive, I made the decisions on its design and operation based upon overall company strategy.

Subsequent to the Board ousting the CEO, I found myself in a position where my role and duties within the company had changed significantly. The Board stopped communicating with the executive team and withheld strategic information. Board members instead began to contact my engineers directly for information and assistance without my knowledge and/or consent. It became quite clear that Barings was assuming control over the decisions and operations of the network. I voiced my concerns several times with the interim CEO. My concerns were largely ignored.

After six weeks of increasing isolation from my duties, I tendered my official written resignation to the Board, the COO, and the interim CEO. I provided 30 days' notice, per my employment agreement. My resignation was accepted without comment, other than one of the Board members wishing me well. Two days later upon arrival at the office, I was given a separation letter from the COO. In effect, it was asking me to acknowledge that I was resigning for NO GOOD REASON and that my employment was terminated immediately. I refused to sign, explaining that I had not provided any rationale for my departure in my resignation and that it was for good reasons, as my job duties has changed. The COO replied that it was an HR matter.

I left and emailed the HR director regarding the matter. The COO responded that the HR Director would "handle the request and respond shortly." I received no further correspondence regarding the matter. After several weeks, I retained the services of legal counsel, and he drafted and sent an official notice to GigaMonster. It, too, was ignored. It became obvious to me that the remaining executives and Board were hoping that the matter would go away or that the sale or bankruptcy of the company would make it moot.

Under the terms of my employment agreement, I maintain that I left WITH GOOD REASON and that I am entitled to additional severance pay detailed in said agreement. Based upon my salary, which was 165,000 at the time of my departure and the 5 months severance calculated from the terms of the agreement, I

maintain that I am owed $68,750 by GigaMonster Networks, LLC. I have included information germane to my claim, including copy of my resignation letter, the unsigned separation letter, the employment agreement, as well as correspondence to HR. I have also included my contact information below should you have any questions or desire any additional information.


Regards,


Jason P. Gardiner
15 Vickwood Ct.
Marietta, GA 30068

404.557.4007
jgardiner9297@gmail.com

**United States Bankruptcy Court, District of Delaware**

| Fill in this information to identify the case (Select only one Debtor per claim form): |
|---|
| ☒ GigaMonster Networks, LLC (Case No. 23-10051) |
| ☐ Gigasphere Holdings LLC (Case No. 23-10052) |
| ☐ GigaMonster, LLC (Case No. 23-10053) |
| ☐ Fibersphere Communications LLC (Case No. 23-10054) |
| ☐ Fibersphere Communications of California LLC (Case No. 23-10055) |

## Modified Official Form 410

# Proof of Claim

04/22

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense (other than a claim entitled to priority under 11 U.S.C. § 503(b)(9)). Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
|---|---|

| 1. | Who is the current creditor? | **Jason Gardiner** |
|---|---|---|
| | | Name of the current creditor (the person or entity to be paid for this claim) |
| | | Other names the creditor used with the debtor _____ |

| 2. | Has this claim been acquired from someone else? | ☑ No |
|---|---|---|
| | | ☐ Yes. From whom? _____ |

| 3. | Where should notices and payments to the creditor be sent? Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|---|---|
| | | Address1: | 15 Vickwood Ct. | Address1: |
| | | Address2: | | Address2: |
| | | Address3: | | Address3: |
| | | Address4: | | Address4: |
| | | City: | Marietta | City: |
| | | State: | GA | State: |
| | | Postal Code: | 30068 | Postal Code: |
| | | Country: | | Country: |
| | | Contact phone | 4045574007 | Contact phone |
| | | Contact email | jgardiner9297@gmail.com | Contact email |

| 4. | Does this claim amend one already filed? | ☑ No |
|---|---|---|
| | | ☐ Yes. Claim number on court claims registry (if known) _____ Filed on MM / DD / YYYY |

| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No |
|---|---|---|
| | | ☐ Yes. Who made the earlier filing? _____ |

**Part 2:    Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 68,750 .

**Does this amount include interest or other charges?**

☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

Severance owed per employment agreement

_____

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed)_____%
☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes. *Check one:*

**Amount entitled to priority**

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $3,350* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☑ Wages, salaries, or commissions (up to $15,150*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____$15,150

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(    ) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/25 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?**

☑ No

☐ Yes. **Indicate the amount of your claim arising from the value of any goods received by the Debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.**    $_____

---

**Part 3:    Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

*Jason P Gardiner*                              05/15/2023

_____        _____
Electronic Signature                    Date

**Name of the person who is completing and signing this claim**

| | | | |
|---|---|---|---|
| Name | Jason | Padraick | Gardiner |
| | First name | Middle name | Last name |

Title    _____

Company    _____
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    15 Vickwood Ct.
_____
Number        Street

Marietta                    GA                    30068
City                        State                ZIP Code        Country

Contact phone    4045574007    Email    jgardiner9297@gmail.com

## Additional Noticing Addresses (if provided):

**Additional Address 1**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

**Additional Address 2**
Name:
Address1:
Address2:
Address3:
Address4:
City:
State:
Postal Code:
Country:

Contact Phone:
Contact Email:

## Additional Supporting Documentation Provided

☑ Yes
☐ No

------------------------------------------------------------------------------------------

Attachment Filename:

KROLL.pdf

**KROLL**

Electronic Proof of Claim Confirmation: **3320-1-OFFWD-639541121**

Claim Electronically Submitted on (UTC) : **2023-05-15T13:05:43.493Z**

Submitted by:  Jason Gardiner
           jgardiner9297@gmail.com

KROLL







This envelope is for use with the following services:

**UPS Next Day Air®**
**UPS Worldwide Express™**
**UPS 2nd Day Air®**

Apply shipping documents on this side.

Do not use this envelope for:

**UPS Ground®**
**UPS Standard®**
**UPS 3 Day Select®**
**UPS Worldwide Expedited®**

**upsstore.com** to learn more
about The UPS Store®
UPS Print & Business Services.

Visit ups.com for details on our privacy practices.

U.S.M.S
X-RAY

Serving you for more than 100 years

United Parcel Service.

EXtremely Urgent

**upsstore.com** to find a location near you.

Shipments

for the Letter rate, UPS Express Envelopes may only contain
ndence, urgent documents, and/or electronic media, and must
oz. or less. UPS Express Envelopes containing items other than
ed or weighing more than 8 oz. will be billed by weight.

nal Shipments
The UPS Express Envelope may be used only for documents of no commercial

U.S.M.S
X-RAY



JASON GARDINER
15 VICKWOOD CT
MARIETTA GA 30068

**0.5 LBS LTR**          **1 OF 1**

SHIP TO:
OFFICE OF THE CLERK
US BANKRUPTCY COURT DISTRICT OF DEL
824 N MARKET ST
**WILMINGTON DE 19801-3024**

DE 197 9-25

**UPS NEXT DAY AIR**                **1**
TRACKING #: 1Z H55 65V 24 1309 1221



BILLING: 3RD PARTY
SIGNATURE REQUIRED

XOL 24.03.15      NV45 13.0A 03/2024°



ipping Notice – Carriage hereunder may be subject to the rules relating to liability and other terms and/or conditions established by the Convention for the Unification of Certain Rules Relating to International Carriage by Air (the "Warsaw Convention") and/or
on the Contract for the International Carriage of Goods by Road (the "CMR Convention"). These commodities, technology or software were exported from the U.S. in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.