<pre>
 1                    UNITED STATES BANKRUPTCY COURT
                        DISTRICT OF DELAWARE
 2
                                   .  Chapter 11
 3   IN RE:                        .  Case No. 23-10051 (JKS)
                                   .
 4   GIGAMONSTER NETWORKS, LLC,    .  (Jointly Administered)
     et al.,                       .
 5                                 .
                                   .  Courtroom No. 6
 6                                 .  824 North Market Street
                 Debtors.          .  Wilmington, Delaware 19801
 7                                 .
                                   .  Tuesday, August 27, 2024
 8   . . . . . . . . . . . . . . . .  1:00 p.m.

 9                       TRANSCRIPT OF HEARING
                BEFORE THE HONORABLE J. KATE STICKLES
10                 UNITED STATES BANKRUPTCY JUDGE

11   APPEARANCES:

12
     For the Debtors:         Laura Davis Jones, Esquire
13                            PACHULSKI STANG ZIEHL & JONES LLP
                              919 North Market Street, 17th Floor
14                            P.O. Box 8705
                              Wilmington, Delaware 19801
15

16   For the U.S. Trustee:    Timothy Fox, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
17                            844 King Street, Suite 2207
                              Lockbox 35
18                            Wilmington, Delaware 19801

19   (APPEARANCES CONTINUED)

20   Audio Operator:          Brandon J. McCarthy, ECRO

21   Transcription Company:   Reliable
                              1007 N. Orange Street
22                            Wilmington, Delaware 19801
                              (302)654-8080
23                            Email:  gmatthews@reliable-co.com

24   Proceedings recorded by electronic sound recording,
     transcript produced by transcription service.
25
</pre>

1    <u>APPEARANCES (CONTINUED)</u>:

2    For the Prepetition
     Agent:                    Andrew Remming, Esquire
3                              MORRIS, NICHOLS, ARSHT & TUNNELL LLP
                               1201 North Market Street
4                              Suite 1600
                               Wilmington, Delaware 19801
5

6    For the Committee:        Richard Bernard, Esquire
                               FAEGRE DRINKER BIDDLE & REATH LLP
7                              1177 Avenue of the Americas
                               41st Floor
8                              New York, New York 10036

9    For Babif Giga
     Blocker:                  Katherine Lynn, Esquire
10                             HOGAN LOVELLS US LLP
                               390 Madison Avenue
11                             New York, New York 10017

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

INDEX

2

MOTION:                                                            PAGE

3

Agenda
Item 1: Combined Disclosure Statement and Joint          4
        Plan of Liquidation of GigaMonster
        Networks LLC and Its Affiliated Debtors
        Under Chapter 11 of the Bankruptcy Code
        [Filed 6/25/2024] (Docket No. 802)

7

        Court's Ruling:                                         60

8

DECLARATIONS:                                                      PAGE

9

1) Craig Johnson                                               6

10

2) Rian Branning                                              8

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4

5      (Proceedings commence at 1:01 p.m.)

6      (Call to order of the Court)

7           THE COURT:  Good afternoon, everyone.  Please be

8  seated.

9           This is Judge Stickles.  We're on the record in

10  GigaMonster Networks, LLC, Case Number 23-10051.

11           Good afternoon, Ms. Jones.

12      (No recording microphones at lectern/podium or counsel

13  table)

14           MS. DAVIS JONES:  Thank you, Your Honor.  Good

15  afternoon.  It's great seeing you, it's been a while.

16           Your Honor, for the record, Laura Davis Jones,

17  Pachulski, Stang, Ziehl & Jones, on behalf of GigaMonster

18  Networks, LLC and its related debtors.

19           Your Honor, we are here today with one matter going

20  forward, and that's seeking approval of the debtors' combined

21  disclosure statement and plan.

22           Your Honor, the plan and disclosure statement now

23  before the Court enjoys the full support of the debtors, the

24  creditors' committee, and the pre-petition agent and lenders.

25  It also has been unanimously accepted by those voting who are

1    entitled to vote.

2        There are no objections pending to the plan by any

3    creditor.  And the objection filed by the U.S. Trustee has

4    been narrowed, so that we will be discussing issues raised by

5    the U.S. Trustee about releases, the injunction to enforce

6    third-party releases, and the inclusion of certain related

7    parties in the definition of "exculpated parties," all in

8    light of the Supreme Court's decision in Purdue.

9        Your Honor, there are no issues about the

10   tabulation of votes or the debtors' business judgment

11   supporting the plan.

12       We filed a declaration of Craig Johnson of Kroll

13   Restructuring Administration, LLC, with respect to the votes.

14   We are not aware of any issues with Mr. Johnson's testimony.

15   Mr. Johnson is here in case the Court has some questions.

16   But Your Honor, I would move his declaration into evidence,

17   if it would please the Court.

18       THE COURT:  Okay.  Good afternoon, Mr. Johnson.

19       Let me ask.  Does anyone oppose admission into

20   evidence of the voting declaration at Docket Number 862?

21      (No verbal response)

22       THE COURT:  I see no hands on Zoom and I hear no

23   one.

24       Does anyone anticipate cross-examining Mr. Johnson

25   regarding the content of his declaration?

1     (No verbal response)

2          THE COURT:  I hear no one, I see no hands on Zoom.

3          The declaration is admitted uncontroverted.

4     (Johnson Declaration at ECF 862 received in evidence)

5          MS. DAVIS JONES:  Thank you, Your Honor.

6  Appreciate that.

7          Your Honor, similarly, the debtors filed a

8  declaration of their Chief Restructuring Officer Rian

9  Branning in support of the combined plan and disclosure

10 statement.  Again, Your Honor, we're not aware of any issue

11 with Mr. Branning's testimony.  I do believe Mr. Fox wants to

12 make a reservation of rights on the record about it.  But Mr.

13 Branning is here and I would move his declaration into

14 evidence.

15         THE COURT:  Does anyone object to admission of the

16 evidence in the Branning declaration at Docket Number 863?

17         Mr. Fox.

18         MR. FOX:  Good afternoon, Your Honor.  May it

19 please the Court, Tim Fox on behalf of the United States

20 Trustee.

21         The U.S. Trustee does not object to the admission

22 of Mr. Branning's declaration.  But I did want to note that

23 Mr. Branning's conclusions on matters of law should not be

24 viewed as binding the Court.  And specifically, there are

25 items addressing Section 1123(e) of the Bankruptcy Code at

1  Paragraphs 21 through 32 of Mr. Branning's declaration.

2          THE COURT:  What -- wait.

3          MR. FOX:  And so long as --

4          THE COURT:  Paragraphs --

5          MR. FOX:  -- those are not --

6          THE COURT:  -- 21 to 32?

7          MR. FOX:  Correct.

8          THE COURT:  Okay.

9          MR. FOX:  And so long as those are not viewed as

10 binding on the Court, in terms of what conclusions Your Honor

11 may reach after argument on the contested issues, again, no

12 objection to admission of the Branning declaration.  I just

13 wanted to highlight that potential concern, given the

14 structure of the declaration.

15          THE COURT:  Ms. Jones?

16          MS. DAVIS JONES:  Thank you, Your Honor.

17          Mr. Branning, Your Honor, is giving Your Honor his

18 understanding of what he believes with respect to the

19 standards.  He is not a lawyer, he's obviously not the Judge

20 of this Court.  So his declaration is no different than any

21 other declaration Your Honor has seen by a Chief

22 Restructuring Officer, where they set forth what they believe

23 and why they believe that the plan satisfies the requirements

24 of the Code.  Obviously, Your Honor, the final decision on

25 that is made by you.

1          THE COURT:  Okay.  Does anyone else wish to be

2    heard with respect to the Branning Declaration?

3        (No verbal response)

4          THE COURT:  Okay.  The declaration is admitted with

5    the caveat set forth by the United States with respect to

6    Paragraphs 21 through 32.

7        (Branning Declaration at ECF 863 received in evidence)

8          MS. DAVIS JONES:  Thank you, Your Honor.

9          Your Honor, the debtors also filed a memorandum in

10   support of the plan and the disclosure statement and

11   confirmation, discussing all of the confirmation standards,

12   as required by the Bankruptcy Code, and a plan supplement

13   that provides the form trust agreement to be established

14   under the plan.

15          I propose, Your Honor, not to walk through each of

16   the classes, the treatments, and provisions of the plan, as

17   we did that in major part at the preliminary disclosure

18   statement hearing and in our supporting plan confirmation

19   brief.  But rather, Your Honor, I'd like to focus, if I may,

20   our attention on the issues raised by the U.S. Trustee.

21   Outside of those issues raised, there's no other opposition

22   or pending dispute.

23          Your Honor, let me start with a headline issue.

24   The U.S. Trustee asserts that third-party releases are --

25   here, are not consensual; and, therefore, they're not limited

1 | pursuant to Purdue. Your Honor, as the Court knows, this is
2 | an opt-out plan. Creditors have the option, by virtue of a
3 | ballot, to select to decide to grant the release, not to
4 | grant a release; they do it by checking a box.

5 | This plan goes even one step further. It gives all
6 | holders of claims and interests, except to Class 5, who are
7 | deemed to have consented, the right to opt out, even if they
8 | accepted the plan. And much of the precedent that we put
9 | before the Court in the brief, that was not an option. But
10 | we went full throttle on this, Your Honor, and have given
11 | people the opportunity to accept the plan, but still say I
12 | don't want the opting -- or I don't want the releases, so I'm
13 | opting out.

14 | Your Honor, no creditor voting to accept the plan
15 | was deemed to have consented to the third-party releases. As
16 | I said, they can still opt out, even though, without it
17 | (indiscernible)

18 | The opt-out provision and the full text of the
19 | third-party release and the related definitions were
20 | highlighted in the combined plan and disclosure statement;
21 | the notice, the non-voting notices, and the ballots and an
22 | opt-out election form. The deadlines to return those ballots
23 | and opt-out election forms was also conspicuous and clear on
24 | the documents.

25 | Your Honor made a call at the disclosure statement

1 | hearing that Your Honor carefully had gone through those

2 | documents and had a number of inserts for us to make sure

3 | that that language was conspicuous and that folks receiving

4 | the documents would know what they are -- were receiving.

5 | Your Honor, as discussed in our brief, this Court

6 | and others have found that, when a disclosure is prominent

7 | and conspicuous, an opt-out mechanisms is a valid means of

8 | obtaining consent.  Indeed, in this case, we have parties who

9 | did opt out, as reflected in Mr. Johnson's declaration.

10 | The Purdue decision does not change this analysis

11 | or the result.  Purdue held only that non-consensual releases

12 | were not permissible in a plan.  The Supreme Court did not

13 | address and, in fact, told us it did not address what

14 | constitutes consent.  And this Court and the Courts in this

15 | District and this Circuit have held that opt-out provisions

16 | are effective and permissible.

17 | In our brief, Your Honor, we set forth decisions

18 | from other courts issued post Perdue that, again, have found

19 | opt-outs do work, they provide the consent necessary to

20 | approve the releases.  Obviously, Your Honor, there are --

21 | there's a decision or two out there post Perdue that says no,

22 | it does not work.  Again, Your Honor, those are districts

23 | where they had not used opt-outs previously, so I'm not

24 | surprised by those decisions.  But again, they do exist.

25 | Here, as set forth in the Branning's declaration,

1  the third-party releases are integral to the plan and the

2  parties reaching resolution on a plan.

3          In addition to being consensual and integral to the

4  plan, the releases are sufficiently specific and they were

5  given for consideration.  And we talk that in our brief, that

6  consideration, ending the litigation, providing a fund for

7  the unsecureds, and so forth.

8          THE COURT:  But is the consideration relevant to a

9  third-party release if it's consensual?

10         MS. DAVIS JONES:  Your Honor, I think it's -- I --

11 the courts have found -- and I think the case law instructs

12 us -- that, frankly, if you gave consent, even if it didn't

13 make sense for you to give consent, you gave a consent.  But

14 I think a number of the courts have liked the bootstrap of

15 saying, not only did they give the consent, but they got --

16 there was consideration for it.

17         I'm with Your Honor.  I don't think -- or assuming

18 that's Your Honor's position.  I don't think the

19 consideration is essential, but the Courts have looked for

20 it.  In this Third Circuit, it's been one of the elements

21 that it has set forth in looking at the propriety of releases

22 --

23         THE COURT:  For --

24         MS. DAVIS JONES:  -- on the --

25         THE COURT:  For debtors, certainly.

1          MS. DAVIS JONES:  Yes.  Yes, Your Honor.

2          And for third parties, Your Honor, we've had judges

3   ask about it.  And I think that, as -- again, I think it's

4   something that gives people more comfort that there was some

5   logic in the consent that was given.

6          Your Honor, there's been a number of judges who

7   have said you received the information in the mail, if you

8   have questions, it's your duty to get a lawyer or get

9   somebody to help you or, in whatever event, appear in court

10  if you don't understand it or have a problem with it.  But I

11  think, despite that -- and I do agree with the -- that line

12  of thinking that covers most of the judges in this District -

13  - I do think that the Courts have taken some comfort in

14  knowing that there's additional consideration.

15         Your Honor, I think it also goes to the releases

16  being integral to the plan.  I do not think we would have

17  gotten there with an agreement with the creditors' committee

18  -- And I'll let counsel speak for himself -- but without this

19  consideration being given.

20         THE COURT:  And by "this," we're talking about the

21  plan funding.

22         MS. DAVIS JONES:  Yes.

23         THE COURT:  The trust funding.  Excuse me.

24         MS. DAVIS JONES:  Yes.

25         THE COURT:  The million --

1         MS. DAVIS JONES:  And --

2         THE COURT:  -- three.

3         MS. DAVIS JONES:  And so, Your Honor, I think all

4  of it, working together, is what led to a consensual plan.

5  We're standing here with no objections.

6         Your Honor, the other thing I would point out is I

7  pretty closely watch my cases and I'm not aware of any party

8  or creditor calling and saying I don't understand this, this

9  doesn't work, what does it mean I'm getting a release, what

10  have you.  Did get the calls of hey, what is GigaMonster, why

11  did I get this notice, those which we've all in practice have

12  received from time to time and you walk through whether

13  somebody has a claim, they can file a claim, and explain why

14  they might have a notice.  But I'm not aware of any

15  complaints in that regard, as well.

16         Your Honor, the U.S. Trustee also opposing the

17  third-party releases on grounds that they are over-broad

18  because they include related parties.  That language, Your

19  Honor, this Court and others have found necessary to make

20  sure that unnamed partners, whether it -- parties, whether it

21  be employees or folks like that, are protected from being

22  sued, if not identified.  Your Honor, this is not new.  And

23  indeed, this Court, as well as other judges in this District,

24  have all ruled on that.  But surely, Your Honor, and most

25  importantly, it's not affected by Purdue.

1        Another issue --

2        THE COURT:  Ms. Jones, can I ask you about the

3 scope?

4        MS. DAVIS JONES:  Yes, Your Honor.

5        THE COURT:  Here, obviously, there are plan-related

6 definitions with related persons and released parties and

7 releasing parties.  But isn't it the language of the third-

8 party release itself which limits the scope to what is

9 applicable?

10        MS. DAVIS JONES:  Yes, Your Honor.

11        THE COURT:  Okay.

12        MS. DAVIS JONES:  Your Honor, another issue that

13 the U.S. Trustee raises is that a plan injunction enforcing

14 the consensual third-party releases is not appropriate and

15 not needed.  Your Honor, respectfully, that argument ignores

16 reality.

17        The injunction is -- the injunction set forth in

18 the plan ensures that parties cannot do an end run around the

19 terms of the plan and the confirmation order.  The releases

20 are an integral part of the plan, as we discussed.  Value has

21 been given.  And the injunction turns out to be the typical

22 method.  It's the mechanisms that debtors have used over the

23 years to make sure that the plan is complied with.

24        I'm not sure where the argument is coming from.

25 Again, Your Honor, I think it might be kind of a bootstrap --

1  trying to bootstrap something onto Purdue.  But again, Your

2  Honor, injunctions set forth in a plan to make sure the terms

3  of a plan are complied with are longstanding and surely

4  precedential in this District.

5       Your Honor, the last issue I'll address is the U.S.

6  Trustee's objection to inclusion of certain related parties

7  in the definition of "exculpated parties."  Your Honor, you

8  may have seen that we revised the language to try to address

9  the trustee's concerns, we didn't quite get there.  But we

10  revised it, so now it says:

11       "'Exculpated parties shall mean each, in their

12  respective capacities, as such, (a) The debtors; (b) The

13  committee, including its members; (c) the debtors' Chief

14  Restructuring Officer and Novo Advisors and related

15  professionals retained pursuant to the order granting

16  debtors' motion to retain and employ Novo Advisors to provide

17  a Chief Restructuring Officer and additional personnel as of

18  the petition date; (d) The independent director; (e) With

19  respect to each of foregoing and Clauses (a) through (d),

20  each of their respective financial advisors, attorneys,

21  accountants, investment bankers, consultants, agents, and

22  other professionals, including the professionals who have

23  served in such capacity during these Chapter 11 cases; and

24  (f) With respect to each of the foregoing in Clauses (a)

25  through (e), such persons or entities, successors and

1  assigneds, solely to the extent such person or entity acted

2  as a fiduciary of such person or entity during these Chapter

3  11 cases."

4          Your Honor, that language, especially that last

5  part of that, is clear and confirms that it must be a

6  fiduciary.

7          Your Honor, I think maybe the U.S. Trustee is

8  looking for a written list of everybody and everything, who

9  could possibly be a fiduciary.  Your Honor, this Court cannot

10  give that guarantee based on a list at this point.  And if it

11  becomes an issue, obviously, the issue of fiduciary will be

12  discussed and considered.  But that fiduciary standard is

13  listed, it's clear, and I don't think there's anything more

14  we can do on that.

15          Your Honor, based on the record of this case and

16  the Johnson and Branning declarations; our brief that sets

17  forth the confirmation standards; the application of those

18  standards to this case; the precedent of this Court, this

19  District, and the Third Circuit; and the persuasiveness, Your

20  Honor, of the cases that have been decided since Purdue;

21  putting that together with the fact that we have a plan

22  before the Court that has the unanimous vote of those who

23  elected to vote, were entitled to vote; and also, Your Honor,

24  demonstrates that the opt-out situation and mechanism work by

25  the fact that we had opt-outs come, as we -- as reflected in

1   Mr. Johnson's declaration --

2           THE COURT:  And correct me if I'm wrong, but that

3   related to both creditors and voting classes and non-voting

4   creditors?

5           MS. DAVIS JONES:  Yes, Your Honor.

6           So, Your Honor, given all that, we do think this

7   plan and disclosure statement, as combined, does warrant the

8   Court's approval, and we'd ask that it be approved.

9           THE COURT:  Okay.  Thank you.

10          MS. DAVIS JONES:  Thank you, Your Honor.

11          THE COURT:  Others?

12          MR. BERNARD:  All right.  Statements for, so in

13   support of the releases, yes, Your Honor.  We agree that

14   these releases are voluntary.

15          But going to what we knew -- or what we know, the

16   consideration in support -- and this is what got the

17   committee's support for -- to agree to the releases -- it's a

18   twenty-cent plan right now.  There's potentially one

19   additional asset that could amplify returns for unsecured

20   creditors.  But the committee was very satisfied with the

21   potential close-to-twenty-cent recovery in the case, and that

22   was a big part of, you know, the committee's consideration in

23   resolving this.  And we would not be in a consensual plan

24   process right now, but for, you know, us agreeing to do the

25   releases.  So they were integral to Barings' willingness to

1  put money on the table for the committee and resolve the

2  adversary proceeding that's out there and, you know,

3  incorporate that resolution into the plan that's before Your

4  Honor today.

5         So the committee is supportive of the plan.  We see

6  these releases as voluntary.  The opt-out, everything was

7  clearly set forth.  There was a separate form for any

8  creditor.  There was no coerciveness with respect to an opt-

9  out, so there was no detrimental impact (indiscernible)

10 you're not going to receive under the plan if you choose to

11 opt out.  So we see this -- these as voluntary and that the

12 plan should be confirmed.  Thank you.

13        THE COURT:  Thank you.

14        MR. REMMING:  Good afternoon, Your Honor.

15        THE COURT:  Good afternoon.

16        MR. REMMING:  Andrew Remming of Morris, Nichols,

17 Arsht & Tunnell for Barings, the secured lender.  I'm joined

18 today by my colleague from Hogan Lovells, Katherine Lynn;

19 she's been admitted *pro hac vice* and will handle the

20 presentation for Barings today.

21        THE COURT:  Okay.

22        MR. REMMING:  Thank you.

23        THE COURT:  Good afternoon.

24        MS. LYNN:  Good afternoon, Your Honor.  Katherine

25 Lynn of Hogan Lovells US, LLP on behalf of Babif Giga Blocker

1   LLC and Barings Asset-Based Income Fund (US), who I'll refer

2   to as "Barings."

3           Barings was the debtors pre-petition secured

4   lender, having lent the debtors approximately $44 million

5   prior to the bankruptcy filing.  Barings has been involved in

6   the debtors' bankruptcy case since the start, and we are

7   pleased to support confirmation of the debtors' plan here

8   today.

9           In June 2003 [sic], the unsecured creditors'

10  committee filed an adversary complaint against Barings,

11  asserting claims for equitable subordination,

12  recharacterization, and fraudulent transfer, among others.

13  Barings contested the merits of these claims and filed a

14  motion to dismiss in response to the complaint.  Prior to

15  ruling on this motion, Your Honor requested that the parties

16  engage in mediation and -- in effort to resolve these issues.

17          Barings and the committee did engage in an in-

18  person mediation on September 13th, 2023, with retired Judge

19  Kevin Gross as mediator.  The mediation was, ultimately,

20  successful and the parties reached a settlement agreement in

21  the Fall of 2003, and did agree to some of the terms

22  reflected in the plan support agreement, which is included as

23  Exhibit A to the plan.

24          The plan support agreement resolved all claims

25  between Barings and the committee and includes the following

1  provisions:

2        First, all claims against Barings asserted in the

3  committee's complaint are deemed resolved and (indiscernible)

4  Barings' liens on the debtors' property was affirmed.

5        Barings' secured claim was allowed in an amount of

6  $48,876,357.

7        And further, Barings is obligated to use $1.3

8  million of its distribution from the debtors to fund the GUC

9  fund, which will be used to satisfy general unsecured claims.

10        Barings has also agreed to fund a cash reserve to

11  pay for disputed administrative claims, outstanding estate

12  professional fees, and costs associated with filing the

13  debtors' final tax return.  And it creates a cap on fees to

14  be paid to the committee professionals.

15        The plan support agreement requires the debtor to -

16  -

17        THE COURT:  And I'm just -- I'm sorry.  The cap on

18  attorneys' fees for the committee, that was an agreed-to term

19  as part of the settlement, correct?

20        MS. LYNN:  It was, Your Honor.

21        THE COURT:  Okay.

22        MS. LYNN:  The plan support agreement requires the

23  debtor to seek approval of certain releases, including an

24  opt-out for party releases for various parties, including

25  Barings.  And Barings views these third-party releases

1  included in the plan as appropriate under the circumstances.

2         Barings is only expected to recover about 50

3  percent of its pre-petition secured claim, but it's

4  contributing $1.3 million of its distributions to fund

5  recovery for general unsecured creditors, which will likely

6  be about (indiscernible) was stated.

7         Further, the third-party releases are consensual

8  and consistent with releases that are frequently approved by

9  Your Honor and are consistent with settled law of this Court,

10  as demonstrated by the debtors' argument here today.

11         Barings believes that the confirmation of the

12  debtors' plan is the best way forward for the debtors'

13  estate, and we respectfully request that Your Honor confirm

14  the debtors' plan and overrule the U.S. Trustee's objection.

15         THE COURT:  Okay.  Thank you.

16         Anyone else?

17     (No verbal response)

18         THE COURT:  Mr. Fox, the floor is yours.

19         MR. FOX:  Good afternoon again, Your Honor.  May it

20  please the Court, Tim Fox on behalf of the United States

21  Trustee.

22         Before I get started with my argument, I did want

23  to ask if I may approach with a copy of the Ebix, Inc.

24  transcript.  Ebix is one of the two decisions cited in the

25  debtors' confirmation brief as a judge declining to authorize

1  an opt-out release as consensual post Purdue.

2  THE COURT:  Certainly.

3  MR. FOX:  I have a copy for each of your clerks, as

4  well, if that's acceptable.

5  THE COURT:  That would be great.  Thank you.  Thank

6  you.

7  MR. FOX:  Thank you, Your Honor.

8  And Your Honor, prior to commencing today's

9  proceeding, I did hand a copy, as well, to debtors' counsel

10  and to counsel for the committee, Barings' counsel

11  (indiscernible) I have one more copy remaining.

12  So, Your Honor, just to table-set, as Ms. Jones

13  indicated during her presentation, we're done to essentially

14  three issues that are still live from the U.S. Trustee's

15  filed objection.

16  THE COURT:  Okay.

17  MR. FOX:  First is the third-party release, which

18  will likely be the vast majority of the argument for today.

19  But I do want to note that there are some definitional issues

20  that are associated with the releases that are still live,

21  just based on how the definitions interact with one another.

22  Second, the injunction, as it relates to the third-

23  party releases, is still live.

24  The discharge issue that was identified in the U.S.

25  Trustee's objection has been resolved.

1          But to the extent the injunction is seeking to

2    enforce the third-party releases, we view that issue as live.

3    And we would direct Your Honor's attention to Paragraph 69 of

4    the U.S. Trustee's objection for this specific slice of the

5    injunction issue.

6          And then, finally, as Your Honor heard from

7    debtors' counsel, the exculpation and the exculpated parties,

8    as revised, still leaves open some issues from the U.S.

9    Trustee's perspective.  Your Honor will likely recall that's

10   an issue that I argued before you in the Fast Radius case

11   some months ago.  And this is, essentially, a follow-on to

12   some of those arguments that my office made with respect to

13   those provisions in Fast Radius.

14         So, with that roadmap set out, I want to start with

15   the third-party releases and the crux of the issue being --

16         THE COURT:  Can I ask --

17         MR. FOX:  -- what -- yes.

18         THE COURT:  -- one quick question?

19         MR. FOX:  Certainly.

20         THE COURT:  Your objection to the disclosure

21   statement, is that still live?

22         MR. FOX:  So, Your Honor, because of the posture

23   here, the disclosure statement only being conditionally

24   approved, unless there's adequate information to support the

25   disclosure statement being approved on a final basis, I still

1  live, as well --

2           THE COURT:  Okay.

3           MR. FOX:  -- but --

4           THE COURT:  As part of your release objection.

5           MR. FOX:  Correct.

6           THE COURT:  Okay.  All right.

7           MR. FOX:  But --

8           THE COURT:  I just want to make sure I have all of

9  the issues.

10          MR. FOX:  Yes.  And that dovetails in with is the

11 third-party release, as requested, appropriate under the

12 Bankruptcy Code and case law, following the Supreme Court's

13 decision in Purdue.

14          And Your Honor, again, what is the central issue is

15 what is a consensual release that was not opined on by the

16 Supreme Court in Purdue, but that has been the subject of

17 litigation in the past and will likely continue to be the

18 subject of litigation for some time.

19          I note that Your Honor, at the disclosure statement

20 hearing, specifically identified that Your Honor had some

21 thoughts and was going to reevaluate your prior position with

22 respect to the opt-out third-party releases.  And at this

23 stage, the U.S. Trustee would contend -- are we having

24 technical difficulties?  Should I stop?  I'm seeing some

25 blinking on the screen.

1        THE COURT:  I don't know.  It caught my eye and I

2   was ...

3        (Court and court personnel confer)

4        MR. FOX:  Okay.  I'll proceed, unless directed that

5   we're having further issues.

6        THE COURT:  Does anyone in the courtroom have any

7   problem hearing Mr. Fox?

8        (No verbal response)

9        THE COURT:  Okay.  You may proceed, Mr. Fox.

10        MR. FOX:  Thank you, Your Honor.

11        And so Your Honor identified that you may be

12   reevaluating your position with respect to opt-out third-

13   party releases.  And the U.S. Trustee, after evaluating the

14   analysis in Purdue, as well as arguments made previously,

15   presented its objection on these issues here with respect to

16   the specific debtors and the Chapter 11 plan at bar.

17        Your Honor, following the Supreme Court's opinion

18   in Purdue, I would note that Section 1123(b)(6) of the

19   Bankruptcy Code is identified as being cabined to no longer

20   include non-consensual third-party releases as an otherwise

21   appropriate term of a plan.  And in the fallout from Purdue,

22   it is imperative to understand what amounts to consent from a

23   party that is thought to be bound by the third-party release

24   provisions, to the extent that you can say that they are

25   consensual and, therefore, not covered by Purdue's ruling.

1        The decision in Purdue on 1123(b)(6), I think

2    implicates some other statutory provisions that debtors in

3    the past have used to support the validity of an opt-out

4    third-party release.  And for instance, the argument has been

5    made that Section 1141 of the Bankruptcy Code, when the plan

6    is confirmed, would operate to bind such parties to the

7    third-party release in the event that they failed to confirm

8    an opt-out.

9        But after the Purdue ruling, that, as a basis, no

10   longer seems to be an appropriate one to support an opt-out

11   as being a consensual third-party release.  And so, Your

12   Honor, the U.S. Trustee posits that courts should turn to

13   contract law to understand whether or not there has been a

14   manifestation of consent to the third-party release

15   sufficient to support a contract between the nondebtor third

16   parties that will benefit from the third-party release and

17   the nondebtor parties that are sought to be releasing parties

18   under the terms of that third-party release.

19       I would further note that the Third Circuit's

20   decision in Continental, which ultimately held that third-

21   party releases in that case were not consensual and not

22   supported by any of the other, more permissive tests that

23   were in existence at the time, essentially has much less to

24   say about what parties should be looking to, in order to find

25   whether a third-party release is consensual or non-

1   consensual.  And as a result, certain decisions of the

2   Bankruptcy Court here in the District of Delaware, such as

3   Indianapolis Downs and Stanchion that rely on Continental for

4   charting what is acceptable may have less persuasive

5   authority than it did when Purdue had not yet been decided.

6   Again, this prompts a reevaluation of what consent equals

7   post the Supreme Court's decision in Purdue.

8          I would note that two judges in this distract

9   already accede to a view that a specific manifestation of

10  consent through an opt-in is more appropriate, in terms of

11  finding a consensual third-party release, and that there's

12  currently a matter under advisement with Judge Goldblatt in

13  the form of the Smallhold case that was argued early last

14  week, where --

15          THE COURT:  What case?

16          MR. FOX:  Smallhold.  And I can get a citation for

17  you, if that would be helpful.  I don't have that immediately

18  in my notes.

19          THE COURT:  Okay.

20          MR. FOX:  That addresses similar concerns with

21  respect to consent for third-party release relief.

22          But as Judge Walrath, in her Washington Mutual

23  decision, decided, and as Judge Owens decided in the Emerge

24  Energy matter, opt-ins have been required to demonstrated

25  consent.  And those decisions, along with contract

1   principles, again, demonstrate that the debtors' requested

2   third-party releases here in the GigaMonster matter are

3   insufficient to operate as consensual third-party releases.

4           Your Honor, applying the law of contracts, the U.S.

5   Trustee's objection walks through an analysis in the Second

6   Restatement of Contracts, as well as certain Delaware

7   precedent that is applicable to when an offeree's [sic]

8   silence can be viewed as binding on that party.  That

9   analysis, Your Honor, is consistent with the Bankruptcy Court

10  in the Southern District of New York in the Chassix decision

11  reviewed.  There are citations in the brief throughout to

12  Chassix.

13          And that is a similar point that is highlighted in

14  the Ebix ruling that I handed up to Your Honor earlier, and

15  it's specifically identified at Pages 12 through 14 of the

16  Ebix transcript, walked through a number of alternative items

17  that demonstrate that an opt-out is not something that can be

18  viewed as being a voluntary consent to the terms of a third-

19  party release.

20          Specifically, in the Ebix ruling transcript, the

21  Court in Ebix identifies that a third-party release is

22  different than another aspect of a bankruptcy case, where

23  failure to act could bind that party to items requested by

24  the debtors in the form of cure or contract assumption

25  purposes.

1          Again, it's important to view that a contract

2    assumption and cure notice is an item between the debtors and

3    a creditor or party-in-interest in the bankruptcy case that

4    require that party to step forward and identify that they

5    have an issue with the cure, as opposed to the third-party

6    release relief which says nondebtor party-in-interest, your

7    rights against other another nondebtor party-in-interest that

8    is the subject of this release that will be released from any

9    claims that you have are being released.

10         And the absence of the debtor's role in the third-

11   party releases and a specific code provision like Section 365

12   is what makes the contract assumption and cure objection

13   procedure different from requiring a nondebtor third party to

14   object or otherwise act in order to avoid being bound by a

15   third-party release.

16         In the Ebix ruling, some other analogous body of

17   law is identified, including default under the Federal Rules

18   of Civil Procedure as being an instance where a failure to

19   act could result in negative consequences to a party's rights

20   against another party.  But again, that is distinguishable

21   here when the action is not specific between a plaintiff and

22   a defendant, but rather, again, implicates nondebtors that

23   are parties-in-interest of the debtor, as well as nondebtors

24   that are the beneficiaries of the third-party release.

25              THE COURT:  Well, how is that different than

1  Purdue?

2        MR. FOX:  Well, and so, Your Honor, again, when

3  Purdue was decided and indicated that Section 1123(b)(6) did

4  not allow a non-consensual release to be included, it's

5  difficult to see what procedural or statutory provision the

6  debtors are advancing that makes an opt-out consensual third-

7  party release.

8        Again, Your Honor, in some previous interactions

9  with my office and in overruling certain objections similar

10 to this, had identified that, you know, parties have a duty

11 to review their mail and to act accordingly.  And Your Honor,

12 what my argument right now is focusing on is:  Does a third-

13 party release based on an opt-out mechanisms create a duty

14 for those parties to act in order to otherwise avoid being

15 bound by the consequences of a third-party release?  And Your

16 Honor, absent applying contract principles to say that they

17 are assenting to that contract to be so bound, there doesn't

18 seem to be a basis under the Code that would be applicable to

19 a nondebtor releasing party, to a nondebtor released party,

20 as requested here and in similar opt-out plans.

21       THE COURT:  What about, as is here, a settlement

22 that's tied to the plan, pursuant to 1123(b)(3)(A)?

23       MR. FOX:  So, Your Honor, that is a great point.

24 And where I would say that that issue falls into place is

25 with respect to the debtors' release of those claims.  Again,

1  the committee, in making an adversary complaint against the

2  lender and ultimately settling those issues, was acting in a

3  manner to assert derivative claims or standing on behalf of

4  the debtors as part of its fiduciary responsibilities to

5  creditors.  The debtors could determine and among the parties

6  to that settlement to release the debtors' claims against

7  Barings that were being asserted by the committee.  But that

8  should relate only to parties at the negotiating table and

9  not to a myriad of third parties that may not necessarily be

10  involved in those negotiations or otherwise be affirmatively

11  relinquishing their rights.

12       Which dovetails in with another issue, and that is

13  the definition of "related persons."  That is an expansive

14  definition and results in both parties identified as

15  releasing parties and released parties, expanding to an

16  untold universe of parties that are covered by the language

17  as currently drafted in the plan.  Your Honor, that creates

18  notice issues under Folger Adam, as it relates to any party

19  that finds themselves in the Space Balls-esque, you know, I

20  am your nephew's cousin's brother's uncle, twice removed kind

21  of situation, that those expansive definitions create a

22  potential problem for interpretation of the plan in other

23  forms later on that, again, emphasizes how these releases

24  should not be viewed as consensual because it implicates

25  parties that don't even have any reason to know of their

1  rights being impacted by the provisions in the plan.

2         THE COURT:  Well, first of all, isn't it limited in

3  scope by the definition of "third-party release"?

4         MR. FOX:  So, Your Honor, there is language in

5  "releasing party" and in the substantive provision that seeks

6  to cabin that.  However, there are instances where -- I

7  believe the objection cites to one such example -- and just

8  bear with me while I find that -- that a potential taxing

9  authority that may have a claim related to income derived

10 from a transaction with a debtor would find its rights

11 against a nondebtor third party released because it involves

12 a transaction with the debtor, that that taxing authority has

13 rights against the released party.

14         And because the language, although limited in

15 connection to the debtor, also covers the employees,

16 affiliates, assigneds, representatives, et cetera, there

17 could be an argument made that the claim was released by that

18 nondebtor third party, by failing to submit the opt-out when

19 it's only an affiliate of that party that was actually in

20 receipt of the opt-out election form.

21         And just pardon, I do have that specifically in the

22 brief somewhere and will --

23         THE COURT:  I --

24         MR. FOX:  -- direct Your Honor's attention to it

25 when I can find that citation.

1      (Pause in proceedings)

2          MR. FOX:  And Your Honor, I believe that example is

3   identified in Paragraph 66 of the U.S. Trustee's objection at

4   Docket Item 859.

5          THE COURT:  I see that.  Thank you.

6          MR. FOX:  So, Your Honor, again, understanding that

7   the parties are trying to implement limiting principles, the

8   ultimately outcome, as it relates to the defined terms and

9   the mechanics being employed, creates a situation where

10  there, again, innumerable parties that are affected by the

11  release relief, as requested, and have not done anything to

12  either be bound by silence, in terms of not returning the

13  opt-out, or may not have even ever received an opt-out in the

14  first place, which is why the U.S. Trustee views this

15  provision as objectionable and further --

16         THE COURT:  Well, if --

17         MR. FOX:  -- you know, is --

18         THE COURT:  If someone comes forward and can

19  establish that they didn't receive notice, are they bound by

20  a release?

21         MR. FOX:  Your Honor, I think that moves the burden

22  from the debtors to identify that the plan is consistent with

23  applicable law and appropriate under the confirmation

24  standards of 1129 and then creates a situation where a party

25  who is seeing a plan used as a sword at a later date, having

1  to vindicate their rights, again, when this is conduct or

2  claims that exist between parties that are not the debtor

3  and, instead, a third party being asked to release claims and

4  a third party receiving a benefit (indiscernible)

5        THE COURT:  But your notice issues applies the

6  same, whether it's voting to accept or reject a plan, or to

7  send back an opt-out.  And I have consistently held, if you

8  don't get notice and you come in and establish there wasn't

9  due process, it's not going to apply to you.

10       MR. FOX:  And Your Honor, I think, again, where the

11 distinguishing principle exists post Purdue is that, when it

12 comes to voting in favor or rejecting a plan, those are

13 duties that the Code can impose upon parties-in-interest to

14 be responsive to the solicitation process; whereas, a release

15 that exists between nondebtor third parties to be released

16 and parties-in-interest in a bankruptcy case and the related

17 persons, as this plan structured it, is not the same that

18 should impose a duty to act on all of those parties, in order

19 to avoid having their rights impaired as to those third

20 parties.

21       And Your Honor, there's one last point from the

22 Ebix ruling that I'll hit before moving on to some other

23 topics.  The Court in Ebix considers class action practice

24 and that opt-outs are a mechanism used in class action

25 practice, but that's with respect to deciding if you want to

1  go it alone and bring your own individual action against the

2  defendant.  And a party that fails to return an opt-out in a

3  class action setting is still being represented by a class

4  representative who is acting in the best interests of all

5  parties that are similarly situated with respect to common

6  issues of law and fact, and will have further court process

7  as to what will happen to their rights should that class

8  representative move later to settle the claims held by

9  members of the class.  That is not a function or a feature of

10 the third-party releases in the bankruptcy plan context that

11 are being sought to be applied to parties-in-interest and the

12 related persons under the definitions applicable here in the

13 GigaMonster plan and similar plans.

14        So, Your Honor, to segue into the second release

15 issue that I wanted to highlight, it's useful to understand

16 that the definitions here create a potential source of

17 confusion.  And this dovetails back to the disclosure

18 statement issues that Your Honor requested some clarification

19 on earlier, in that there is a debtor release under Article

20 X(f)(1) of the plan, as well as the third-party release at

21 Article X(f)(2).

22        However the definitions in Article X(f)(2) of

23 releasing parties includes the debtors in their capacity as

24 such and as debtors-in-possession, which essentially means

25 that, in addition to the debtor release at Article X(f)(1),

1  the debtors are releasing all of the parties a second time in

2  Article X(f)(2) because of the incorporation of those

3  definitions.

4          And in Article X(f)(2), that then opens that up to

5  all of the related persons of the debtors because releasing

6  parties, including the debtors, also includes the related

7  persons of the debtors; meaning that, in addition to the

8  direct debtor release in Article X(f)(1), there is a whole

9  other release that is being granted by the debtors under

10 related persons that creates confusion and/or makes it

11 unclear as to, if Your Honor were to permit the debtor

12 release in Article X(f)(1), but not sustain the third-party

13 releases, as the U.S. Trustee contends what the outcome of

14 that is, again, or if Your Honor does approve the third-party

15 releases, is there additional relief beyond what the debtors

16 are specifically requesting to release themselves that the

17 definitions in the plan provide for.

18         And Your Honor, again, that's not a feature of a

19 disclosure statement that explains what is covered by Article

20 X(f)(1) and what would be covered by the debtors' inclusion

21 in the definitions under Article X(f)(2).

22         And admittedly, I think this is an issue where you

23 can work yourself into knots trying to figure out what is

24 covered, what is not covered, how this Venn Diagram would

25 essentially be laid.  And so, Your Honor, that we view as an

1   independent issue for confirmability of a plan outside of if

2   Your Honor reassesses what is consensual for third-party

3   releases as it relates to the opt-out mechanics here.

4        So switching gears.  The injunction, again, is --

5   as it relates to the third-party release relief is a separate

6   issue that the U.S. Trustee still has issues with.  Again,

7   the changes addressed the discharge concern that was

8   identified in the objection from the U.S. Trustee.  But the

9   injunction, as described in Paragraph 69 of the U.S.

10  Trustee's objection, highlights some additional problems with

11  the consensual purported nature of the third-party releases.

12       If such a release is truly consensual, an

13  injunction wouldn't be necessary to enforce it because you

14  would have had parties agree that we are relinquishing our

15  rights against all of the released parties; and, therefore,

16  would act in accordance with that consent, as opposed to

17  requiring that a provision of the plan separately say you can

18  take no such action.  It creates a concern that that release

19  is not truly consensual if an injunction is necessary to

20  enforce it.

21       And in Purdue specifically, the Supreme Court

22  points to Section 524(g) as providing the only mechanism for

23  such an injunction as being appropriate when you're dealing

24  with a non-consensual release.

25            THE COURT:  When dealing --

1          MR. FOX:  So Your Honor --

2          THE COURT:  -- with a non-consensual release.  So

3    are you saying, when dealing with a consensual release, a

4    plan can never -- and let's take -- this is not a mass torts

5    case, so we're not dealing with 524(g).  Okay?

6          So are you saying, in a Chapter 11 plan, that, if

7    you have consensual releases, you cannot have an injunction

8    provision under Purdue?

9          MR. FOX:  That it should not be necessary to

10   specifically enjoin such claims because they're being

11   voluntarily and consensually released against the covered

12   released parties.  So, Your Honor --

13         THE COURT:  So you -- you're saying there should be

14   no belts and suspenders, is really what you're saying.

15         MR. FOX:  I believe that's correct, Your Honor,

16   that, if this is truly a consensual release, you don't need a

17   specific injunction provision in the plan to say that that

18   consensual release between nondebtor third parties and other

19   nondebtor third parties can be enforced specifically by the

20   Bankruptcy Court because there should be a meeting of the

21   minds and consent among those parties to act in accordance

22   with the terms of that release.

23         THE COURT:  So just can I take that a step further?

24   Because we live in the real world.  Okay?  So, practically

25   speaking, when there comes an issue down the road, the

1  response isn't let me cite to you this injunction; rather,

2  let me retrieve the copy of your release, your -- is that

3  what you're suggesting --

4            MR. FOX:  And I --

5            THE COURT:  -- in the --

6            MR. FOX:  I would say --

7            THE COURT:  -- practice?

8            MR. FOX:  -- that, in practice, that would operate

9  fairly similarly to a party moving under the confirmation

10 order to assert that the injunction applies; and, instead, it

11 would be that you have voluntarily relinquished their rights

12 and here's the proof of that, which may be in the form of an

13 opt-in or some other agreement among that party with the

14 debtors and the nondebtor third parties that are seeking the

15 relief related to that voluntary and consensual release.

16            So, Your Honor, I'll pause in case, on the release

17 or injunction issues, there are any items I haven't addressed

18 before I turn to the exculpated parties issue.

19            THE COURT:  Well, I do have a question that's kind

20 of been in the back of my mind since you talked about the

21 committee's settlement here.  And is it your position that

22 the committee can't act on behalf of the creditor body in

23 agreeing to releases?

24            MR. FOX:  The committee and its members, I think

25 can be so bound by actions of the committee.  But that should

1   not be viewed as necessarily implicating every creditor in

2   the general unsecured class that the committee represents as

3   a fiduciary.  Those are individual parties who have

4   individual rights and ought to be allowed to exercise those

5   in a manner consistent with applicable law, which, again, the

6   U.S. Trustee asserts here, with respect to the opt-out

7   mechanic, is not sufficient to say that they have consented

8   to the third-party release relief sought.

9          So, Your Honor, that brings me to the exculpation.

10  And I would note that, in the Third Circuit, it's permissible

11  to exculpate only estate fiduciaries.  Again, while we

12  appreciate the debtors' efforts to narrow the scope of the

13  exculpation and the exculpated parties consistent with the

14  informal comments and the objection lodged by the U.S.

15  Trustee, the provision, as revised, still includes broad

16  categories of parties that may not be estate fiduciaries.

17         And that secondary clause that says "only to the

18  extent that such parties are estate fiduciaries," again,

19  serves to only muddy the waters and creates a situation where

20  a party that is not an estate fiduciary can claim the benefit

21  of the exculpation and seek to have that used in another

22  forum that might not be this Bankruptcy Court, to cloak

23  itself in the protection of the exculpation, when, if the

24  provision was drafted so as to only specify those parties

25  that are estate fiduciaries, there wouldn't be an

1  interpretative problem that a later court might have to

2  resolve.

3        As I mentioned, again, Your Honor, I understand

4  that I argued that issue to you in the first -- Fast Radius

5  case, I want to say in early 2023, and that Your Honor

6  ultimately overruled that objection.  That, ultimately, was

7  narrowed to two specific subclauses that related to whether

8  all employees of the debtors in Fast Radius were estate

9  fiduciaries that should benefit from the exculpation, as well

10 as the successors and assigneds of those parties.

11       We had colloquy during the Fast Radius hearing

12 about well, if a party is an estate fiduciary and it later

13 merges with another entity, say, for instance, Pachulski

14 Stang, as a firm, acquired another law firm in a merger, it

15 would only be the Pachulski Stang portion of the firm that

16 should retain its status as an exculpated party, and that

17 shouldn't operate to cloak the acquired firm in the

18 protection of the exculpation because they were not estate

19 fiduciaries from the petition date through the effective date

20 of the GigaMonster Chapter 11 plan.

21       So, again, Your Honor, I understand that that is a

22 little bit of an academic issue and that that language has

23 been approved in other plans as consistent with custom and

24 practice and case law limiting the exculpation to estate

25 fiduciaries.  But again, the U.S. Trustee contends that the

1  definition needs to be specific and only list estate
2  fiduciaries, instead of seeking to include categories of
3  parties that are not estate fiduciaries, but relying on that
4  savings-type language that they're only exculpated to the
5  extent that they were estate fiduciaries.

6          THE COURT:  So your position would be you need to
7  strike everything from "and (f)" forward.  Is that correct?

8          MR. FOX:  I think that addresses it, in part.  The
9  language before --

10         THE COURT:  You have issues with identifying
11 various professionals?

12         MR. FOX:  So there are parties earlier in the
13 sequence, and I'll use the committee and the committee's
14 members as an example, that, to the extent a committee member
15 retained its own counsel or financial advisor, that would not
16 be a professional retained by the -- retained by the estate
17 and entitled to an exculpation under current Third Circuit
18 law.  And the drafting of that provision currently would
19 allow the committee member X's financial advisor or
20 individual counsel to be a potential beneficiary of the
21 exculpation, as currently drafted.

22         THE COURT:  It's your position that the language:
23         "-- solely to the extent such person or entity
24 acted as a fiduciary to any such person or entity during
25 these Chapter 11 cases" --

1          Is too broad because it doesn't specify with

2   respect to this case?

3          MR. FOX:  That is a fair point, as well, Your

4   Honor.  Again, the --

5          THE COURT:  I'm trying to -- I'm trying to see -- I

6   don't know what it is that the U.S. Trustee requested of the

7   debtor, so I'm trying to understand it what it -- how -- what

8   it is that would be appropriate language on exculpation for

9   the United States Trustee.

10          MR. FOX:  So, again, the best formulation here,

11   from the U.S. Trustee's perspective, would only to be listing

12   the parties that are estate fiduciaries, entitled to the

13   protection of the exculpation, and then potentially some very

14   limited set of related persons that are serving on behalf of

15   those specified entities in the same fiduciary capacity.  And

16   so, again, this is a problem of the definition trying to

17   solve for a lot of complexity, but, in doing so, creating an

18   interpretative problem for later courts, potentially, as to

19   who is covered.

20          THE COURT:  Okay.  I think I understand your

21   argument with respect to that.

22          MR. FOX:  So, Your Honor, again, the U.S. Trustee

23   objects to confirmation of the debtors' plan as currently

24   presented.  The third-party release issue and the mechanics

25   for manifesting consent to those third-party releases we

1   believe is not consistent with applicable law, especially in

2   light of what Purdue provided as to non-consensual third-

3   party releases.

4          And in the absence of specific analysis from the

5   debtors to identify how these parties are consenting, relying

6   on the prior decisions that said an opt-out is consent

7   doesn't pass muster from the U.S. Trustee's perspective.

8          So, unless Your Honor has any further questions --

9          THE COURT:  I do.  So do you agree that, in Purdue,

10  the Court declined to express a view on what constitutes a

11  consensual release?

12         MR. FOX:  I agree that the Supreme Court was clear

13  that it wasn't opining on what a consensual third-party

14  release is.

15         And at the same time, Your Honor, now, in

16  evaluating an opt-out mechanic, as to whether or not that is

17  consensual, there is a split of authority in this district

18  and elsewhere throughout the country as to what equates to

19  consent.  And the U.S. Trustee posits that consent ought to

20  be something more akin to an opt-in and may not satisfy an

21  opt-in with respect to related parties, again, for some of

22         THE COURT:  I'm going to -- I'm troubled by the

23  fact of the committee's settlement here.  I am troubled by

24  the U.S. Trustees position with respect to a release and the

25  release, as I understand it, and someone can correct me, is

1  the consideration for the agent giving a million-three to
2  fund the litigation trust, for giving certain causes of
3  action and for waiving the deficiency claims.  Among other
4  things, those are the three that kind of pop into my head
5  right now.
6           MR. BERNARD:  I was going to say, Your Honor,
7  don't forget the admins and the priority claims can satisfy
8  the plan -- a plan that satisfies the priorities.
9           THE COURT:  Right.  So, I am trying to reconcile
10  that with the U.S. Trustees position here with releases and
11  the committee's involvement in a global settlement.
12           MR. FOX:  So, Your Honor, those are fair points
13  and, again, the way I would frame this is when you have
14  Article 10(f)(1) of the debtors release that is an
15  appropriate mechanism for dispensing what the estates causes
16  of action, and again satisfies Section 1123, to the extent
17  the debtor is a party that is releasing such claims.  And so
18  while the debtors, the committee, and Barings may agree to
19  those certain salient deal points to then go beyond the
20  parties that are at the settlement table or that be so bound
21  by those parties that are at the settlement table and impose
22  that on all parties in interest that the plan covers is,
23  again, where the rub is created between are those parties
24  actually consenting to that third party release or is that
25  being extracted on a non-consensual basis as to all of them.

1        Again, understanding that there is being

2   consideration paid to resolve those claims.  That is, again,

3   between Barings and the parties that agree to that settlement

4   specifically and shouldn't then be used to say, you know, all

5   other parties, unless you return an opt-out are going to be

6   bound by these releases that you had no active hand in

7   negotiating and did not agree to.

8        Its, again, entirely appropriate for the committee

9   to lay down its sword in resolution of its issues that it

10  asserted against Barings in exchange for that consideration

11  and that treatment.  That treatment may be binding on all

12  parties that would receive claims paid as part of the

13  bankruptcy case but the additional layer of extracting a

14  release from those parties as it relates to the non-debtors

15  is not something that Purdue contemplates and, again, when

16  1123(b)(3)(6) is no longer available as a code provision to

17  say that that release, as it relates to the third parties, is

18  permissible it doesn't appear that there are any other

19  specific provisions of the code that authorize that relief.

20       If there is not a substantive provision of the

21  code to say that such relief is appropriate, then its purely

22  a contract between third parties and for Your Honor to be

23  able to approve that there has to be an agreement among those

24  third parties that that treatment is acceptable to both sides

25  of the proposed transaction.

1            THE COURT:  Thank you, Mr. Fox.

2            Can you wait one second, Ms. Jones.  Sorry, Ms.

3    Jones, I'm just trying to make a note.

4            MS. DAVIS JONES:  Thank you, Your Honor.  I am not

5    going to repeat things I said earlier but let me address a

6    few other points that Mr. Fox made and in our response to

7    them.

8            Your Honor, in his discussion of the couple cases

9    that have come out post Purdue and that they use a contract

10   analysis and, therefore, its unfair to put consent on parties

11   who didn't respond, Your Honor, that could be true of every

12   motion ever heard in the Bankruptcy Court.  We have a concept

13   called the mailbox rule.  I'm going to take you back to my

14   days of clerking for Judge Helen Balick where she reminded me

15   of this quite often.  We send out notice, the parties deem to

16   have sent it.  Whether they choose not to open their mail

17   that week, wait three weeks to open it, six weeks, never,

18   whether they say this is too difficult for me and I'm not

19   going to do anything about it or whether they take it to a

20   lawyer and have it figured out or they figure it out

21   themselves that is up to them.

22           The analysis that Mr. Fox would ask you to adopt

23   ignores the federal rules.  The federal rules tell us that

24   there is a mailbox rule. I cannot not and you cannot force a

25   recipient to review, vote, object, consider, what have you,

1 but you have to make it available to them.  Indeed, <u>Purdue</u>

2 did not change any of that.  If the Supreme Court wants to

3 instruct us through case law that we have to do something

4 more it will do so or, frankly, Your Honor, Congress will

5 change the statute and say, you know, the last couple hundred

6 years of mailbox rule no longer good, here is what we are

7 requiring you to do something new.

8        So, Your Honor, again, I think <u>Purdue</u> is being

9 used as a vehicle to try to move the goalpost, if you will,

10 but the Court could not have been clearer that it was not

11 changing and, indeed, was not given any guidance on what is

12 consent.  Surely, Your Honor, it didn't change the mailbox

13 rule.

14        Your Honor, this Court's decision --

15        THE COURT:  Let me ask you a question, Ms. Jones.

16        MS. DAVIS JONES:  Of course, Your Honor.

17        THE COURT:  Is the mailbox rule different because

18 your waiving a right as opposed to consenting to something?

19        MS. DAVIS JONES:  Your Honor, I'm going to say no.

20 The reason is if I made a motion for the debtors to have a

21 KEIP approved by the Court, and that KEIP is going to provide

22 millions of dollars to a chief executive officer and the

23 committee is in support of it, the committee in its business

24 judgment thinks it makes sense, the debtor in its business

25 judgment thinks it makes sense, me, as an individual

1  creditor, no matter any way you cut it that's a couple

2  million dollars that is not going to be available.

3          Now we can all argue that couple millions of

4  dollars to the CEO is going to end up in tens of millions of

5  dollars in value, so it is well worth it.  I would expect we

6  would hear evidence to that effect, but we don't know that.

7  So, if I don't respond I have consented to that couple

8  million of dollars going out the door.

9          So, Your Honor, I really don't see its different

10 because I am giving up a right that I could have come to

11 Court and said put your guy on and show me why that couple of

12 million dollars doesn't make a difference to me, you know,

13 why I should be here.  If they don't do anything it's not the

14 debtor's job to go call the 39,000 people on the matrix one

15 by one and say, are you okay with the KEIP (indiscernible).

16         Your Honor, as I said, Purdue did not define

17 (indiscernible).  This Court's decision in Lannett or post-

18 petition -- post Purdue or Nexii is not effective nor does it

19 make it --

20         THE COURT:  Well, let's be clear, Nexii was a

21 Chapter 15 recognition proceeding.  So, isn't that different

22 then this because the Court is simply recognizing a foreign

23 court's ruling?

24         MS. DAVIS JONES:  Yes and no, Your Honor.  In the

25 main, yes, you are recognizing that ruling.  Your Honor, if

1  that ruling out of the Canadian Court was shocking to the

2  conscious of this Court Your Honor could say, you know,

3  that's working in Canada, it's not working here and here is

4  the reason why.

5          I agree with Your Honor that in my Chapter 15

6  experience maybe I saw it once where the domestic court chose

7  to differ with the Court that had the primary jurisdiction,

8  but it can happen.  There is nothing in Chapter 15 that says

9  it cannot happen, Your Honor.

10          Your Honor, bankruptcy judges have often looked at

11  matters differently. It's part of what makes this fun.  Also,

12  its good for the system that people think.  Obviously, no

13  bankruptcy judge is bound by another bankruptcy judge's view

14  or their decision.  Obviously, it can be persuasive.

15  Obviously, it should be considered.  But this Court does, and

16  it should, do its own analysis.

17          Your Honor, the U.S. Trustee has asked us to

18  ignore the reality of the value of third-party releases and

19  how they lead to consensual plans.  They want to tell the

20  Court -- and indeed Mr. Fox stood here and said debtor

21  release should be enough, there shouldn't be a need for a

22  third-party release.

23          Your Honor, nowhere did the Purdue Court say there

24  cannot be third party releases or that they don't have value

25  or that they can't be done.  Indeed, it's not the rule of the

1  U.S. Trustee to decide the judgment of the economic parties.

2  Your Honor, it is persuasive here that the creditors

3  committee, as the fiduciary for all unsecured creditors,

4  thought it was important for that release.

5        Your Honor, to Mr. Fox's point about it doesn't

6  seem fair that there should be burden shifting because

7  somebody didn't respond.  Your Honor, it goes to the first

8  point I was making; get the notice out there, get the

9  opportunity to be heard out there.  The burden is on the

10 party that didn't do so.

11       Simple example, Your Honor, bar date.  Send a bar

12 date notice out there, if the person doesn't respond or if

13 they let it sit on the kitchen table too long, and they say,

14 oops, I'm missing a distribution.  It is their burden to come

15 in and say why they missed it.  Now, Your Honor, frankly,

16 that standard in the Third Circuit is fairly low, its

17 excusable neglect. This Court has been very forgiving of

18 people missing those deadlines, but, Your Honor, I don't

19 think this is any different.  So, I am not agreeing that

20 there is some unnecessary hardship by the burden shifting.

21       THE COURT:  What about the U.S. Trustee's argument

22 that there is, and I'm paraphrasing, either a statutory or a

23 rule hook in the instance of a bar date, sale order, cure, or

24 claim objection, but there isn't a hook with respect to third

25 party releases.

1        MS. DAVIS JONES:  I don't understand the analysis,

2   Your Honor, frankly, from the Trustee on that.  I don't think

3   that makes a difference. I think it's a notice issue. It's a

4   due process issue we have talked about non-stop.  Very

5   importantly, Your Honor, again, there is nothing that

6   happened in Purdue that changes the decades of precedent of

7   this Court and of the Third Circuit on how you view plans,

8   third party releases, and debtor releases.

9        So, Your Honor, I think again we are trying to

10  introduce some more factors into this.  Again, that have the

11  Court maybe consider, reconsider positions it has taken in

12  the past.  Again, Your Honor, its healthy for us all to

13  continue to do analysis and go back, but there is nothing

14  that happened under Purdue that requires a change that has

15  been done or decisions that have been made by this Court.

16       Your Honor, the U.S. Trustee continues to have an

17  issue with the injunction as the mechanism to make sure that

18  the plan is complied with.  Your Honor, we just got done

19  talking a lot about we want things clear; we want it

20  conspicuous.  Nothing does it clearer then an injunction. It

21  avoids any confusion, makes it clear what the plan says, you

22  shall abide by the plan.

23       On exculpation, Your Honor, Mr. Fox jokingly lost

24  me after he left off Ziehl & Jones on that hypothetical, so I

25  was having problems, I didn't recognize the name of that

1  firm. I was trying to think of whether my boxes are being

2  packed or what is going on.

3          (Laughter)

4          MS. DAVIS JONES:  I'm sure Mr. Ziehl was concerned

5  as well.  Your Honor, I think what the Trustees office is

6  asking is should we or could we be seeking to list everyone

7  who could be effected, who could be a fiduciary.  Your Honor,

8  that is not realistic.  Again, as I said in my opening

9  comments, you have hit the major parties in that definition.

10  We were very specific on them, but you do have to have

11  (indiscernible) of the related parties with the caveat that

12  they are fiduciaries.

13          Your Honor, its just in the Third Circuit, there

14  is often times objections to our plans where the debtor has

15  reserved its right to bring future causes of action or for a

16  liquidating trust to do so.  He will command, and object, and

17  say unless you list every possible claim that you are going

18  to bring or litigation you can bring, they are deemed waived.

19  The Third Circuit, and I am forgetting the Latin term right

20  now for that, has been very clear that they are not waived;

21  that you just have to make that reservation clear in the

22  plan.  You do not have to list out every possible claim and

23  every cause of action.

24          I think this is analogous to that, Your Honor.

25  And its clear that it has to be a fiduciary.  The day in the

1  Court is not lost because when somebody brings the action and

2  that person is not a fiduciary that is going to be tested

3  quite quickly.

4         THE COURT:  Well, Mr. Fox's concern here is that

5  you could be a fiduciary to one of these professionals in a

6  capacity that is not related to estate for work that you have

7  done for the estate.  I think I am characterizing that

8  correctly.  He is concerned about the, for example, committee

9  professional who retains their own counsel, for purposes

10 other then this bankruptcy they may have retained a tax

11 consultant for their business but he reads this as being

12 overly broad that it doesn't limit it.  That said, it seems

13 to me that in PWS the Court was clear about estate

14 fiduciaries, that this is something that maybe a little

15 wordsmithing could take care of.

16        MS. DAVIS JONES:  I think that is correct, Your

17 Honor. I have no problem with the ruling on PWS. It made it

18 clear that it has to be a fiduciary.  We can look at that

19 sentence and add the word, probably "estate" in there and

20 that may address the issue for Mr. Fox.

21        The point I want to make, Your Honor, is that the

22 protection that it is a fiduciary and that isn't one and

23 done.  Once that action needs to be brought it surely, within

24 the realm of the person bringing the action to say I don't

25 care if the plan says fiduciary, there is no way this person

1  is a fiduciary, let me tell you why and I'm bringing my

2  action.

3         Now, again, Your Honor, we are talking about

4  exculpation which is a defense as compared to the releases.

5  So, I think its going to happen in a couple of steps, but

6  that is the only point I was trying to make on that, Your

7  Honor.

8         Thank you.

9         THE COURT:  Thank you.

10         MR. BERNARD:  Your Honor, Richard Bernard, Faegre

11  Drinker, on behalf of the committee.

12         As to exculpation I see it as something that

13  overlaps with, sort of, judicial protection, right, because

14  actions taken during the course of the Chapter 11 case will

15  generally get, I guess, approved by the Court and if so,

16  approved then, you know, generally the actors are protected

17  for seeking the Court's approval on various motions.

18         That said, I wanted to go back to the releases

19  here and the way I sort of see the releases I mean Barings

20  wanted finality and that was a big part of the settlement

21  discussions.  Barings agreed to pay consideration.  The plan

22  is full of that consideration.  A significant portion of

23  which is going directly into hands of unsecured creditors.

24  There is just, simply said, I want the right to go past those

25  creditors to get me voluntary releases.  You know, we see no

1   issue with that.

2          The form, again, opt-in, opt-out its been debated.

3   There is ample authority for both.  You know, I do see an

4   opt-out as a very real voluntary choice and creditors, you

5   know, you get notice of a proceeding.  You have the

6   opportunity to opt-out.  There were no other coercive terms

7   to avoid somebody from opting out or the like.  So, you know,

8   we saw this as very voluntary and acceptable.  The parties

9   that are being requested to provide that voluntary release

10  are parties that are directly receiving consideration from

11  the settlement.

12          Thank you, Your Honor.

13          THE COURT:  Let me ask you also the question of

14  the statutory rule that Mr. Fox referred to as being the hook

15  for procedures related to things like sale, and cure, and

16  claims objection how does that interplay with the releases in

17  this plan.

18          MR. BERNARD:  Your Honor -- well, the components

19  of the plan are within the bankruptcy code and, you know, one

20  of the components here is a settlement of a litigation where

21  one of the parties, as a term to the settlement, would like

22  to go and request these releases from parties that have

23  benefited from the settlement.  I don't -- I mean, I think it

24  falls within, sort of, general rules for confirmation of a

25  plan and approval of disclosure statement in the sense that

1  everything in this plan is permissible, its within discretion

2  to the extent it's not specifically part of the bankruptcy

3  code.  Nothing in the plan violates the bankruptcy code.

4           So, if you are looking for a procedural hook as

5  to, you know, parties receiving notice and having to respond

6  I think it goes hand in hand with confirmation of this plan.

7  And unlike a lot of plans, we actually did have an adversary

8  proceeding on file which did prompt the parties to sit down

9  and negotiate out a resolution.  It was true arm's length and

10 took a while to get there.

11          THE COURT:  Thank you.

12          MR. BERNARD:  Thank you, Your Honor.

13          THE COURT:  Anything further?

14          MR. FOX:  Good afternoon, Your Honor.  May I

15 please the Court, Tim Fox on behalf of the United States

16 Trustee.

17          Just want to rise briefly, again, to draw a

18 contrast between Ms. Jones example of a KEIP motion and how

19 that falls into the same category as the contract cure item

20 that I previously eluded to.  Again, a KEIP is affirmative

21 relief sought by a debtor that is under Section 503 or

22 Section 363 of the Bankruptcy Code and implicates the debtor

23 using its own property outside the ordinary course of

24 business and is then tested by other parties in the case.

25          Third party release through an opt-out, again,

1  deals with non-debtor parties as releasing parties and non-

2  debtor parties as released parties, and doesn't have a nexus

3  to the Court's authority under another provision in the

4  bankruptcy code. I think the responses from the debtor and

5  from the committee highlight how that third party release

6  component is different then other elements where the mailbox

7  rule should bind parties that aren't acting to protect their

8  interests with respect to the bankruptcy case, but when it

9  involves rights that that non-debtor party has against

10 another non-debtor party there needs to be something that

11 links those two parties together in order for Your Honor to

12 approve it.  The U.S. Trustee posits that that requires

13 affirmative consent from a non-debtor party to be releasing

14 the non-debtor release party.

15        With respect to the Chapter 15 point, again, Your

16 Honor, that is, I think, entirely distinct from confirmation

17 of a Chapter 11 plan.  That was not an issue that was briefed

18 with respect to the Nexii case. It may be a point of

19 contention in matters to come and I know that certain

20 analysis following the Supreme Court's decision in Purdue has

21 highlighted that foreign bankruptcy proceedings and

22 recognition of the same under Chapter 15 may be the next

23 battlefield over non-consensual third-party releases.

24        So, Your Honor, again, the third-party release

25 here is not consensual. If you analyze the release required

1  from non-debtor parties under principles of contract law

2  their silence can't be used to bind them to a relinquishment

3  of rights, especially as it relates to parties that are not

4  receiving any sort of consideration from the plan.  Again,

5  that complicates the issue from what is important as to

6  consenting to the release to have it be appropriate.

7         The debtor and the committee can relinquish their

8  rights and can embody that in a settlement, but this is not a

9  situation where if Your Honor got a 9019 settlement among the

10  debtors, Barings, and the committee they couldn't seek to

11  say, well, all parties in interest you are also releasing all

12  claims you may have against Barings that relate to these

13  debtors.  That would be an improper sub rosa plan.  Again,

14  here, the fact that they're agreeing to those terms shouldn't

15  be used to require those parties that have an affirmative

16  duty to act in order to avoid relinquishing their rights.

17         So, unless Your Honor has any further questions, I

18  will cede the podium and, again, appreciate your time on the

19  argument.

20         THE COURT:  Certainly.  Thank you, Mr. Fox.

21         Ms. Jones, the last word is yours.

22         MS. DAVIS JONES:  Thank you, Your Honor.  The

23  danger of having telecons with us in the courtroom and

24  looking at the internet trying to refresh our recollection,

25  Your Honor, of the statute.  Section 1123, Your Honor, talks

1  about (indiscernible) including a settlement that is one

2  statutory hook.  Then, Your Honor, as counsel to the

3  committee wisely said, you are dealing with confirmation so

4  that statute is 1129, Your Honor.

5              MR. BERNARD:  And 1126.

6              THE COURT:  Okay.  Anyone else?

7        (No verbal response)

8              THE COURT:  Okay. I want to take a little time to

9  get my thoughts together.  I know people have traveled here.

10  I could do this two ways. If you give me an hour I could rule

11  today or I can rule tomorrow morning on Zoom.

12              MS. DAVIS JONES:  Later today is fine, Your Honor.

13  From the debtors perspective we are all very close in

14  proximity.

15              THE COURT:  Okay.  So, just because its me let's

16  say 3:45 so if people want to go back to their offices or you

17  are happy to stay here, but I won't start before 3:45.  Okay.

18              Thank you, all.  These arguments have been very

19  helpful. I appreciate it. I will get my thoughts together and

20  I will resume at 3:45.

21              MS. DAVIS JONES:  Thank you, Your Honor.

22        (Recess taken at 2:27 p.m.)

23        (Proceedings resumed at 4:02 p.m.)

24              THE COURTROOM DEPUTY:  All rise.

25              THE COURT:  Please be seated.  We are back on the

1  record.  I am prepared to make my ruling and I thank you all

2  very much for your patience.

3         Let me state that I have reviewed, among other

4  things, the disclosure statement and plan, including the plan

5  support agreement, a plan supplement, the voting declaration,

6  the United States Trustee's objection and the debtors

7  memorandum of law.  Based on my review of the record in these

8  cases the evidence and argument presented at this hearing I

9  find the plan satisfies the requirements of the bankruptcy

10  code and will confirm the plan.

11         In terms of meeting the standards for approval of

12  a disclosure statement and confirmation of a plan, the

13  debtors have admitted into evidence the uncontroverted voting

14  declaration at Docket 862 demonstrating the debtors have

15  satisfied provisions of Section 1125 and 1126 of the

16  Bankruptcy Code as applicable.  The declaration also shows

17  that voting Classes II and IV unanimously voted to accept the

18  plan and further reports that certain holders opted out of

19  the proposed third-party releases.

20         The Branning declaration at Docket 863 addresses

21  the plan's compliance with the applicable provisions of

22  Section 1122, 1123 and 1129 of the Bankruptcy Code.  No one

23  cross-examined Mr. Branning or offered counter testimony, so

24  all factual statements in the Branning declaration in support

25  of the plan confirmation are unrefuted.

1        The debtors also filed a comprehensive memorandum

2   of law in support of approval of the disclosure statement and

3   confirmation of a plan.  Although that memorandum is not

4   evidence, it is part of the record before the Court.  The

5   memorandum lays out with specificity how the debtors have

6   satisfied their various statutory burdens and requirements,

7   and response to the U.S. Trustee's confirmation objections.

8        The requirements of Section 1129 are not at issue,

9   so I will not address each standard governing confirmation of

10  a plan, but note the following:  No one has challenged

11  classification, the treatment of claims, the debtors good

12  faith, the best interest of creditors or feasibility.  The

13  plan support and settlement agreement attached as Exhibit A-2

14  and incorporated into the plan resolves numerous

15  debtor/creditor issues and provides, among other things, for

16  the prepetition credit agreement lenders payment of

17  administrative and priority claims, the funding of a

18  liquidating trust with a GUC fund and causes of action, and

19  the waiver of any GUC deficiency claim.

20       The U.S. Trustee is the sole objector of the plan

21  and his remaining objections relate to third party releases,

22  specifically the opt-out mechanism to obtain consent for the

23  third-party release, the two releases benefitting release

24  parties, the scope of the third-party release and the

25  adequacy of the disclosure statement due to the purported

1  lack of disclosure regarding the releases.

2         The U.S. Trustee also raises an issue with the

3  injunction provision and exculpation.  The Court addresses

4  each issue in turn.

5         The debtors sought Court approval of an

6  uncontested solicitation procedures motion authorizing them

7  to send solicitation materials and ballots to creditors

8  informing them that they would automatically be deemed to

9  have agreed to give the third-party releases contained in the

10 plan unless they affirmatively indicated on the ballot that

11 they opted out of the releases.

12        At the hearing on the motion the Office of the

13 United States Trustee reserved rights to address releases at

14 the confirmation hearing, but no one objected to the proposed

15 procedural mechanism by which debtors sought creditor consent

16 for the third-party release.  As a result, the Court approved

17 the proposed solicitation procedures, including the form of

18 notices, ballots, and form of opt-out election.

19        As set forth in the voting declaration, the

20 debtors solicited acceptances of a plan in accordance with

21 the Court approved solicitation procedures; namely, the

22 ballots and non-voting notices advised creditors that the

23 plan contained third-party releases, included the text of the

24 third party provision with key definitions and as to the

25 ballot for Classes II and IV contained a box to opt-out of

1  the release and with respect to the notice of non-voting

2  status to holders in Classes I, III, and VI contained an opt-

3  out election form and noted that the top of the form your

4  legal rights may be effected if you fail to act and further

5  explain "If you wish to opt-out of the third party release

6  set forth in Article 10(f) you must affirmatively indicate

7  your opt-out election."

8         The U.S. Trustee now objects to the plan's third-

9  party releases arguing the plan violates the Supreme Court's

10  holding in Harrington v. Purdue Pharma.  More specifically,

11  the U.S. Trustee argues that a release may only be consensual

12  if the parties opt-in rather then opt-out of a release.

13  Purdue holds that bankruptcy courts lack the authority under

14  the bankruptcy code to confirm a plan that contains a non-

15  consensual third-party release.

16         The Supreme Court specifically stated, "Nothing in

17  what we have said should be construed to call into question

18  consensual third-party releases offered in connection with a

19  bankruptcy reorganization plan."  Further, the Supreme Court

20  declined to express a view on what constitutes a consensual

21  release or the procedural mechanism to obtain a consensual

22  release.

23         Pre Purdue this Court held that an opt-out with

24  prominent instruction and conspicuous disclaimers was a valid

25  means or mechanism to obtain consent to a release.  As the

1  parties acknowledge post <u>Purdue</u> that question is being

2  debated by courts.  However, in this case no one contested

3  that the Court approved an opt-out mechanism to obtain

4  consent to the third-party release.  In fact, the U.S.

5  Trustee waived any objection to the relief sought in that

6  motion.

7       The noticing process to obtain consent to the

8  release has occurred.  With this backdrop and at this

9  juncture of the case, and absent clarity as to whether an

10 opt-out is demanded, its unfair, its inequitable, and

11 prejudicial to revisit the procedural mechanism for obtaining

12 consent especially since <u>Purdue</u> is silent on what constitutes

13 consent.

14      In fairness and as a matter of equity, the

15 solicitation process, including the mechanism for obtaining

16 consent, needs to be raised before the debtors incur the

17 expense and time associated with solicitation, although the

18 Court may re-evaluate the mechanism for obtaining consent to

19 third-party releases in future cases.  In this case, and this

20 ruling is limited solely to this case, because the mechanism

21 for obtaining consent was uncontested and solicitation has

22 already occurred, the Court will overrule the U.S. Trustees

23 objection to the extent that it relates to the procedural

24 mechanism to obtain consent for third-party releases.

25      With respect to the U.S. Trustees substantive

1   issues regarding the third-party releases, the Court finds

2   the third-party release provision in Article 10(f)(2) of the

3   plan must be read together with the release related

4   definitions.  The scope for the third-party release limits

5   the definition of related persons. The provision is

6   consistent with definitions used in other cases in this

7   district.

8          Furthermore, the inclusion of two sets of releases

9   for the release parties is the result of a heavily negotiated

10  and mediated compromise between the cases major stakeholders.

11  The prepetition agent and the creditors committee and

12  fundamental to the debtors proposed plan.  Moreover, the

13  provision, again, is not unusual in this district.

14         With respect to the disclosure statement, I am

15  satisfied the debtors have carried their burden under Section

16  1125 of the Bankruptcy Code.  The disclosure statement

17  contains information adequate to permit a hypothetical

18  stakeholder to make an informed decision to vote for or

19  against the plan or to opt-out of a third-party release.

20  Although the United States Trustee raises issues with respect

21  to the identity of the release parties no creditor has raised

22  an issue with respect to the third-party release and

23  creditors participated in the voting and the opt-out.

24  Moreover, no creditor has raised any objection to the

25  disclosure statement terms or the plan.  So, I will approve

1 the disclosure statement on a final basis.

2    With respect to exculpation Courts in this

3 district have interpreted <u>PWS</u> as implying that a parties

4 exculpation is based on its role or status as an estate

5 fiduciary. The scope of exculpation is limited to actions

6 during the pendency of the case and prior to the effective

7 date.  As noted on the record earlier today, the parties

8 should confer and tighten this provision to limit exculpation

9 to the role or status of a party as an estate fiduciary.  As

10 currently written, this language is too broad and I will

11 sustain the United States Trustees objection.

12    With respect to the injunction, as proposed the

13 injunction provision simply reinforces the third-party

14 release.  So, I will overrule the United States Trustees

15 objection.

16    Finally, Section 1123(b)(3)(a) of the Bankruptcy

17 Code provides that a Chapter 11 plan may provide for the

18 settlement or adjustment of any claim or interest belonging

19 to the debtor or the estate.  Importantly, the plan

20 incorporates the plan's settlement agreement agreed between

21 the committee and the prepetition agent and accepted by the

22 debtors.  Settlements and compromises of estate claims are

23 favored in bankruptcy cases which generally seek to foster

24 consensual resolution.

25    The decision whether to approve a compromise is

1    committed to the sound discretion of the Court and it is the

2    duty of the Bankruptcy Court to determine that a proposed

3    compromise forming part of a reorganization of a plan is fair

4    and equitable.  And the standards for proving settlements

5    under 9019 or as part of a plan is the same.  The Bankruptcy

6    Court should consider the four Martin factors when evaluating

7    a proposed settlement: the probability of success in

8    litigation, the likely difficulties in collection, the

9    complexity of the litigation involved, and the expense,

10   inconvenience, and delay necessarily attending it, and the

11   paramount interest to creditors.

12          The Court notes the creditors committee, the

13   entity charged with protecting the rights of unsecured

14   creditors, negotiated the settlement embodied in the plan

15   including the proposed third-party release.  The committee

16   supports confirmation of the plan and recommended creditors

17   vote to accept the plan.  According to the Branning

18   declaration, as a result of the settlement, the debtors

19   propose the plan with the support of the committee and the

20   prepetition agent to avoid substantial litigation and delay

21   of distribution and to ensure a meaningful recovery for

22   unsecured creditors.

23          Mr. Branning opined that the settlement maximizes

24   the value for all constituents.  Consideration of the Martin

25   factors leaves no doubt that the global settlement, including

1   the plan, falls well within the range of reasonableness that

2   courts consider the paramount interest of the estate and

3   creditors.  Creditors voted overwhelmingly, unanimously to

4   accept the plan including the releases.  A meaningful and

5   certain recovery whether then the uncertainty of litigation

6   reflects the sound exercise of debtors' business judgment;

7   therefore, I conclude the settlement is fair and in the best

8   interest of the various creditor groups and will be approved.

9          In conclusion, the evidence admitted into the

10  record supports confirmation and I will confirm the plan

11  subject to a few modifications to the form of order.

12  Unfortunately, I left my notes on the form of order.

13         I can tell you on, I think, page 2 there is a

14  missing docket number.  Its 2-J, it should have Docket 865

15  inserted.  Are we looking at Docket 864?  There wasn't

16  another one filed, correct?  Okay.

17         On page 3, and this is a list of things the Court

18  reviewed and at the top of the page, this is a continuation

19  of B, but it reflects including all objections, statements

20  and reservation of rights. I just ask that you delete

21  statements and reservation of rights because there were none

22  in this case.  And given the specificity in which the order

23  identifies it, I want to be accurate.

24         As a general matter, and this carries through in a

25  lot of my cases, Paragraph (b) on page 4, I would just ask

1  that you strike exclusive in the header.  I have no issue in

2  the body, but with respect to jurisdiction I would ask that

3  you delete exclusive since I don't have it for everything.

4          On page 19 -- and, Ms. Jones, this is kind of

5  somewhat to the issue that I raised at argument with respect

6  to differentiating the standard for consensual third-party

7  release versus a debtor release. I would ask that Paragraph

8  (nn) -- I think the first part of that paragraph should

9  address debtor releases and then the second part maybe split

10  out a second paragraph or it doesn't have to be, but that its

11  third-party releases and they're consensual.  And I would ask

12  that you run that language past the United States Trustee and

13  the committee.

14          In Paragraph 4 on page 22, this refers to the

15  intent of the Court in the last paragraph and I would just

16  ask that you strike it being the intent of the Court so that

17  the second sentence just reads the plan is approved and

18  confirmed in its entirety.

19          In Paragraph 19, this has to do with substantive

20  consolidation. This paragraph exceeds -- well, let me put it

21  this way, it isn't consistent with Paragraph 8(c)(1) of the

22  plan. So, I think it should simply have the first sentence

23  that just says substantive consolidation of the debtors

24  estate with respect to voting on the plan and making

25  distributions pursuant to Article 8(c)(1) of the plan as

1  approved and strike the remainder of the paragraph.

2          Paragraph 23, with respect to Section 1146(a)

3  exemptions, in the third to last line from the bottom of that

4  paragraph rather then say be ordered and directed it should

5  just say be ordered to accept -- be authorized, I'm sorry.  I

6  can't read my own writing, apologies.

7          In Paragraph 9, this is just a question, I'm

8  assuming that a confirmation order will be served consistent

9  with the local rules separate and apart from notice of entry

10  of the confirmation order and the effective date.

11          In Paragraph 32, but its on page 33, in the middle

12  of that paragraph it says are authorized and approved when

13  finalized.  This is perspective relief, so I'd ask that you

14  strike and approved and just say are authorized.

15          In Paragraph 33, the last sentence, this is about

16  binding taxing authorities. I would ask that you insert at

17  the beginning of that sentence to the fullest extent of the

18  plan, the plan -- wait, hold on let me see what I meant here.

19  Oh, I think it should be to the fullest extent of the law,

20  the plan shall also bind any taxing authority.

21          Again, in Paragraph 35, this has to do with

22  government approvals. I think it should state except as

23  otherwise specifically provided herein, and to the extent

24  permitted, this confirmation order.

25          I am going to ask that you strike Paragraph 41 as

1  perspective relief.

2         In Paragraph 42, line 2, what does short form

3  mean?

4         MS. DAVIS JONES:  We can strike that, Your Honor.

5         THE COURT:  Okay.  Well, I think -- okay, that

6  would be terrific.

7         I think those are all my comments.  Did anyone

8  want to be heard?

9     (No verbal response)

10         THE COURT:  Okay.  Well, that -- I am assuming you

11  will have an order tomorrow morning.

12         MS. DAVIS JONES:  I think so, Your Honor.  The

13  changes that you just went through I think we can all do.  We

14  do need to get together with Mr. Fox and just make sure its

15  an estate fiduciary with respect to exculpation which I think

16  we can do in a matter of moments.  So, hopefully, Your Honor,

17  tomorrow morning.

18         THE COURT:  Terrific.  Thank you, all.  Let me

19  just say, I want to thank the parties.  I think this is -- we

20  were in a unique posture in this case.  So, I think it called

21  for a unique ruling. I will also note that I think as a whole

22  this case from filing through the sale, through the

23  mediation, and settlement that the parties worked very well

24  together in this case.  So, I compliment you on achieving

25  what you did through this plan.

1          So, thank you all.  Have a good evening.  We stand

2  adjourned.

3       (Proceedings concluded at 4:26 p.m.)

1                          CERTIFICATION

2            We certify that the foregoing is a correct

3    transcript from the electronic sound recording of the

4    proceedings in the above-entitled matter to the best of our

5    knowledge and ability.

6

7    /s/ William J. Garling                    August 28, 2024

8    William J. Garling, CET-543

9    Certified Court Transcriptionist

10   For Reliable

11

12   /s/ Tracey J. Williams                    August 28, 2024

13   Tracey J. Williams, CET-914

14   Certified Court Transcriptionist

15   For Reliable

16

17

18

19

20

21

22

23

24

25